# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

EIGHT MILE STYLE, LLC; MARTIN
AFFILIATED, LLC,

                Plaintiffs,

vs.

SPOTIFY USA INC.,

                Defendant.

No. _____

**COMPLAINT FOR COPYRIGHT
INFRINGEMENT**

**JURY DEMAND**

## COMPLAINT

### NATURE OF THE ACTION

1.      This is an action for willful copyright infringement brought by Plaintiff Eight Mile

Style, LLC and Martin Affiliated, LLC ("Eight Mile" or "Plaintiff"), who own and control musical

compositions written in whole or in part by Marshall Mathers p/k/a Eminem, against Defendant

Spotify USA Inc. ("Spotify" or "Defendant") for its unauthorized use of the musical compositions

listed in the attached Exhibit A (the "Eight Mile Compositions" or the "Infringed Works") in

blatant disregard of the exclusive rights vested in Eight Mile. As discussed more fully below,

Spotify did not have any license to reproduce or distribute the Eight Mile Compositions, either

direct, affiliate, or compulsory, but acted deceptively by pretending to have compulsory and/or

other licenses. In addition, Spotify instructed the Harry Fox Agency ("HFA") to send purported

"royalty statements" out, when Spotify and HFA knew the compositions were not licensed via the

compulsory license, or otherwise, to further lead Eight Mile and others into believing the songs

1

were licensed and Eight Mile was being paid properly. In fact, neither was true. In addition, as pleaded further below, even after the enactment of the Music Modernization Act of 2018 (the "MMA"), Spotify did not comply with its requirements, and does not therefore enjoy the limitations of liability under the MMA. Even if it had, as also discussed below, the MMA's retroactive elimination of the right of a plaintiff to receive profits attributable to infringement, statutory damages, and attorneys' fees, is an unconstitutional denial of due process (both procedural and substantive), and an unconstitutional taking of vested property rights. This Court should so declare.

2.     On information and belief, despite their not being licensed, the recordings of the Eight Mile Compositions have streamed on Spotify billions of times. Spotify has not accounted to Eight Mile or paid Eight Mile for these streams but instead remitted random payments of some sort, which only purport to account for a fraction of those streams.

3.     Specifically, on information and belief, the Eight Mile Compositions identified on Exhibit A have all streamed on Spotify. Eight Mile has not been paid at all on many of those compositions, but Spotify has reproduced and distributed the Eight Mile Compositions listed on Exhibit A nonetheless knowing, on information and belief, that they were not licensed. The most egregious example of Spotify's willful infringement is with respect to Eminem's iconic musical composition "Lose Yourself." Despite "Lose Yourself" being one of the most famous and popular songs in the world, Eight Mile recently learned that Spotify, and its agent HFA, placed "Lose Yourself" in what they call "Copyright Control," a category reserved for songs for which the copyright owner is not known so the song cannot be licensed. On information and belief, Spotify also sent untimely and ineffective Notices of Intent to obtain Compulsory License ("NOI's") to the United States Copyright Office, with respect to "Lose Yourself" and potentially other Eight

2

Mile Compositions, an indication, if not an outright admission, that the musical compositions were not licensed. To the extent Spotify claims it sent NOI's to the Copyright Office on the Eight Mile Compositions because it could not locate the copyright owners, that is absurd. Spotify, and HFA, its agent, whose knowledge is imputed to Spotify, certainly knew (and had the easy means to know) that Eight Mile is the copyright owner of "Lose Yourself." With commercially reasonable efforts, that information was certainly available to them. On information and belief, the "Lose Yourself" musical composition had been matched to its sound recordings on Spotify, but Spotify simply committed willful copyright infringement and did not pay for the vast majority of the more than billion unlicensed streams of one of the most well-known songs in history.

4. Further recognizing that it was not licensed for the Eight Mile Compositions, Spotify has been recently sending to Eight Mile untimely and ineffective NOI's. These purported NOI's recently sent and received, including for "Lose Yourself," indicate on each an expected first date of distribution many years before the NOI's were sent. There would be no reason for these to be sent now except to mislead Eight Mile into believing Spotify had a compulsory license when it did not. In fact, the sending of these NOI's now actually represents an admission by Spotify that it knows it was not licensed and has committed willful copyright infringement.

5. Despite knowing, on information and belief, that Eight Mile is the copyright owner of the Eight Mile Compositions, Spotify did not license the compositions from Eight Mile at any time, and subsequently has not complied with the requirements of the MMA properly or fully for the interactive streams of the Eight Mile Compositions, including with respect to Eminem's iconic hit "Lose Yourself." Meanwhile, Spotify gained the financial benefit of tens of millions of Eminem fans becoming Spotify users and subscribers. The value of these subscribers and the market share they brought to Spotify has been realized by Spotify not only in its multiple

3

fundraising activities exceeding $2.5 billion and pre-public offering valuations, but also in its direct listing in the stock market that now has Spotify's market cap at approximately $26 billion. This windfall has made its way into the pockets of Spotify's equity holders who not only were aware they were unlicensed, but chose to operate unlicensed in a rush to get their company to a financial exit. Notably not sharing in these billions of dollars were music publishers like Eight Mile, or songwriters like Eminem, whose songs are the only assets Spotify has to attract the users that increased Spotify's value.

6.     In other words, as alleged more fully below, Spotify has built a multi-***billion*** dollar business (its current market cap at approximately $26 billion) with no assets other than the recordings of songs by songwriters like Eminem made available to stream on demand to consumers on its digital platform. Yet, as the Lowery and Ferrick class action lawsuits and the settlement with the National Music Publishers' Association ("NMPA") have firmly established, Spotify built its behemoth by willfully infringing on the copyrights of creators of music worldwide without building the infrastructure needed to ensure that songs appearing on the Spotify service were properly licensed or that appropriate royalties were paid on time (or at all) in compliance with the United States Copyright Act. Spotify's apparent business model from the outset was to commit willful copyright infringement first, ask questions later, and try to settle on the cheap when inevitably sued.  It later included working (with their equity holders, such as the major music publishers) to pass legislation that would purport to get them off the hook scot-free.

7.     Spotify's online interactive music streaming service is offered to end users in the United States on a paid, subscription basis or at no cost to consumers through an advertiser-supported, non-subscription basis. Spotify distributes phonorecords embodying musical compositions to its end users through interactive streaming and limited downloads available on

4

their computers and mobile devices ("Spotify's interactive streaming service"). Upon information and belief, Spotify also makes server copies, in the United States, of phonorecords embodying the musical compositions at issue in this litigation.

8.     For the reasons discussed below, the financial resolution agreed to by the NMPA was woefully inadequate and failed to hold Spotify adequately accountable due, on information and belief, to the interests of the three largest dues paying members of the NMPA owning massive equity in Spotify and working to get Spotify public so that they could reap billions through the sale of their equity interests. The NMPA/Spotify "Settlement" waived all the other NMPA music publishers' rights to sue for statutory damages in an attempt to limit the liability to help propel Spotify to its financial exit and also compelled them to license to Spotify the very compositions Spotify appears not to have licensed in the first place. The waiving of the right by NMPA members to sue in the future for statutory damages and the forced licensing of NMPA members appears now in hindsight to be the strategy of the NMPA and Spotify to attempt to eliminate the ability of all of the victims of Spotify's willful infringement to be able to hold Spotify liable for its unlawful activity. Indeed, the NMPA helped write with Spotify, and others, what ultimately became the MMA, which became law on October 11, 2018, and which, among other things, provides retroactively that, if a Digital Music Provider ("DMP") can meet certain requirements, a plaintiff may not receive profits attributable to the infringement, statutory damages, or attorneys' fees for copyright infringement if the lawsuit was not filed by December 31, 2017. The only recourse a copyright plaintiff (such as Plaintiff) has against a DMP complying with the MMA is to receive undefined "royalties" that should have been paid.

9.     As discussed below, however, with respect to Eight Mile, Spotify does not meet the requirements for MMA damage limitations. In the alternative, the retroactive elimination of the

right of a successful plaintiff to receive profits attributable to the infringement, statutory damages, and attorneys' fees is an unconstitutional denial of substantive and procedural due process and an unconstitutional taking of a vested property right.

10.     Specifically, under the MMA, a copyright owner may commence an action under 17 U.S.C. § 501 against a DMP for the exclusive rights provided by paragraph (1) or (3) of Section 106 arising from the unauthorized reproduction or distribution of a musical work by such DMP prior to the license availability date (i.e., January 1, 2021).

11.     Because Spotify, upon information and belief, will be unable to demonstrate its compliance with 17 U.S.C. § 115 (d)(10)(B), the limitation of liability set forth in paragraph (d)(10)(A) of the MMA does not apply. As discussed more fully below, Spotify (1) knew that Plaintiff was the copyright owner of the Eight Mile Compositions and how to locate Eight Mile prior to enactment of the MMA, and in fact matched the Eight Mile Compositions with the sound recordings embodying those compositions, so the limitation of liability under the MMA for previously unmatched compositions does not apply; or in the alternative (2) did not engage in the required commercially reasonable efforts to match sound recordings with the Eight Mile Compositions as required by the MMA so the MMA's liability limitations do not apply; and (3) did not engage in timely good faith efforts in accordance with paragraphs (d)(10)(B)(i) &(ii), by not timely providing to Eight Mile the reports and payments required pursuant to paragraphs (d)(10)(B)(iii)&(iv), so the MMA's liability limitations do not apply for this reason as well.  Each of these points are discussed in turn below.

12.     First, by its terms, the MMA liability limitation section only applies to compositions for which the copyright owner was not known, and to previously unmatched works (compositions not previously matched with sound recordings), and not to "matched" works for

6

which the DMP knew who the copyright owner was and just committed copyright infringement. This conclusion is borne out by the language of the MMA. Specifically, Paragraph B entitled "requirements for limitation of liability" (i) provides that "not later than 30 calendar days after first making a particular sound recording of a musical work available through its service via one or more covered activities, or 30 calendar days after the enactment date, whichever occurs earlier, a Digital Music Provider shall engage in good faith commercially reasonable efforts to *identify and locate* each copyright owner of such musical work (or share thereof)." (Emphasis added). The MMA goes on to identify the matching efforts required following the identification of the copyright owner. 17 U.S.C. § 115(d)(10)(B)(iii) & (iv). Then, Section (v) of Paragraph B, reinforces that this limitation of liability section only applies to previously unmatched works by stating that: "a digital music provider that complies with the requirements of this subparagraph with respect to unmatched musical works . . ." Spotify and its agent HFA knew that Eight Mile was the owner of the Eight Mile Compositions prior to the MMA's enactment, and had, on information and belief, matched those compositions prior to the MMA's enactment, as is evidenced by the random payments that were made, or at minimum had the information to match. Since Spotify paid Plaintiff prior to the enactment of the MMA [albeit woefully and incompletely and without a license], it clearly knew that Eight Mile was the copyright owner of the Eight Mile Compositions, and had matched the Eight Mile Compositions prior to the enactment of the MMA. Nowhere does the MMA limitation of liability section suggest that it lets a DMP off the hook for copyright infringement liability for matched works where the DMP simply committed copyright infringement. The same should also be true where the DMP had the information to match, but simply ignored it and committed copyright infringement instead. Spotify does not therefore meet

Case 3:19-cv-00736   Document 1   Filed 08/21/19   Page 7 of 32 PageID #: 7

the requirements for the liability limitations of the MMA with respect to Eight Mile for this reason alone.

13.     Furthermore, even if some or all of the Eight Mile Compositions were not matched prior to enactment of the MMA, upon information and belief, Spotify has not engaged in the good-faith, commercially reasonable efforts to identify and locate the copyright owner of the Infringed Works (or share thereof) under Section 115, paragraphs (d)(10)(B)(i)&(ii). Upon information and belief, Spotify's matching efforts failed to meet the required good-faith, commercially reasonable efforts to obtain from the owner of the corresponding sound recordings made available through Spotify's service, among other things, musical work ownership information, including each songwriter and publisher name, percentage ownership share, and international standard musical work code. Nor has Spotify employed adequate bulk electronic matching processes, and has not adequately repeated such efforts on a monthly basis as required by law or industry custom and practice. Spotify knew from the class action lawsuits and the NMPA settlement that HFA did not have the means to adequately match but continued using HFA as its agent. For example, upon information and belief, using HFA for the NMPA settlement yielded a less than 15% match rate on the prior unmatched sound recordings (85% of the recordings went unmatched) causing the revenue from these 85% of unmatched recordings to be paid out by market share with the bulk of the revenue going to Spotify equity owners Universal, Sony, and Warner. Spotify's conduct in continuing to use HFA to match was not commercially reasonable. Spotify therefore does not have the MMA liability limitations for all of these reasons listed in this paragraph as well.

14.     Spotify has also not timely provided to Plaintiff the reports and payments required pursuant to 17 U.S.C. § 115 paragraphs (d)(10)(B)(iii)&(iv). Where the required matching efforts were successful in identifying and locating the copyright owner of an Infringed Work (or share

thereof) by the end of the calendar month in which the digital music provider first makes use of the work, Spotify must provide statements of account and pay royalties to Plaintiff in accordance with law and applicable regulations. Spotify failed to send the required monthly statements, monthly payments, or the annual statements of account as required by law and regulation.

15.     Specifically, Spotify failed to: (aa) not later than 45 calendar days after the end of the calendar month during which [Eight Mile] was identified and located, pay [Eight Mile] all accrued royalties, and accompany such payment with a cumulative statement of account that includes all of the information that would have been provided to [Eight Mile] had Spotify been providing monthly statements of account to [Eight Mile] from initial use of the [Eight Mile Compositions] in accordance with this section and applicable regulations, including the requisite certification and annual statements of account under subsection (c)(2)(I); and to (bb) beginning with the accounting period following the calendar month in which [Eight Mile] was identified and located, and for all other accounting periods prior to the license availability date, provide monthly statements of account and pay royalties to the copyright owner as required under this section and applicable regulations.

16.     Eight Mile has been expressing its concerns to HFA, Spotify's agent, about failure to license and non-payment since at least 2018. Through other communications between 2012 and 2018, HFA, upon information and belief, knew then (or had to know having the simple means to know) that Eight Mile was the copyright owner of the Eight Mile Compositions. HFA's knowledge as Spotify's agent is imputed to Spotify.  There is absolutely no doubt that Spotify and its agent had the information needed to match. The failure to comply with the matching, statement, and payment obligations of the MMA means that Spotify does not qualify for the MMA damage limitation.

17. In addition, the retroactive elimination of the right to profits attributable to infringement, statutory damages, and attorneys' fees under the MMA is an unconstitutional denial of substantive and procedural due process, and an unconstitutional taking of Eight Mile's vested property right, and this Court should so declare. It is settled law that an infringement claim is a property right that vests in a plaintiff the moment the infringement occurs. The Bill that ultimately became the MMA, written by the NMPA with input from Spotify, became law in October 2018, but provides retroactively that a plaintiff who did not file an action by December 31, 2017, could lose any right to profits attributable to infringement, statutory damages, and attorneys' fees if successful in a case against Spotify or other DMP of interactive streams. On information and belief, the MMA, according to the NMPA's own announcements, lobbyist spending, and congressional testimony on Capitol Hill, was jointly crafted by members of the NMPA (whose three top markets shares and dues-paying affiliated companies own equity in Spotify) and Spotify, DiMA, and other interactive streaming companies. They knew what they were doing. Given the penny rate for streaming paid to songwriters, the elimination of the combination of profits attributable to infringement, statutory damages, and attorneys' fees would essentially eliminate any copyright infringement case as it would make the filing of any such action cost prohibitive, and ensure that any plaintiff would spend more pursuing the action than their recovery would be. In addition, with the removal of these remedies, it cleared the last hurdle for Spotify to go public, thereby reaping tens of billions of dollars for its equity owners. The unconstitutional taking of Eight Mile's and others' vested property right was not for public use but instead for the private gain of private companies.

18. As discussed below, the elimination of profits attributable, statutory damages, and the ability to recoup attorneys' fees leaves a plaintiff with no real remedy against Spotify. The

elimination of these damages thus goes too far, and makes the copyright right valueless, and DMPs like Spotify essentially immune from liability if they adhere to the requirements of the MMA. The proof is in the pudding: Spotify was sued many times prior to December 31, 2017, for similar acts of copyright infringement as alleged herein, but not once since December 31, 2017. This is because the Bill that ultimately became the MMA first publicly leaked shortly before December 31, 2017, leaving music publishers with little or no time to investigate or file a lawsuit for infringement, even if they somehow became aware of the Bill at that time.

19.    As far back as 2013, Spotify was on record in sworn testimony before the United States Copyright Board saying that the "crushing" statutory damages available for copyright infringement was the biggest obstacle it faced. The NMPA, whose three largest dues payers were owners of Spotify, used the threat of statutory damages to resolve its complaints with Spotify and get equity in the company, but, having done so, then sold out all smaller publishers not affiliated with the NMPA in helping to craft the MMA and eliminate the only meaningful thing that could ensure Spotify's attempt to comply with the United States Copyright Act. As stated, the combination of eliminating profits attributable to infringement, statutory damages, and attorneys' fees deprives copyright plaintiffs of any true remedy, gives Spotify and others essential and practical immunity from suit, and should be declared unconstitutional. The remaining availability of "royalties" that would have been paid is no remedy at all. Had Eight Mile known it was not licensed, it never would have agreed to allow its Eminem compositions on Spotify for the statutory rate under the compulsory license. As Spotify lost the right to the compulsory licenses due to its infringing activities, the only way for Spotify to get a license to the compositions would have been via a direct voluntary license. Like others received, Eight Mile would have demanded equity in Spotify and demanded a much higher mechanical royalty rate for the direct license, or it would not

11

have allowed the Eminem musical compositions to stream on Spotify. The only practical or realistic remedies in these cases is the statutory damage remedy, and profits attributable, together with the ability to receive attorneys' fees, and the drafters of the MMA knew it. The elimination of these remedies takes away from Eight Mile any practical or realistic remedy, immunizes complying DMP's from suit, and should be declared an unconstitutional deprivation of due process and a taking of a vested property right. There are 243 copyrighted works involved in this action that are collectively listed on Exhibit A attached hereto. Spotify made unlawful server copies of each of these musical compositions and they were all unlawfully reproduced and distributed by Spotify.

## PARTIES

20.     Eight Mile is a Michigan Corporation with its principal place of business located at 1525 East Nine Mile Road, Ferndale, Michigan. Eight Mile co-owns and administers the 243 musical compositions at issue in this case identified on Exhibit A hereto. Eight Mile and Martin Affiliated have conveyed certain limited rights to Kobalt Music Services America Inc. ("Kobalt"), which has an office in Nashville, Tennessee, at 907 Gleaves Street, allowing Kobalt the right to receive income arising from licenses issued by Eight Mile and Martin Affiliated, such right to issue digital mechanical licenses being specifically reserved to Eight Mile and Martin Affiliated. Kobalt is not an HFA affiliate, and does not have the right or ability to license Eight Mile compositions for digital mechanical licenses, unless consented to by Eight Mile and Martin Affiliated. Eight Mile and Martin Affiliated did not consent to the licensing of the Eight Mile Compositions to Spotify. Each of the compositions identified in Exhibit A have been duly registered with the United States Copyright Office.

Case 3:19-cv-00736   Document 1   Filed 08/21/19   Page 12 of 32 PageID #: 12

21.     Martin Affiliated, LLC is a Michigan Corporation with its principal place of business located at 1525 East Nine Mile Road, Ferndale, Michigan. Martin Affiliated also co-owns and exclusively administers the 243 musical compositions at issue in this case identified on Exhibit A hereto as discussed above. Eight Mile and Martin Affiliated are collectively referred to hereinafter as "Eight Mile."

22.     Eight Mile has standing to bring this action for copyright infringement because they co-own the Eight Mile Compositions involved in this action, and have the exclusive rights under Section 106 of the United States Copyright Act to grant nonexclusive licenses to other parties, as well as the exclusive right to print, publish, sell, dramatize, use and license the use of the Compositions, to execute in its own name any and all licenses and agreements whatsoever affecting or respecting the Composition(s), including but not limited to licenses for mechanical reproduction, public performance, dramatic uses, synchronization uses and sub publication, and to assign or license such rights to others. Eight Mile also has the right to prosecute, defend, settle, and compromise all suits and actions with respect to the Compositions.

23.     Defendant Spotify USA Inc. is a Delaware corporation with its principal place of business at 45 W. 18th Street, 7th Floor, New York, New York 10011. Spotify maintains a corporate office in Nashville, Tennessee located at 1033 Demonbreun Street, Nashville, Tennessee 37203.

<u>**JURISDICTION AND VENUE**</u>

24.     The jurisdiction of this Court with respect to the copyright infringement claims is based upon 28 U.S.C. §§ 1331 and 1338(a) in that the controversy arises under the Copyright Act and Copyright Revision Act of 1976 (17 U.S.C. § 101 *et seq.*), which is within the exclusive jurisdiction of federal courts pursuant to 28 U.S.C. § 1331.

25.     This Court has general personal jurisdiction over Defendant because Defendant has continuous and systematic contacts within the Middle District of Tennessee such that it can be found to be essentially at home within this Judicial District.

26.     This Court has specific personal jurisdiction over Spotify for numerous reasons, including, but not limited to, the following:

27.     Upon information and belief, Spotify has maintained a strong presence in Nashville, including its Nashville office, since 2013 and is dedicated to building Spotify's brand and relationships within the Nashville music community. Upon information and belief, Spotify's Nashville office is designed to broker deals with, as well as secure licenses for its interactive streaming services from, record labels, music publishers, and others in Nashville and elsewhere.

28.     Upon information and belief, Spotify specifically targets Tennessee through its licensing and distribution agreements. Upon information and belief, Spotify provides targeted ads to individuals in Tennessee and Tennessee residents, including those who have streamed the Infringed Works in Tennessee. Upon information and belief, Spotify provides its interactive streaming service and platform to individuals in Tennessee and Tennessee residents, who have used such platform to stream the Infringed Works at issue in this case.

29.     Upon information and belief, Spotify has hired top executives from within the music industry to head its streaming operations in the Nashville office. Spotify's Nashville office includes an impressive list of executives that includes but is not limited to: John Marks, Spotify's Global Head of Country Music Programming (previously with SiriusXM); Brittany Schaffer, Spotify's Head of Artist & Label Services (an attorney previously with Nashville firm Loeb & Loeb); Alison Junker, Spotify's Manager for Artist & Label Marketing (previously with Warner/Chappell); James

14

Clauer, Spotify's Creative Producer (previously with CMT); and other employees, including employees directly involved in songwriter relations.

30. In January 2019, *Rolling Stone* magazine published an online article stating that "To Spotify, Nashville is an oil-rich frontier." In the article, John Marks of Spotify was quoted as saying, "[Y]ou have to have a presence in Nashville . . . [T]here's nothing like having a presence in Nashville to be able to connect with the artist and with industry people." Marks further stated that, for Spotify, Nashville is "a music territory for us. The primary component is country music, but we know that's going to adjust over time and we want to be at the ready for that."

31. Additionally, Spotify's interactive app and website includes subscription-based users located in Tennessee. Upon information and belief, Spotify has thousands of registered users in Tennessee, and the musical compositions involved in this action have been streamed to users throughout Tennessee. As a result, the brunt of the harm caused by Spotify's actions is felt in Tennessee.

32. As noted, Eight Mile has a limited collection agreement with Kobalt, which has an office in Nashville, Tennessee.

33. Spotify was also well aware of its infringing activities prior to this action through other complaints, lawsuits, and otherwise, including lawsuits in this Court brought by Tennessee residents, but has continuously refused to comply with United States Copyright law.

34. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400(a) because Spotify is subject to personal jurisdiction in this Judicial District and has committed unlawful acts of infringement in this Judicial District by directing its illegal activities against Tennessee citizens and others with a presence in Tennessee.

15

## FACTS

35.     Eight Mile is an independent music publisher and copyright administration company that owns and administers some of the most iconic and successful musical compositions in the world by recording artist Eminem.

36.     Eight Mile owns and exclusively administers the Eight Mile Compositions for interactive streaming in the United States and Canada. The Infringed Works are listed on Exhibit A, attached hereto, all of which have been duly registered with the United States Copyright Office and have an IP number.

37.     Spotify does not have a license to display, reproduce, and/or distribute the Infringed Works through its interactive streaming service due to not procuring an appropriate license as required.

38.     Prior to bringing this action, Eight Mile spoke to Spotify's admitted agent, HFA, and others, and confirmed that Spotify does not have a direct or affiliate license to stream the Infringed Works. Kobalt did not enter into a direct or affiliate license with HFA with respect to any of the Eight Mile Compositions (as it did not have the authority or ability to do so), and as HFA and Spotify were aware, no other party had any right (other than Eight Mile), to enter into a direct license with Spotify for the musical compositions involved herein. Spotify also does not have a compulsory license because any NOI's that were sent by HFA were, on information and belief, sent well after the Infringed Works began streaming on Spotify and were therefore ineffective.  On information and belief, the sending of late and misleading NOI's was done to make music publishers believe that Spotify was licensed when it was not and knew that it was not. The sending of incomplete, purported royalty statements was also done for the same purpose since Spotify (and HFA) knew that they were not licensed, and were not paying out hundreds of millions

16

of dollars for Spotify's use of the compositions. As Spotify's admitted agent, HFA's knowledge is imputed to Spotify.

39.     Spotify is an interactive music streaming service (among other business services) that allows its users to access and enjoy a catalog of musical recordings using its downloadable application and web-based platform. In fact, Spotify identifies itself as the "largest interactive streaming music service in the United States." As an interactive service, Spotify must obtain either a direct or compulsory license allowing for the reproduction and/or distribution of each musical composition on its interactive streaming service. Spotify's business model offers tiered participation levels to its users, including a "premium" subscription level that allows users to interactively stream "any song" without ads, and a lower tier, non-subscription level that is supported by advertisements which play at regular intervals during use in exchange for providing users the ability to interactively stream nearly the entire Spotify library of music for free. In 2019, Spotify claimed that it had more than 217 million global active users that streamed songs hundreds of billions of times, which included both paying subscribers as well as users that utilize its free, ad-supported platform. In April of 2019, Spotify announced it hit a milestone claiming it has more than 100 million paying users.

40.     Spotify also allows its users to download specific songs. On Spotify's website, Spotify urges consumers, "With Spotify Premium, you can download music so it's available everywhere you go. You can listen without an internet connection . . . ." Spotify Website, https://support.spotify.com/sk/using_spotify/the_basics/listen-offline/ (last visited Aug. 20, 2019).

41.     Spotify must obtain either a direct or compulsory license in order to make, reproduce, and/or distribute phonorecords embodying the musical compositions offered through

Case 3:19-cv-00736   Document 1   Filed 08/21/19   Page 17 of 32 PageID #: 17

its interactive service, including by means of digital phonorecord deliveries ("DPDs"), interactive streaming, and/or limited downloads.

42. To better understand Spotify and its service, and its willfully infringing behavior, as well as how it has been able to grow in value despite the music industry's awareness of its non-existent and non-compliant systems, it is important to understand the background of the ever-evolving music industry and how enforcement of copyright law has grown from an industry of illegal downloads to a history of sanctioned illegal streaming.

43. In the late 1990's and early 2000's, peer-to-peer (P2P) file sharing companies became popular and allowed individuals to share music over the Internet. In response to these companies allowing users to share copyrighted works without proper licenses, the Recording Industry Association of America ("RIAA"), a trade organization comprised of United States record companies, filed lawsuits against major P2P file sharing companies, including Napster, Scour, Aimster, Audiogalaxy, Morpheus, Grokster, Kazza, iMesh, and LimeWire.

44. On September 8, 2003, the RIAA sued 261 American music fans for sharing music on P2P file sharing networks. Within five years, the recording industry had filed, settled, or threatened legal actions against at least 30,000 individuals, including children, grandparents, unemployed single mothers, and college professors, and sought and obtained judgments in many cases for the maximum $150,000 statutory damage award per illegal download. These same major music companies and their trade organizations who were so vigilant in protecting their copyrights now own part of Spotify and put in motion a successful plan to make billions through Spotify's public offering.

45. Once P2P file sharing networks were effectively shut down, major music companies turned to so-called legal download and streaming services as a way to generate revenue from their

Case 3:19-cv-00736   Document 1   Filed 08/21/19   Page 18 of 32 PageID #: 18

sound recordings. This income became the major source of revenue from the recordings that the labels controlled.

46.     Spotify was established in 2005 by Daniel Ek and Martin Lorentzon in Stockholm, Sweden. Mr. Ek's background was in illegal file sharing through the company called uTorrent using the BitTorrent protocol. The company released its first public beta version in 2007. Spotify then launched on the Apple operating system in 2007. Spotify began advertising through its interactive applications in 2008 and officially launched in the United States in June 2011. Upon information and belief, at the time of its United States launch, Spotify had between 15,000,000 and 25,000,000 sound recordings available through its interactive streaming service. Upon information and belief, the number of sound recordings in its service is now over 35,000,000.

47.     By 2011, Spotify had reached 1,000,000 paid subscribers. By 2013, Spotify had 24,000,000 active users who had streamed 4.5 billion hours of music in 2013 alone. Spotify's articulated goal was to gain as much market share as possible to dominate the interactive streaming market, and to fend off potential new comers to the market.  In that regard, it was essential, as Spotify admitted, to its business plan to have all of the musical compositions on its platform so it could say the consumer needed to go nowhere else, even if it meant infringing to do so. Having Eminem's musical compositions on its platform was, needless to say, crucial to its planned domination. Spotify simply did not care if it did not have the appropriate licenses to do so.

48.     By that time, Spotify had raised enormous amounts of money to support its business.  Spotify originally raised two hundred million dollars ($200,000,000.00), and then, by the end of 2013, raised another three hundred fifty million dollars ($350,000,000.00), bringing its total raised at that time to over half a billion dollars ($500,000,000.00).

19

49.     By 2015, Spotify announced it had 75,000,000 users overall, which included 20,000,000 paying users.

50.     By the middle of 2016, Spotify raised yet another two billion dollars ($2,000,000,000.00) on top of the aforementioned five hundred million dollars ($500,000,000.00), bringing its total capital raised to over two billion five hundred million dollars ($2,500,000,000.00).

51.     In 2018, Spotify went public in the United States.  It now has a market cap north of $26 billion.

52.     Under the United States Copyright Act, the owner of a copyright is entitled to certain exclusive rights, including the exclusive right to reproduce and distribute a musical work. Every sound recording contains two separate and distinct copyrights–one copyright for the sound recording itself and one copyright for the underlying musical composition. Spotify will often make different recordings of a composition available for streaming on-demand, which Spotify displays through an interface in conjunction with the name of the artist performing the recording, the name of the recording and other "metadata," and a "play" button that the user can click to play the song. In all cases, to allow for the on-demand interactive stream of a song, Spotify must have two separate licenses and pay two separate royalties. One license is for the sound recording and the second, separate license, is for the embodied musical composition. The former generates revenue for the record label, while the latter generates revenue for songwriters and their music publishers.

53.     A mechanical license grants the right to reproduce and distribute copyrighted musical compositions for use on compact discs, records, tapes, ringtones, permanent digital downloads, interactive streams, and other digital formats. Anyone wishing to use a musical work is required to license the composition separately from the recording either through a direct

20

voluntary mechanical license secured by negotiating with individual copyright owners, or, in the United States, through a compulsory mechanical license.

54. Spotify has expressly and repeatedly acknowledged that Spotify, an *interactive* streaming service, must secure rights to reproduce and distribute the musical works embodied in its sound recordings, or else face the "crushing statutory damages" available under the United States Copyright Act. In its comments before the United States Copyright Office, Spotify has acknowledged that in order "[t]o operate the Spotify Service, Spotify needs to secure multiple rights from multiple copyright owners. These rights include, among others, the right to reproduce sound recordings and the musical works embodied therein, the right to distribute sound recordings and the musical works embodied therein, and the right to publicly perform sound recordings and the musical works embodied therein by means of digital audio transmissions."

55. In order to obtain a compulsory license under the Copyright Act, as detailed in Section 115, a licensee, such as Spotify, is required to send an NOI to each copyright owner before or within thirty (30) days after making a phonorecord embodying the musical composition, and before distributing the work. If the name and address of the copyright owner is not known, the distributor, after putting effort into finding them, is then required to file the NOI in the Licensing Division of the Copyright Office, and then submit the statutory filing fee for each title listed in the notice in a single payment and make checks payable to the Register of Copyrights or authorize deduction from a deposit account for the filing fee.

56. The NOI serves the important role of requiring the music service to connect the sound recording to the composition before it makes the sound recording live so when it generates revenue the service knows whom to pay and alerts the copyright owner(s) to the use of their musical compositions and the right to legally required compensation for that use. Under United

Case 3:19-cv-00736   Document 1   Filed 08/21/19   Page 21 of 32 PageID #: 21

States Copyright law, the failure to timely file or serve an NOI forecloses the possibility of a compulsory license and, in the absence of a negotiated license, renders the making and distribution of phonorecords an act of copyright infringement with respect to the underlying musical composition.

57.    According to Section 115 of the Copyright Act, once a license for the musical composition is obtained, the licensee must follow the terms of a direct license or the statutory requirements for a compulsory license which include, but are not limited to: (1) making accurate royalty payments accompanied by a compliant monthly accounting statement, (2) providing itemized details as to how the per stream rate was calculated, (3) rendering annual certified accountings to the copyright owner or authorized agent, (4) making timely payments to the administrator on or before the 20th day of each month for every phonorecord/recording made and distributed in accordance with the license, and (5) curing any breach of these requirements within 30 days of the notification. Spotify, like every other person or entity, must obtain a license and comply with the requirements of the license for the works it includes in its catalog.

58.    Subpart B of the Code of Federal Regulations § 385 "establishes rates and terms of royalty payments for interactive streams and limited downloads of musical works by subscription and nonsubscription digital music services in accordance with the provisions of 17 U.S.C.§ 115." § 385.10(a).  Spotify, a licensee that, pursuant to 17 U.S.C. § 115, makes or authorizes interactive streams or limited downloads of musical works must comply with the requirements of 17 U.S.C. § 115; § 385.10(b).

59.    Prior to launching in the United States, Spotify made some efforts to license sound recordings by reaching out to labels and distributors for the metadata of each recording, but did not attempt to collect any information about the compositions that each recording embodied.

Case 3:19-cv-00736   Document 1   Filed 08/21/19   Page 22 of 32 PageID #: 22

Spotify built no infrastructure capable of collecting compositional information, and failed to ask for such information. Additionally, in a race to be the first to market, Spotify made the deliberate decision to distribute sound recordings without building any internal infrastructure to license compositions properly or comply with the requirements of Section 115 of the Copyright Act.

60.     Spotify did not build proper infrastructure or require sound recording rights holders to provide data as to what specific composition the sound recording embodies. Upon information and belief, Spotify makes recordings live for interactive streaming and/or limited download without, in many cases: (1) knowing the identity of songwriters and publishers that should be receiving royalties; and (2) knowing or caring whether the compositions have been licensed. Songwriters and publishers are therefore placed in the very difficult position of identifying the compositions streaming on Spotify and whether licenses exist or royalties are owed.

61.     Instead of attempting to comply with United States Copyright law and build a proper system to identify the compositions available through its service, Spotify contracted with HFA. HFA is a provider of rights management, licensing, and royalty services for the United States music industry that specifically issues licenses, and collects and distributes royalties on behalf of musical copyright owners. At the time of contracting with Spotify, HFA was owned by the aforementioned NMPA, a trade group representing the interests of its members, including, but not limited to, the major music companies that have reaped the financial benefits of the Spotify public offering. In October 2015, the NMPA sold HFA for a reported twenty million dollars ($20,000,000.00) to the private equity owned United States performing rights organization SESAC. Upon information and belief, approximately ten to fifteen percent (10% to 15%) of the sale price was held in an "escrow" account to be liquidated at a future date if there were no

23

unforeseen financial liabilities against HFA, for example, not getting licenses or paying inaccurately as it did for Spotify.

62.     At the time that Spotify hired HFA, HFA had a database with less than the number of recordings and compositions available in the Spotify library. Between this insufficient database, Spotify's piecemeal system, and HFA's own lack of a system capable of complying with the statutory requirements for compulsory licensing, copyright infringement was assured. Despite knowledge of these deficiencies, Spotify moved forward with a non-compliant system that allowed for massive infringement from its launch in the United States in June 2011. To the extent they did not know it initially, which they did, Spotify certainly was aware of HFA's inability to match musical compositions with sound recordings as a result of the massive litigation, or threats of litigation, brought against Spotify for copyright infringement. Spotify nonetheless continued with HFA despite other options available to it. Spotify has continued with HFA even after enactment of the MMA, and has continued to fail to engage in commercially reasonable efforts to match musical compositions with sound recordings.

63.     Upon information and belief, there were approximately 35 billion (35,000,000,000) unpaid streams that occurred from June of 2011 to the end of 2015. This means Spotify failed to pay approximately fifteen million dollars ($15,000,000.00) in royalties. According to an NMPA communication with its members, this figure was estimated to increase by now to another 140 billion (140,000,000,000) to 280 billion (280,000,000,000) unpaid streams totaling between sixty million dollars ($60,000,000.00) to one hundred twenty million dollars ($120,000,000.00). Spotify has not only admitted to its failure to pay out these royalties, but also has shown it knew it was unlicensed for many of them and, if licensed, was not paying them accurately, on time, or in

Case 3:19-cv-00736   Document 1   Filed 08/21/19   Page 24 of 32 PageID #: 24

compliance with any of the other Section 115 requirements, thereby making the royalty statements non-compliant.

64.     Nevertheless, despite raising over two and one-half billion dollars ($2,500,000,000.00), and now going public with a market cap north of $26 billion, Spotify has still failed to invest in building a compliant solution. To make matters worse, when Spotify's scheme is discovered by a rights holder, and Spotify is notified of lack of a license or termination of licenses due to the failure to comply with legal requirements, Spotify has nonetheless continued to willfully and knowingly exploit the compositions.

65.     Spotify's history is riddled with these notifications. Spotify has previously been pursued for failure to properly license compositions or pay for licenses, most notably by the NMPA on behalf of its membership. Spotify was quick to enter into a settlement agreement that required it to pay out the fifteen million seven hundred thousand dollars ($15,700,000.00) in unpaid royalties it was holding onto along with an additional five million dollars ($5,000,000.00) penalty to those NMPA members who voluntarily participated in the settlement. Sadly, this "settlement" was woefully insufficient financially and nothing more than a way to allow the major music companies, who are the largest members of the NMPA, to help Spotify move forward to a public offering as, upon information and belief, collectively their affiliated record labels own over sixteen percent (16%) of Spotify and each stand to generate significant revenues through Spotify's public offering.

66.     In addition, the NMPA settlement did nothing to resolve the outstanding issues with the Spotify licensing and royalty payment system as the settlement allowed Spotify to continue to not pay accurately and did not require it to build any systems moving forward. Add to this that the NMPA settlement only applies to the select members of the NMPA. Finally, the settlement itself encouraged the continued infringement by Spotify as evidenced by the NMPA's June 2017 email

that indicated that the amount of unpaid royalties would grow after the settlement agreement was entered into (meaning Spotify was not required to put in the needed compliance systems).

67.     In addition to the NMPA settlement for non-compliance and infringement, Spotify agreed to settle a class action lawsuit for forty-three million four hundred thousand dollars ($43,400,000.00). The stated intent of the settlement is to compensate rights holders for Spotify's years of infringing actions. However, the settlement is also woefully insufficient to pay songwriters and publishers for the infringement by Spotify. Upon information and belief, there are over 100,000 unique individuals who meet the criteria to be in the class with an interest in approximately 8,000,000 compositions. Upon information and belief, the class attorneys will be taking approximately twenty-five percent (25%) of the settlement payout, which leaves, approximately, a mere thirty-two million dollars ($32,000,000.00) to be divided between the composition owners. Averaging the payout for each owner, Spotify will be allowed to walk away after paying approximately four dollars ($4.00) per infringed composition. Such a settlement is essentially an empty gesture that encourages infringement and is entirely insufficient to remedy years of illegal activity. Eight Mile opted out of the class action.

68.     The non-financial terms of the class action settlement are also unacceptable as they force class members to license their works to Spotify moving forward whether they wish to do so or not. In addition, if Spotify breaches the terms of the license, which it has already indicated it will do in the NMPA settlement, the rights-holder can never terminate the license as the class settlement is forcing the rights-holder to grant a license "in perpetuity." Therefore, even if Spotify breaches and does not cure, Spotify can never be held liable for infringement. Spotify now has a license and no incentive to build the required systems as there is no penalty if they continue to operate without doing so. In effect, Spotify is being rewarded for willfully infringing on copyrights.

26

69.     Upon information and belief, a number of major record labels, including Sony Music, Universal Music Group, Warner Music, and EMI, allowed Spotify to use their sound recordings in its service in exchange for being allowed to purchase a stake in Spotify at below market value. In some cases, equity in Spotify was provided to sound recording rights holders for no additional compensation. As a result of these deals, upon information and belief, the major record labels own an approximate sixteen percent (16%) stake in Spotify. With a successful Spotify public offering, this allows the labels to potentially generate billions of dollars, none of which they need to share with the copyright creators, performing artists, or songwriters. These record labels, who control their affiliated publishing companies, members of the NMPA, therefore had no incentive to pursue or truly hold Spotify accountable for its actions.

70.     Spotify's illegal behavior and its willful and deliberate disregard of United States Copyright laws is clearly demonstrated in Eight Mile's case, which shows no license and the non-payment of money over many years with respect to some of the most famous songs ever written. If Spotify did not pay on "Lose Yourself," smaller publishers never had a chance to be paid or paid properly.

71.     Not only did Spotify fail to get timely and effective compulsory licenses, but Spotify further failed to comply with 37 C.F.R. § 210.16 by failing to file a detailed annual statement of account, certified by a certified public accountant. Instead of complying with copyright law and sending a NOI or obtaining a proper license, Spotify chose to willfully infringe Eight Mile's rights.

72.     Spotify has continued to exploit compositions, including the Infringed Works, without a license to do so and has therefore engaged in continuous actionable acts of copyright infringement.

Case 3:19-cv-00736   Document 1   Filed 08/21/19   Page 27 of 32 PageID #: 27

73.     Spotify's public defense as to its wrongdoing has been to claim that the data are simply not available to track the compositions and the sound recordings that embody them on its service in order to prevent wholesale copyright infringement. Yet, as will be shown, that position is simply untrue.

74.     Spotify's business practices are reminiscent of the primitive illegal file sharing companies. This is shocking considering the record companies that once made headlines for vigorously pursuing claims against Napster, children, grandparents, and others, are the same companies that have invested in Spotify with a knowledge of Spotify's lack of systems necessary to properly license and properly pay for the use of music. However, the fact that the major music companies collectively stood to make (and now have made) billions of dollars with Spotify's initial public offering may explain their actions (or lack thereof).

75.     By knowingly reproducing and distributing musical compositions without the licenses necessary to legally reproduce and distribute the music, Spotify has been and is willfully infringing upon the copyrights Eight Mile owns and administers, as well as the copyrights of music publishers that are not party to this litigation. As Spotify has admitted, being the market leader in number of compositions available through its interactive streaming service is important for Spotify to be competitive, and each of the Infringed Works have a direct impact on Spotify's market value, advertising, and other revenues, and profits.

## CAUSES OF ACTION

## COUNT I

## DIRECT COPYRIGHT INFRINGEMENT

76.     Eight Mile repeats and re-alleges each of the foregoing paragraphs, as though fully set forth herein.

77. Under § 106 of the Copyright Act, the copyright owner of a musical composition has the exclusive rights to reproduce and distribute the composition in phonorecords. 17 U.S.C. § 106(1) and (3). This includes the exclusive rights to make or authorize DPDs, interactive streams, and limited downloads of the musical composition through subscription or non-subscription online digital music services. *See* 17 U.S.C. § 115(d), 37 C.F.R. §§385.10, 385.11.

78. Eight Mile owns and administers the Infringed Works, and has standing to bring this action for copyright infringement because of its ownership interest in the musical compositions at issue. Each of the musical compositions administered by Eight Mile has been reproduced and/or distributed by Spotify through its interactive streaming service (including interactive streaming and temporary downloads), and Spotify has also made server copies thereof during the last three years, all without the required licenses.

79. Spotify has thus made unauthorized reproductions and engaged in unauthorized distributions of the Infringed Works. The infringement of these copyrights is in violation of 17 U.S.C. § 106, *et seq.* and § 501.

80. Spotify has violated many of the exclusive rights enumerated under Section 106 of the United States Copyright Act by its activities discussed above. Among other things, each interactive stream and/or temporary download of the Infringed Works reproduced by Spotify and/or distributed to end-users constitutes a separate and distinct act of infringement, for which Spotify is a direct infringer.

81. Spotify's conduct has at all times been knowing, willful, and with complete disregard of Eight Mile's rights.

82. The infringement by Spotify has been, and continues to be, willful and knowing.

29

83. As discussed and alleged fully above, Spotify has not met the requirements of the MMA to enjoy immunity from damages for profits attributable to the infringement, statutory damages, or attorneys' fees.

84. Pursuant to 17 U.S.C. § 504(b), Eight Mile is entitled to actual damages, including the substantial profits of Spotify, as will be proven at trial. In the alternative, Eight Mile requests the maximum amount for willful statutory damages, one hundred and fifty thousand dollars ($150,000), for each of the 243 of the Infringed Works involved in this action identified on Exhibit A hereto.

85. To the extent that the MMA bars Eight Mile from asserting already vested claims and pre-existing remedies under the Copyright Act, Eight Mile also requests that the MMA's retroactive elimination of profits attributable, statutory damages and attorneys' fees be declared unconstitutional as a denial of procedural and substantive due process, and an unconstitutional taking of vested property rights.

86. Eight Mile also asks to be awarded its costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant and for the following relief:

A. A declaration that Defendant has willfully infringed the Infringed Works in violation of the Copyright Act;

B. A declaration that Defendant is directly liable for copyright infringement;

C. A declaration that Spotify does not qualify for the MMA limitation from damages;

D. A declaration that the MMA's retroactive elimination of damages for profits attributable to infringement, statutory damages, and attorneys' fees is unconstitutional as applied to Eight Mile's circumstances;

30

E.     A declaration that Eight Mile is entitled to receive all revenue associated with all exploitations of the Infringed Works, commencing from the date of judgment and for all amounts not taken into consideration in the judgment;

F.     An award of damages pursuant to 17 U.S.C. § 504(b), including actual damages, inclusive of the injury to the market value of their copyright in the Infringed Works, and the profits of Defendant as will be proven at trial, including advertising revenue and the value of the equity interest Eight Mile was deprived of by virtue of the infringement, or, in the alternative, the maximum amount of statutory damages pursuant to 17 U.S.C. § 504(c), one hundred and fifty thousand dollars ($150,000.00) for each act of willful infringement with respect to each of the musical compositions involved in the action;

G.     An award of attorneys' fees and full costs pursuant to 17 U.S.C. § 505 and under other applicable law;

H.     For pre-judgment and post-judgment interest according to law, as applicable; and

I.     For such other and further relief as this Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Pursuant to the Federal Rules of Civil Procedure Rule 38(b), and otherwise, Plaintiff respectfully demands a trial by jury.

Dated: August 21, 2019

By: /s/ Richard S. Busch
Richard S. Busch (TN Bar # 14594)
KING & BALLOW
315 Union Street, Suite 1100
Nashville, TN 37201
Telephone:     (615) 726-5422
Facsimile:     (615) 726-5417
rbusch@kingballow.com

James F. Blumstein (TN Bar # 004147)
Of Counsel
Vanderbilt University
131 21st Avenue South
Nashville, TN 37203
Telephone:      (615) 343-3939
Facsimile:      (615) 322-6631

*Attorneys for Plaintiffs*