# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

EIGHT MILE STYLE, LLC; MARTIN
AFFILIATED, LLC,

Plaintiffs,

v.

SPOTIFY USA INC.,

Defendant.

Case No. 3:19-cv-00736

**District Judge Aleta A. Trauger**

**JURY DEMAND**

---

**EIGHT MILE'S RESPONSE IN OPPOSITION TO SPOTIFY'S MOTION TO DISMISS
FOR LACK OF PERSONAL JURISDICTION AND IMPROPER VENUE, OR, IN THE
ALTERNATIVE, TO TRANSFER VENUE TO THE SOUTHERN DISTRICT OF NEW
YORK**

---

## INTRODUCTION

Plaintiffs Eight Mile Style, LLC and Martin Affiliated, LLC (collectively, "Eight Mile") by and through undersigned counsel, hereby submit this response to the motion of Defendant Spotify USA Inc. ("Spotify") to dismiss the Complaint for lack of personal jurisdiction and improper venue, or, in the alternative, to transfer venue to the Southern District of New York ("Spotify's Motion" or "Motion"). (Doc. 47). As discussed fully below, this Court absolutely has jurisdiction over Spotify, and Spotify has not come close to establishing the "substantial burden" that it must to show transfer of venue is appropriate.[1]

## STATEMENT OF FACTS

Spotify, a $26 billion company perpetrating copyright infringement nationwide, suggests that it is only subject to jurisdiction in one place, a location of its choice—New York. (Doc. 48). That is wrong. Spotify operates an interactive digital music service throughout the United States that offers digital audio distributions of sound recordings of musical works to members of the public in the form of interactive streams and limited downloads.[2] (Doc. 1; Ex. A, Kohn Decl. at ¶ 16). Spotify currently offers two versions or "tiers" of its service in the United States: (1) Spotify Free, which offers interactive streams on a non-subscription, advertising-support basis, and (2)

---

[1] Eight Mile has previously briefed the framework for jurisdictional discovery. (Docs. 59,66). As stated by the Court, "if the court is unable to rule on the Defendant's motion without further information, it will provide for targeted discovery in aid of disposing of the motion." (Doc. 67). If jurisdictional discovery is appropriate, Eight Mile asks the Court to allow its previous request for this alternative relief.

[2] Spotify's End User Agreement specifically recognizes that it offers services on a subscription basis to users residing in the U.S., including Tennessee, who pay for its services. *Spotify Terms and Conditions of Use*, Spotify, https://www.spotify.com/us/legal/end-user-agreement/ (last visited Dec. 15, 2019). Spotify has specifically recognized and tailored its content towards Tennessee residents. *See e.g.* Megan Keller, *Spotify Launches Custom State Playlists for Midterms*, The Hill, https://thehill.com/blogs/in-the-know/in-the-know/414122-spotify-launches-custom-state- playlists-for-midterms (last visited Dec. 15, 2019).

1

Spotify Premium, which offers interactive streams and limited downloads on a paid-subscription basis.  (Kohn Decl. at ¶ 18).

The Spotify Free service is offered at no charge to consumers.   Spotify Free is considered an ad-supported, interactive non-subscription music service.  (Kohn Decl. at ¶ 19).  This means that Spotify solicits advertisements from business owners to be streamed in between the songs being transmitted to Spotify's users of Spotify Free. Since Spotify streams to tens of thousands of users in Tennessee, and  possibly  hundreds  of  thousands  or  more,  it  also  targets  local advertisements to those users, which explains why, in addition to running Artist & Label Services out of Nashville, Spotify's Nashville office also maintains an "Ad Sales" force.  Declaration of Anna Lundström (Doc. 50 at ¶ 23).  The ads being targeted to Tennessee users are likely to be solicited by Spotify's Nashville "Ad Sales" force from local Tennessee businesses.  (Kohn Decl. at ¶ 30).  The ads in all likelihood involve the musical compositions owned and controlled by Eight Mile ("Eight Mile Compositions"). (Kohn Decl. at ¶ 30).[3]

The Spotify Premium service offers interactive streams to end users without interruption by audio advertisements, permits the user to also make limited downloads of recordings for "off-line" listening (i.e., without being connected to the Internet), and transmits recordings using a higher  quality  format,  among  other  benefits.  Spotify  Premium  is  considered  an  interactive subscription music service.  (Kohn Decl. at ¶ 20).

The activity engaged in by Spotify which is alleged by Eight Mile to constitute copyright infringement  is  the  unauthorized  reproductions  of  the  Eight  Mile  Compositions,  and  the distribution by Spotify of copies of the Eight Mile Compositions to consumers through this interactive streaming and download process. (Doc. 1 at ¶¶ 37, 78). Spotify has not and cannot deny

---

[3] Eight Mile sought discovery on this issue.  (Doc. 59-1 at Requests 13-14).

that tens of thousands, and possibly hundreds of thousands or more, of those consumers are located within the Middle District of Tennessee, and many more throughout all of Tennessee. (Kohn. Decl. at ¶ 26). Yet, Spotify would have this Court believe that it is "the Southern District of New York where Spotify is headquartered and engages in conduct that Eight Mile challenges." (Doc. 62 at 7). This is incorrect.

Importantly, Spotify does not dispute that hundreds of thousands (and possibly more) of Tennessee residents have downloaded Spotify's software applications and recorded music files to consumers' personal computers or mobile devices, and that tens or hundreds of thousands of them or more have downloaded or chosen to interactively stream the Eight Mile Compositions. See Declaration of Anna Lundström (Doc. 50 at ¶ 12). Spotify's users "decide whether and when music is transmitted through the Spotify service to their devices." (Doc. 50 at ¶13). The copying, and distribution of the copy, of the Eight Mile Compositions occurs when a consumer chooses through the interactive service to receive or download a copy of an Eight Mile Composition. (Kohn Decl. at ¶ 26). Specifically, Spotify responds by authorizing the reproduction, and the distribution of the copy, of the selected Eight Mile Composition to the users' devices in Tennessee. (Kohn Decl. at ¶ 26). The distribution of reproduced copies of the Eight Mile Compositions to Tennessee consumers all terminate on the devices of many tens of thousands (or hundreds of thousands) of users within this District who chose to receive the Eight Mile Compositions. (Kohn Decl. at ¶ 26). It is, therefore, the Tennessee consumer who is initiating the conduct that constitutes the infringing distribution of the Eight Mile Compositions in Tennessee.

Interestingly, it does not even appear that the distributions of copies of the Eight Mile Compositions are launched from servers in Spotify's New York headquarters or, for that matter, anywhere within the jurisdiction of the Southern District of New York. (Kohn Decl. at ¶ 22).

3

Indeed, it seems Spotify authorizes the reproduction of the copyrighted works onto servers (i.e., server copies) operated by either Google or Amazon. (Kohn Decl. at ¶ 23-25).

Although the precise location of Google's servers, including the technological infrastructure that governs Spotify's streaming activities, is not publicly known, it is publicly known (as of 2017) that Google's servers in North America are located in the following counties: (1) Berkeley County, South Carolina; (2) Council Bluffs, Iowa; (3) Jackson County, Alabama; (4) Lenoir, North Carolina; (5) Mayes County, Oklahoma; (6) **Montgomery County, Tennessee**; and (7) The Dalles, Oregon. (Kohn Decl. at ¶ 23). Montgomery County, Tennessee falls within the Nashville Division of the Middle District of Tennessee. Thus, it is even possible that the reproductions and distributions of Eight Mile Compositions to many Tennessee consumers may be taking place entirely—from end to end—within the Nashville Division.

Spotify is also known to use Amazon for the storage of its source files (i.e., data files containing sound recordings of musical works) and/or server copies.[4] (Kohn Decl. at ¶ 25). Amazon data centers in North America have been reported to be located in the states of Washington, California, and Virginia. Amazon does not appear to maintain any server copy infrastructure used by Spotify within the jurisdiction of the Southern District of New York. (Kohn

---

[4] A "*server copy*" of a sound recording embodying a musical work is a copy of the musical work, and phonorecord of the recording of that work, that is made, not for distribution for private use, but for some other purpose, such as to facilitate the reproduction of the recorded music in the form of a limited download or permanent download. *See generally Kohn On Music Licensing*, 4th Ed., Chapter 14 on "Licensing Music in Background Music Services, Digital Jukeboxes, and Other Commercial Reproductions (Electrical Transcription Licenses" at 1065, 1073-1074). To operate its service, Spotify receives, typically from record companies and other owners of sound recordings, digital data files containing sound recordings of musical works (*i.e.*, sometimes called *source files*) which the service uses to create and store *server copies* from which the reproductions and distributions of copyrighted musical works (e.g., copies that are downloaded) to Spotify's consumers, at the consumer's request, originate.

4

Decl. at ¶ 25). And if those server copies are not stored by Amazon, they are stored by Google. (Kohn Decl. at ¶ 23).

Again, wherever such reproductions and distributions are launched from, the copies of the Eight Mile Compositions that are reproduced and distributed into Tennessee terminate on the devices of, and at the request of, many tens of thousands (or hundreds of thousands) of users within this District who chose to receive the Eight Mile Compositions. (Kohn Decl. at ¶ 26). The infringement takes place in Tennessee by virtue of the fact that the Tennessee consumer is initiating the conduct which Spotify then responds to by making the unauthorized reproduction and distribution of copyrighted works to the devices of consumers in Tennessee.

Spotify has other relevant connections to Tennessee. Spotify has maintained an office in Nashville, Tennessee since 2016. Declaration of Anna Lundström (Doc. 50 at ¶¶ 21-22). Spotify uses its Nashville Office to expand its business in the Nashville music market. Spotify uses the office for courting Nashville artists to help significantly expand its reach to users in Tennessee. Indeed, breaking new artists is "a cornerstone of Spotify's strategy in Nashville." (Kohn Decl. at ¶ 27). Given its recent push to help promote and even "break" new artists in Nashville, it is inconceivable that Spotify is not in a position to use its Nashville office to engage in licensing negotiations with the personal managers, record labels, music publishers or other representatives of artists in the Nashville area. Indeed, in preparation for its new role in Nashville, Spotify hired an entertainment lawyer to become the Head of Artist & Label Services. (Kohn Decl. at ¶ 28). Spotify claims that none of its employees in the Nashville office are "responsible for" mechanical licensing. Declaration of Anna Lundström (Doc. 50 at ¶25). Yet, that does not preclude the possibility that these employees have records or are aware of facts relating directly to the issues in this case. (Kohn Decl. at ¶ 29). Additionally, based upon its business conducted in Tennessee and

5

its office in Tennessee, Spotify would be responsible for Tennessee taxes.  Eight Mile previously sought tax information in its proposed jurisdictional discovery.  (Doc. 59-1 at Request 26).  Finally, even Spotify's agent, The Harry Fox Agency ("HFA"), is owned by Nashville-based SESAC. (Ex. C, Busch Decl. at ⁋ 6, Attachment A).

The record is also clear that Spotify spent the last two years litigating four cases, nearly identical in form and content, with the present case, *Bluewater v. Spotify USA Inc*., (Case No. 3:17-cv-01051); *Gaudio v. Spotify USA Inc*., (Case No. 3:17-cv-01052); *A4V Digital, Inc. et al. v. Spotify USA Inc*., (Case No. 3:17-cv-01256); and *Robertson et al. v. Spotify USA Inc*., (Case No. 3:17-cv-01616) ("Prior Cases"), without ever challenging either jurisdiction or venue. Eight Mile chose the Middle District of Tennessee based, in part, on Spotify's recognition that this Court had jurisdiction over it in the Prior Cases, and that the Middle District of Tennessee was an appropriate venue.  (Ex. B, Martin Decl. at ¶ 5).  Eight Mile therefore chose Professor James Blumstein as co-counsel due, in part, to his presence in Nashville, Tennessee. (Martin Decl. at ¶ 9). Eight Mile's lead counsel in this action is also based in Nashville, Tennessee, and was chosen because of the experience and success in copyright litigation. (Martin Decl. at ¶¶ 7-8). Eight Mile is based in Ferndale, Michigan. (Martin Decl. at ¶ 11). Litigating this action in New York would be much more expensive, and much more inconvenient, than in Nashville, Tennessee (Martin Decl. at ¶ 11-14), and the time to trial would be longer. (Martin Decl. at ¶ 12).  A lengthy trial in New York would also be much more inconvenient and far more expensive for Eight Mile.  (Martin Decl. at ¶ 14).

During the Prior Cases, over the course of two years, counsel for King & Ballow spent a grand total of just eight (8) days in New York for depositions of party witnesses for all ***four*** cases and two (2) days for the deposition of the HFA (which is owned by Nashville-based SESAC).  (Ex.

C, Busch Decl. at ¶¶ 3(a)-(b), 6). The remaining depositions were held outside of New York. (Busch Decl. at ¶¶ 3(c)-(f)). The depositions outside of New York covered fourteen (14) days. (Busch Decl. at ¶¶ 3(c)-(f)). Thus, the parties in the Prior Cases spent more time outside of New York than in New York. (Busch Decl. at ¶ 3(h)). Depositions were held in Los Angeles, California; Nashville, Tennessee; Washington, D.C.; and Baltimore, Maryland. (Busch Decl. at ¶¶ 3(c)-(f)). During the Prior Cases, all document production, including by HFA, was conducted electronically. (Busch Decl. at ¶ 5).

Additionally, during the Prior Cases, over the course of two years, the parties were in court for hearings on three (3) days. (Busch Decl. at ¶ 4(b)). Meanwhile, the parties in the Prior Cases attended Court hearings telephonically on eight (8) days. (Busch Decl. at 4(a)). Spotify, to defend this action alone, has also engaged counsel (11 attorneys) from literally all over the country in multiple law firms. Those counsel are located in Nashville, Tennessee; New York, New York; Seattle, Washington; Los Angeles, California; and Washington, D.C.

## ARGUMENT

I. **THIS COURT SHOULD DENY SPOTIFY'S MOTION TO DISMISS BECAUSE IT HAS PERSONAL JURISDICTION OVER SPOTIFY**

### A. Standard For 12(b)(2) Motion To Dismiss

In reviewing a 12(b)(2) motion to dismiss for lack of personal jurisdiction, the court "consider[s] pleadings and affidavits 'in a light most favorable to the plaintiff,' without weighing 'the controverting assertions of the party seeking dismissal.'" *Anwar v. Dow Chem. Co.*, 876 F.3d 841, 847 (6th Cir. 2017). A defendant cannot "avoid[] personal jurisdiction simply by filing an affidavit denying all jurisdictional facts . . . ." *Theunissen v. Matthews*, 935 F.2d 1454, 1458-59 (6th Cir. 1991). "Presented with a properly supported 12(b)(2) motion and opposition, the court has three procedural alternatives: it may decide the motion upon the affidavits alone; it may permit

7

discovery in aid of deciding the motion; or it may conduct an evidentiary hearing to resolve any apparent factual questions." *Id.* at 1458.

### B. Spotify Should be Judicially Estopped from Denying this Court's Jurisdiction Over It.

Judicial estoppel precludes a party from taking a position in a case that is contrary to a position it has taken in earlier legal proceedings. Judicial estoppel is an equitable doctrine to be exercised in the sound discretion of the Court. *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001). "[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *Id*. "Judicial estoppel is an equitable doctrine that preserves the integrity of the courts by preventing a party from abusing the judicial process through cynical gamesmanship, achieving success on one position, then arguing the opposite to suit an exigency of the moment." *Lorillard Tobacco Co. v. Chester, Willcox & Saxbe, LLP*, 546 F.3d 752, 757 (6th Cir. 2008). A court considers three factors when determining whether judicial estoppel applies: (1) whether the party's later position is clearly inconsistent with its earlier position; (2) whether the party persuaded the court to accept its earlier position such that the perception is that the first or second court was misled; and (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. *Jenkins v. Trane U.S., Inc.*, 2013 U.S. Dist. LEXIS 90455, at *13-14 (M.D. Tenn. June 27, 2013).

First, Spotify is changing its position clearly as it did not contest jurisdiction or venue in the Prior Cases. Second, the perception, if Spotify's motion is granted, will clearly be that this Court is being misled (and/or the prior Court) because Spotify has not articulated any reason for the change in position. It is obvious the change is entirely based on Spotify's unhappiness with

8

this Court's decisions in the Prior Cases and nothing more.[5] Finally, Eight Mile filed this case in this Court and has taken other action in reliance on Spotify's position in the Prior Cases, and will be prejudiced. (Martin Decl. at ¶¶ 5-10; Busch Decl. at ¶¶ 2, 4(c)).

### C. Tennessee's Long-Arm Statute Is Coterminous With The Due Process Requirements Of The United States Constitution

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Daimler AG v. Bauman*, 134 S. Ct. 746, 753 (2014). "Tennessee's long-arm statute has been interpreted to be 'coterminous with the limits on personal jurisdiction imposed' by the Due Process Clause of the United States Constitution," and, thus, "'the jurisdictional limits of Tennessee law and of federal constitutional law of due process are identical.'" *Hosp. Auth. of Metro. Gov't of Nashville v. Momenta Pharm. Inc.*, 353 F. Supp. 3d 678, 689 n.6 (M.D. Tenn. 2018) (citation omitted). Therefore, this Court only needs to "determine whether the assertion of personal jurisdiction violates constitutional due process." *Id.* (internal quote omitted).

### D. This Court Has Specific Personal Jurisdiction Over Spotify

To determine whether the exercise of specific personal jurisdiction over a defendant comports with due process, this Court applies the following three-part test set out in *Southern Machine Co. v. Mohasco Indus.*, 401 F.2d 374, 381 (6th Cir. 1968):

> (1) the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state; (2) the cause of action must arise from defendant's activities there; and (3) the acts of defendant or consequences caused by defendant must have a substantial enough connection with the forum to make the exercise of jurisdiction over the defendant reasonable.

*Neal v. Janssen*, 270 F.3d 328, 332 (6th Cir. 2001). "Where the first two criteria of the *Southern Machine* test are met, 'an inference of reasonableness' arises such that only the unusual case will

---

[5] Eight Mile has set this point out in prior submissions to this Court with examples. (Doc. 19 at 3, 7-8).

9

not meet the reasonableness prong." *CapitalPlus Equity, LLC v. Tutor Perini Bldg. Corp.*, 2017 U.S. Dist. LEXIS 191169, at \*12 (E.D. Tenn. Nov. 20, 2017).

### 1. Spotify has purposefully availed itself of the privilege of doing business in Tennessee

"So long as a commercial actor's efforts are 'purposefully directed' toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there." *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1264 (6th Cir. 1996). "Despite its label, [the 'purposeful availment'] prong includes both purposeful availment and purposeful direction. It may be satisfied by purposeful availment of the privilege of doing business in the forum; by purposeful direction of activities at the forum; or by some combination thereof." *Beydoun v. Wataniya Rests. Holding, Q.S.C.*, 768 F.3d 499, 506 (6th Cir. 2014).

"In deciding whether purposeful availment has occurred, the court must consider whether the defendant 'acted or caused a consequence in [the forum] such that [it] invoked the benefits and protections of [the state's] law.'" *NTCH-West Tenn, Inc. v. ZTE Corp.*, 2017 U.S. Dist. LEXIS 185662, at \*12-13 (W.D. Tenn. filed Nov. 9, 2017). Purposeful availment is "'something akin to a deliberate undertaking,' that is, a deliberate effort by the defendant to direct its activities toward, and to make contact with, the forum." *Cumberland & Ohio Co. v. Coffman*, 719 F. Supp. 2d 884, 889 (M.D. Tenn. 2010). A defendant's "'reaching out' to the forum on a repeated and prolonged basis is precisely the type of 'deliberate undertaking' that demonstrates purposeful availment [such that] it would be entirely reasonable for the defendants to 'anticipate being haled into court' in Tennessee." *Id.* at 889-90. "[E]ven a single act by defendant directed toward Tennessee that gives rise to a cause of action can support a finding of minimum contacts sufficient to exercise personal jurisdiction without offending due process." *Neal*, 270 F.3d at 331 (citation omitted).

10

"A defendant purposefully avails itself of the privilege of acting in a state through its website if the website is interactive to a degree that reveals specifically intended interaction with residents of the state." *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 890 (6th Cir. 2002). "The Sixth Circuit has identified three levels of interactivity for Internet websites: '(1) passive sites that only offer information for the user to access; (2) active sites that clearly transact business and/or form contracts; and (3) hybrid or interactive sites that allow users to exchange information with the host computer.'" *Silent Events, Inc. v. Quiet Events, Inc.*, 2016 U.S. Dist. LEXIS 113026, at *5 (M.D. Tenn. Aug. 24, 2016). "[O]peration of a passive website is not adequate to establish personal jurisdiction over a defendant, whereas operation of an interactive, commercial website is often sufficient." *Rhapsody Int'l Inc. v. Lester*, 2014 U.S. Dist. LEXIS 23160, at *16-17 (N.D. Cal. Feb. 24, 2014).

The Court has found that the operation of an interactive website reaching customers in a forum may subject the defendant operating the website to the jurisdiction of that forum. *See Tailgate Beer, LLC v. Blvd. Brewing Co*, 2019 U.S. Dist. LEXIS 94271, at *10-11 (M.D. Tenn. June 5, 2019). "[E]ven though Defendant's . . . sales to Tennessee residents may be relatively small in number (especially when compared to its overall sales volume), Defendant . . . has sold items to Tennessee residents and remains ready to do business with customers in Tennessee." *Id.*

In *Mavrix Photo, Inc. v. Brand Techs., Inc*., 647 F.3d 1218, 1230 (9th Cir. 2011), a Florida resident brought suit in California against an Ohio defendant for copyright infringement relating to the hosting of infringing images on its website. The defendant's ties to the state of California were primarily limited to: (1) soliciting advertisements from third-party California companies; (2) providing a link on its website to a third-party vendor that sold tickets to events in California; (3) a California firm designed the website and provided maintenance; and (4) a "link-sharing"

11

agreement with a California-based news site. However, the defendant had no offices, real property, or staff in California, was not licensed to do business in California, and paid no California taxes. *Id. at* 1222. Nevertheless, the court in *Mavrix* noted that, given the above facts, limiting the proper forum to Ohio or Florida would substantially undermine the "interests . . . of the plaintiff in proceeding with the cause in the plaintiff's forum of choice." *Id.* at 1231. In finding that specific jurisdiction was proper, the court noted that restricting jurisdiction to these forums "would allow corporations whose websites exploit a national market to defeat jurisdiction in states where those websites generate substantial profits from local consumers." *Id.*

The connections that were sufficient for a finding of specific jurisdiction in *Mavrix* are far less than those present here, discussed fully above, with Spotify having offices, real property, and staff in Tennessee and being responsible for Tennessee taxes.

In *Capitol Records, Inc. v. MP3tunes, LLC*, 2008 U.S. Dist. LEXIS 75329, at *12 (S.D.N.Y. Sep. 29, 2008), the court found that a defendant's contacts with the forum through its website were sufficient to support personal jurisdiction because the website provided software to users in the forum, transferred music to and from customers, and allowed users to exchange emails and postings.[6] The website formed the basis of the plaintiff's claims. The basis of jurisdiction was that "[a]t least 400 New York users engaged in approximately 950 paying transactions with

---

[6] *Capital Records* further adopted the position of *First Tennessee Nat'l Corp v. Horizon Nat'l Bank*, 225 F. Supp. 2d 816 (W.D. Tenn. 2002), which found that a defendant had purposely availed itself when it, like Spotify, stated on its website that its services were targeted to all U.S. states. ("'Tennessee is included in a list of states to which [the defendant] directs its business activities. Furthermore, [the defendant's] website states that [the defendant] is approved to lend in 'ALL 50 States.' Therefore, as to purposeful availment, the court concluded that the defendant's 'website evidences that it is willing and capable of providing services to Tennessee residents. Given that the plaintiff need only make a prima facie showing of jurisdiction, the defendant's alleged maintenance of a highly interactive website that solicits Tennessee customers is a sufficient basis to find that the defendant has purposefully availed itself of acting in the forum state.'")

12

MP3tunes" and, within a twelve-month period, "users with New York internet protocol ('IP') addresses played a song approximately 100,000 times and downloaded 189,000 music files from the mp3tunes.com website to the user's computer." *Id.* at *3-4. This is entirely consistent with Spotify's activities in this case, as discussed fully herein, and as admitted by Spotify in the Declaration of Anna Lundström.

Spotify's interactive website reaches users in Tennessee. Those Tennessee users accessing the infringing Eight Mile Compositions on Spotify's website forms the basis for this cause of action. As in *Tailgate Beer, LLC*, Spotify has sold its music service to Tennessee residents and remains ready to do business with customers in Tennessee. *See* 2019 U.S. Dist. LEXIS 94271, at *10-11. Further, as in *Capitol Records*, users with Tennessee IP addresses have downloaded and played the Eight Mile Compositions. *See* 2008 U.S. Dist. LEXIS 75329, at *3-4. Just as specific jurisdiction was found in those cases, here, the level of interactivity and commercial nature of the information exchanged in Tennessee clearly supports the Court's jurisdiction over Spotify.

Spotify cites to *Neogen Corp.* to argue simply making a website available to residents of a forum does not constitute purposeful availment. Spotify fails to acknowledge that in *Neogen*, the defendant's website consisted "primarily of passively posted information," and that the Sixth Circuit still found personal jurisdiction proper based on the defendant's other contacts with the state which were "more than random or fortuitous events." 282 F.3d at 890-92. Similarly, Spotify's citation to *Capital Confirmation, Inc. v. Auditconfirmations, LLC*, 2009 U.S. Dist. LEXIS 77440 (M.D. Tenn. Aug. 28, 2009) (Trauger J.) points to the Court's discussion of purposeful availment without identifying its many factual dissimilarities with this case. The Court there found "no evidence that [defendant] has taken any specific, deliberate step to establish a substantial connection with Tennessee," including no indications that the defendant "marketed

13

itself in Tennessee, had any Tennessee employees or agents, or that [defendant] has had any legitimate Tennessee customers." *Id*. at *26. Further, the defendant had nothing resembling a business relationship with Tennessee because no one from Tennessee "has legitimately sought out [defendant's] services and actually signed up for an account with [defendant] that he or she intended to use." *Id*. at *27. It is clear from Spotify's own admissions that it has marketed itself in Tennessee (using, *e.g.,* billboards), has Tennessee employees, and has Tennessee customers who have legitimately sought out Spotify and signed up for Spotify accounts, wholly distinguishing the facts here from those in *Capital Confirmation*.

### 2. The cause of action arises from Spotify's contacts to Tennessee

The next prong under the controlling due process test is that "the cause of action must arise from the defendant's activities [in the forum state]." *Neogen Corp.*, 282 F.3d at 890. The Sixth Circuit has "articulated the standard in a number of different ways, such as whether the causes of action were 'made possible by' or 'lie in the wake of' the defendant's contacts, or whether the causes of action are 'related to' or 'connected with' the defendant's contacts with the forum state." *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 553 (6th Cir. 2007) (internal citations omitted). Courts "have characterized this standard as a 'lenient standard' . . . ." *Id.*

"[T]he second criterion does not require that the cause of action formally 'arise from' the defendant's contacts with the forum . . . ." *Third Nat'l Bank v. Wedge Group, Inc.*, 882 F.2d 1087, 1091 (6th Cir. 1989). "[T]his criterion requires only 'that the cause of action, of whatever type, have a substantial connection with the defendant's in-state activities.'" *Bird v. Parsons*, 289 F.3d 865, 875 (6th Cir. 2002). Claims arise from a defendant's contacts when "the operative facts are at least marginally related to the alleged contacts . . . ." *Id.* Claims of copyright infringement stemming from operation of a website may establish that "the operative facts are at least marginally

14

related to the alleged contacts between [Defendant] and [Tennessee] . . . " and satisfy the "lenient standard that applies when evaluating the 'arising from' criterion . . . ." *World Music, LLC v. Priddis Music, Inc.,* 2007 U.S. Dist. LEXIS 80374, at *27 (M.D. Tenn., filed Oct. 30, 2007).[7] "[E]ven a single act by [a] defendant directed toward Tennessee that gives rise to a cause of action can support a finding" of personal jurisdiction. *Neal*, 270 F.3d at 331.

The operative facts in this case meet this lenient standard because the cause of action arises from Spotify's contacts with Tennessee. Spotify attempts to mischaracterize the activity giving rise to Eight Mile's claims as "licensing-related activities" which, according to Spotify, did not take place in Tennessee. (Doc. 48 at 8). The actual activity giving rise to Eight Mile's claims, however, as discussed fully above, is the streaming and downloading of the Eight Mile Compositions by Tennessee residents, and residents all over the United States, all without a license. It is irrelevant where Spotify usually conducts "licensing-related activities" because *no such licensing-related activities occurred* with respect to the Eight Mile Compositions. The alleged copyright infringement instead clearly arises from Spotify's act of providing Tennessee users with access to the infringing works as discussed above.

Therefore, when the acts giving rise to this cause of action are properly classified as the streaming of the Eight Mile Compositions by Tennessee residents on Spotify's website and for which Spotify has never obtained a license, there can be no doubt that the cause of action arises from Spotify's contacts with Tennessee.

---

[7] Contrary to Spotify's Motion, the lenient standard applied in *World Music* is still the operative standard in the 6th Circuit. *See TailGate Beer, LLC*, 2019 U.S. Dist. LEXIS at *13-14.

15

### 3. There is a substantial enough connection to Tennessee to make the exercise of jurisdiction over Spotify reasonable

The final prong for determining whether exercising jurisdiction over a defendant comports with due process is that "[t]he acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum to make the exercise of personal jurisdiction reasonable." *One Media IP Ltd. v. S.A.A.R. SrL*, 122 F. Supp. 3d 705, 716 (M.D. Tenn. 2015). "The 'reasonableness' prong is also lenient . . . ." *Citizens Bank v. Parnes*, 376 F. App'x 496, 503 (6th Cir. 2010). "If prongs one and two of the *Southern Machine* test are satisfied, then there is an inference that the reasonableness prong is satisfied as well." *Intera Corp v. Henderson*, 428 F.3d 605, 618 (6th Cir. 2005). In considering whether exercising jurisdiction satisfies the reasonableness prong, the court considers the following factors: "(1) the burden on the defendant; (2) the forum state's interest; and (3) the plaintiffs' interest in obtaining relief." *MAG IAS Holdings, Inc. v. Schmuckle*, 854 F.3d 894, 904 (6th Cir. 2017). The fact that a Defendant is located outside of Tennessee "does not overcome the inference of reasonableness." *AlixPartners, LLP v. Brewington*, 836 F.3d 543, 552 (6th Cir. 2016). "[T]he issue may be disposed of relatively easily because the defendant faces an inference of reasonableness . . . ." *CapitalPlus Equity*, 2017 U.S. Dist. LEXIS at *12-13.

Spotify has not overcome this inference of reasonableness because it has presented no evidence that defending this case in Tennessee would be unreasonable or burdensome. Spotify has admitted it has a presence here and has litigated four identical cases here over the past two years. (Doc. 48 at 12-13). The parties to the four Prior Cases spent a grand total of eight days in New York in depositions of a handful of Spotify witnesses. (Busch Decl. ¶ 3(a)). The number of days that the parties might spend in New York in this singular case for all of discovery will in all likelihood be less than a week. Discovery in those four prior cases was all done electronically and

16

most of the hearings were done telephonically. (*Id.* at ¶ 13). There was no burden on Spotify to being in Tennessee in those cases, and there is none in this action, and Spotify knows it.

Spotify's contentions are all wrong. First, Spotify wrongly claims that New York has a greater interest in adjudicating this dispute. This is not a factor courts consider in determining whether exercising jurisdiction over a defendant would be reasonable. *See MAG IAS Holdings, Inc.,* 854 F.3d at 904. The second factor in the reasonableness analysis focuses on the forum state's interest, not New York's. *See id.* Furthermore, federalism concerns of state sovereignty do not apply in the context of a federal court applying federal law. They are a red herring. There is no issue of state court jurisdiction in this case, nor is there an interest in the application of New York law. No state is being "divest[ed] . . . of its power to render a valid judgment." *Bristol-Myers Squibb Co. v. Superior Court,* 137 S. Ct. 1773, 1781 (2017).[8]

The Supreme Court has recognized that the plaintiff has an important interest "in proceeding with the cause in the plaintiff's forum of choice." *Bristol-Myers Squibb*, 137 S. Ct. at 1780. Eight Mile chose this forum and Nashville-based attorneys who have experience with these issues. Eight Mile relied on Spotify's litigation of the four actions in this Court for two years when filing here and when retaining Nashville counsel. (Martin Decl. at ¶ 5-6). Spotify cannot show that

---

[8] Spotify routinely mischaracterizes *Bristol* throughout its Motion, citing *Bristol* for the proposition that "ads cannot support specific jurisdiction for the same reason that the Court in BMS held that 'the bare fact that BMS contracted with a California distributor is not enough to establish personal jurisdiction in the State.'" However, the context of this quote is that the plaintiffs never alleged that "[defendant] engaged in relevant actions together with [the distributor]" or that the [defendant] was "derivatively liable for [the distributor's] conduct in California." *Id.* at 1783. This is distinguishable here where Spotify has employees in Tennessee and personally directs advertisements to Tennessee residents. Spotify further mischaracterizes *Bristol* by implying that a substantial connection with the forum is missing because plaintiffs are not residents and did not suffer harm here. What the court actually stated, unlike the facts present here, is that "as in *Walden*, all the conduct giving rise to the nonresidents' claims occurred elsewhere. It follows that the California courts cannot claim specific jurisdiction." *Id.* at 1782.

17

defending this case in Tennessee would be unreasonable. Because this Court has personal jurisdiction over Spotify, venue is also proper in the Middle District.[9]

### E. Spotify is Involved in a Set of "Unitary" or Integrated Activities that Constitutes "Suit-Related Activity" in Tennessee and Further Demonstrates The Reasonableness of Litigating this Action in Tennessee

"The Due Process Clause 'requires some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax.'" *Quill Corp. v. North Dakota*, 504 U.S. 298, 306 (1992) (internal quote omitted). This due process nexus requirement involves "[c]omparable reasoning" with due process in the context of personal jurisdiction. *Id*. at 308. Analogous to the minimum contact requirement in the context of personal jurisdiction, in order for a state to tax income from a nondomiciliary corporation, there must be "a 'minimal connection' or 'nexus' between the interstate activities and the taxing State." *Exxon Corp. v. Department of Revenue*, 447 U.S. 207, 219 (1980) (internal citation omitted).

"[A] State need not attempt to isolate the intrastate income-producing activities from the rest of the business . . . if the business is unitary." *Allied Signal, Inc. v. Director, Division of Taxation*, 504 U.S. 768, 772 (1992). A state may not, however, tax a non-domiciliary corporation's income if that income is "derived from 'unrelated business activity' which constitutes a 'discrete business enterprise.'" *Exxon*. 447 U.S. at 224. Under the "unitary business" principle, a state can tax a share of a business' overall value as an "enterprise." *Allied-Signal*, 504 U.S. at 778. The key is that there be a "flow of value" within the components of the business enterprise. *Id*. at 783. The

---

[9] "Civil actions, suits, or proceedings arising under any Act of Congress relating to copyrights or exclusive rights in mask works or designs may be instituted in the district in which the defendant or his agent resides or may be found." 28 U.S.C.S. § 1400. "It is widely accepted that, for the purposes of this venue provision, a defendant is 'found' wherever personal jurisdiction can be properly asserted against it." *Bridgeport Music v. Agarita Music*, 182 F. Supp. 2d 653, 659 (M.D. Tenn. 2002). "Therefore, if [defendant] is subject to the personal jurisdiction of this Court, then venue would properly lie in this District." *Id.*

focus is functional—whether "intrastate and extra-state activities form[] part of a single unitary business." *Mobil Oil Corp. v. Commissioner of Taxes*, 445 U.S. 425, 438-39 (1980). If the business is integrated, sharing elements of value and "operational function," *MeadWestvaco Crop. v. Ill. Dep't of Revenue*, 553 U.S. 16, 29 (2008), then the analysis does not "isolat[e] the value attributable to the operation of the business within the States." A state can tax its fair share of the overall income of the enterprise but cannot tax extraterritorial value that arises from a "discrete business enterprise." *Id*. at 26.

The unitary business concept illuminates what contacts should be considered "suit-related" in the context of specific jurisdiction. The overall business plan of Spotify has been to appropriate copyright-protected property without abiding by the requirements of copyright law. That plan includes marketing the Spotify service, developing business relationships, and exploiting the intellectual property of Eight Mile and others. Its overall business greatly benefits from its affiliations in such a way that makes its connection to Nashville *invaluable*. Spotify localized its activity to take advantage of the benefits of the music infrastructure of Music City. And the plan is a unitary enterprise, which includes Spotify's affiliation with Nashville as an integral part of its business model of market penetration and copyright exploitation and disregard. Its Tennessee employees include the Head of Artist & Label Marketing and the Manager in Artist & Label Marketing, who are responsible for developing and executing marketing campaigns which target the State's residents. (Doc. 50 at ¶¶ 24(b), (c)).

There is nothing unfair about expecting Spotify to defend its copyright infringement and associated activity in Nashville. The challenged activities form part of an overall, unitary course of conduct, and Spotify should have to defend itself wherever it has minimum contacts, as it has in Nashville.

19

## II.  THIS COURT HAS BROAD DISCRETION AND SHOULD DENY SPOTIFY'S MOTION TO TRANSFER PURSUANT TO 28 U.S.C. § 1404(A)

Spotify wholly fails to satisfy its burden of establishing that venue in this case is improper, and of course exaggerates the [non-existent] burden it would face in litigating this case in this Court.[10] "The party requesting transfer under § 1404(a) bears the 'substantial' burden of proving that transfer is warranted." *Sardeye v. Wal-Mart Stores E., LP*, 2019 U.S. Dist. LEXIS 154118, at *9 (M.D. Tenn. Sep. 10, 2019). Transfer under § 1404(a) is "inappropriate where it would serve only to transfer the inconvenience from one party to the other." *Id.* at *8. "[U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Id.* at *9. The factors a court considers for transferring a case include: "(1) the location of willing and unwilling witnesses; (2) the residence of the parties; (3) the location of sources of proof; (4) the location of the events that gave rise to the dispute; (5) systemic integrity and fairness; and (6) the plaintiff's choice of forum." *Id.*[11]

First, and as an initial matter, Spotify is a $26 billion company with a major presence in Nashville, Tennessee. It just spent two years litigating four identical cases in Nashville without a

---

[10] Spotify points to *Clayton v. Heartland Res., Inc.*, 2008 U.S. Dist. LEXIS 49839, at *4 (M.D. Tenn. June 30, 2008), which this Court transferred without first deciding the issue of personal jurisdiction. However, *Clayton* is a securities fraud action filed by 68 plaintiffs against 44 defendants. This Court noted in that case that "the issue of personal jurisdiction [was] complicated in no small measure by the sheer number of defendants involved and the intricate interplay of federal securities law, Tennessee and Kentucky state law, and the subscription agreements at issue in this case." *Id.* at *6-7. This case involves two plaintiffs and one defendant and none of those issues are present.

[11] Spotify claims that a federal court assessing equivalent factors found transfer appropriate. Spotify relies on *Ferrick*, a case filed against Spotify that was transferred to New York. *Ferrick v. Spotify United States*, 2016 U.S. Dist. LEXIS 197696, at *1 (C.D. Cal. Oct. 26, 2016). *Ferrick* is distinguishable. *Ferrick* was a consolidated case initially consisting of two class actions. The court found that because the case was a class action and there was some indication of forum shopping, the plaintiffs' choice of forum was accorded no deference. *Id.* at *11. Here, however, quite the inverse is true–there is an indication in this case of forum shopping by Spotify. The Court also found the difference in costs between the two forums weighed in favor of denying the motion to transfer "[b]ecause [Spotify] is in a better position to absorb the costs of litigation." *Id.* at *15.

complaint about jurisdiction, burden, or transfer.[12] The lack of burden is discussed fully above in the reasonableness section.

As alluded to *supra,* Spotify claims that New York is where most relevant party and third-party witnesses are located. While some of Spotify's witnesses may be located in New York, there will undoubtedly be a number of party and expert witnesses located outside of New York. Some may be located in Nashville, Tennessee based upon Spotify's business here, and none of the Plaintiffs are located in New York. Given the numerous suits against Spotify for copyright infringement analogous to those here, the chance that Spotify would uncover some new witness that would be helpful to their claims but prejudiced by the location of this forum is nil. The same individuals who were accommodated in the previous cases could just as easily be accommodated here. It is Spotify's burden to show both the unavailability of a particular witness and that witness's importance to the case. *See Bomarko, Inc. v. Hemodynamics, Inc*., 1991 U.S. Dist. LEXIS 5402, at *16 (W.D. Mich. Apr. 17, 1991). ***Importantly, when there are captive witnesses (such as employees or agents), willing to travel, the fact that they are out of state does not support transfer.*** *See Malibu Boats, LLC v. Nautique Boat Co.,* 2014 U.S. Dist. LEXIS 6290, at *16-17 (E.D. Tenn. Jan. 16, 2014) (finding that witnesses willing to travel negates a finding of inconvenience of witnesses in analyzing 28 U.S.C. § 1404(a)).

With respect to the residence of the parties, which Spotify also relies on, it is appropriate for the Court to consider employees and functions of the company divided between offices in

---

[12] Spotify cites to *City of Pontiac Gen. Emps. Ret. Sys. v. Dell Inc.*, 2015 WL 12659925, at *5 (S.D.N.Y. Apr. 30, 2015) for the proposition that previous litigations before this Court should not be considered in determining whether transfer is appropriate. This is not the rule in the 6th Circuit. As evidenced in *Bradford Co. v. Afco Mfg.*, 2011 U.S. Dist. LEXIS 162062, at *8-9 (S.D. Ohio Mar. 10, 2011), experience gained by this Court through prior proceedings, especially when facts are similar as they are here, is a "compelling reason not to transfer the case."

different locations. *Watermark Solid Surface, Inc. v. Sta-Care, Inc.*, 2008 U.S. Dist. LEXIS 47025, at *15 (M.D. Tenn. June 17, 2008). Here, Spotify has employees and a significant presence in Nashville, Tennessee. Spotify's Nashville office is involved in advertising, which is directly related to this case and the discovery sought by Eight Mile. Eight Mile is based in Ferndale, Michigan. Because of Spotify's presence in Tennessee, and Eight Mile's presence in Ferndale, Michigan, this factor too does not favor transfer.[13]

Spotify's claim about the location of the sources of proof also does not favor transfer. "'[L]ocation of documents is generally a neutral factor' in the § 1404(a) analysis because documents may easily be scanned and electronically produced, faxed, or delivered overnight." *Sardeye*, 2019 U.S. Dist. LEXIS 154118, at *14. Here, the discovery at issue is electronic discovery which can be done anywhere and is not location specific. In the previous cases against Spotify, as mentioned, all document production was completed electronically. (Busch Decl. at ¶5).

With respect to the location of the events that gave rise to the dispute, Spotify claims that "the Southern District of New York is where Spotify is headquartered and engages in the conduct that Plaintiffs challenge."[14] (Doc. 62 at 7). The challenged conduct, however, is the streaming of the Eight Mile Compositions by Tennessee residents, and residents all over the United States, *all without a license*. It is therefore absurd to claim that the challenged conduct took place in New York. As set forth herein, neither Spotify's servers that stream musical works nor its data storage is located in New York. (Kohn Decl. at ¶¶ 22-25).

---

[13] As noted above, even Spotify's agent, The HFA, is fully owned by Nashville-based SESAC. (Busch Decl. at ¶ 6).

[14] New York has no special interest in hearing this case. This is not a factor considered by the Court in the venue analysis and provides no basis for transferring this case. Furthermore, New York does not possess any sovereign interests in applying its law to this case, since federal (not state) law is involved. *See Bristol-Myers*, 137 S. Ct. at 1781.

22

Systemic integrity and fairness also weigh against transfer.[15] This factor is a public-interest concern. *Smith v. Kyphon, Inc.*, 578 F. Supp. 2d 954, 962 (M.D. Tenn. 2008). Courts in this district recognize that public-interest factors relevant to the § 1404(a) analysis include: "(1) the enforceability of the judgment; (2) practical considerations affecting trial management; (3) docket congestion; (4) the local interest in deciding local controversies at home; (5) the public policies of the fora; and (6) the familiarity of the trial judge with the applicable state law." *Sardeye*, 2019 U.S. Dist. LEXIS at *15. Each of these factors disfavor or are neutral towards transfer. Spotify's presence in Tennessee leaves no question as to the enforceability of this Court's judgment, and this forum is well acquainted with the law and type of issues to be presented in this case. Public interest concerns also disfavor the prospect of a $26 billion company perpetrating nationwide copyright infringement dictating that it can only be sued in a location of its choice.

Finally, one of the most significant factors in considering whether venue should be transferred is the plaintiff's choice of forum. *Smith*, 578 F. Supp. 2d at 956. "A plaintiff's choice of forum is usually entitled to substantial consideration in balancing the 28 U.S.C.S. § 1404(a) factors." *Id*.[16] "[P]laintiff's choice of forum is typically 'weighted significantly more heavily' than

---

[15] Spotify also cites to *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp*., 549 U.S. 422, 431 (2007) (quoting Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 585 (1999)) for the proposition that "[W]hen considerations of convenience, fairness and judicial economy so warrant," a court may "bypass[] questions of subject-matter and personal jurisdiction" to decide that "the merits of a case should be adjudicated elsewhere." What Spotify excluded however was the recognition that "[f]orum non conveniens […] generally applies when the alternative forum is in a foreign country, rather than in a different district within the federal system." *Jones v. IPX Int'l Equatorial Guinea, S.A*., 920 F.3d 1085, 1090 (6th Cir. 2019), citing *Sinochem*, 549 U.S. at 430.

[16] Spotify's citation to *Johnson v. UMG Recordings, Inc.*, 2018 U.S. Dist. LEXIS 147323, at *22 (M.D. Tenn. Aug. 29, 2018) is misplaced. There, the court determined that the plaintiff's choice of forum carried minimal merit because "plaintiff does not live in the forum **and the action has a limited connection to it**." *Id*. at *22. As set forth fully herein, Eight Mile has established that this action possesses more than a limited connection to this forum. As such, this Court should consider Eight Mile's choice of forum an "important factor," as was noted in *Dreyfus*, in deciding whether

23

the other factors." *Down-Lite Int'l, Inc. v. Altbaier*, 2019 U.S. Dist. LEXIS 131081, at *9 (S.D. Ohio Aug. 6, 2019) (citation omitted). Though "Plaintiff's choice of forum is afforded less deference" if Plaintiff resides outside of the forum rather than within, "it is still an important factor weighing against transfer." *Louis Dreyfus Co. Metals Merch. LLC*, 2017 U.S. Dist. LEXIS 218053, at *15. Here, Ferndale, Michigan-based Eight Mile chose this forum, and Nashville-based attorneys who have experience with these issues. Also, New York is obviously a much more expensive forum, and the time to trial in the Southern District of New York is longer than in the Middle District of Tennessee.[17]

## **CONCLUSION**

For the foregoing reasons, Eight Mile respectfully requests the Court deny Spotify's Motion.

Dated: December 19, 2019

Respectfully submitted,

/s/ Richard S. Busch
Richard S. Busch (TN Bar #14594)
KING & BALLOW
315 Union Street, Suite 1100
Nashville, Tennessee 37201
Telephone:     (615) 726-5422
Facsimile:     (615) 726-5417
rbusch@kingballow.com

---

to transfer. *Louis Dreyfus Co. Metals Merch. LLC v. PLS Logistics Servs.*, 2017 U.S. Dist. LEXIS 218053, at *15 (S.D. Ohio Sep. 30, 2017).

[17] *See Federal Court Management Statistics, June 2019*, UNITED STATES COURTS, https://www.uscourts.gov/statistics-reports/federal-court-management-statistics-june-2019 (last visited Nov. 18, 2019).

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing Eight Mile's Response In Opposition To Spotify's Motion To Dismiss For Lack Of Personal Jurisdiction And Improper Venue, Or, In The Alternative, To Transfer Venue To The Southern District Of New York and Exhibits have been served upon the following parties in this matter using the ECF system this 19th day of December, 2019. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt, including the following:

NEAL & HARWELL, PLC
Aubrey B. Harwell III (BPR #017394)
Marie T. Scott (BPR # 032771)
1201 Demonbreun Street, Suite 1000
Nashville, Tennessee 37203
Telephone: (615) 244-1713
Facsimile: (615) 726-0573
tharwell@nealharwell.com
mscott@nealharwell.com

Allison Levine Stillman*
Matthew D. Ingber*
Rory K. Schneider*
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 506-2500
mingber@mayerbrown.com
astillman@mayerbrown.com
rschneider@mayerbrown.com

Andrew J. Pincus*
Archis A. Parasharami*
MAYER BROWN LLP
1999 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 263-3328
apincus@mayerbrown.com
aparasharami@mayerbrown.com

Carey R. Ramos*
Kathleen M. Sullivan*

Cory Struble*
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 895-2500
kathleensullivan@quinnemanuel.com
careyramos@quinnemanuel.com
corystruble@quinnemanuel.com


Thomas C. Rubin*
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
600 University Street, Suite 2800
Seattle, WA 98101
Telephone : (206) 905-7000
tomrubin@quinnemanuel.com

Robert P. Vance, Jr.*
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
bobbyvance@quinnemanuel.com

*Attorneys for Spotify USA Inc.*

/s/Richard S. Busch
*Attorney for Plaintiffs*