# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

EIGHT MILE STYLE, LLC; MARTIN
AFFILIATED, LLC,

    *Plaintiffs*,

v.

SPOTIFY USA INC.,

---

SPOTIFY USA INC.,

    *Third-Party Plaintiff*,

v.

KOBALT MUSIC PUBLISHING
AMERICA, INC.,

    *Third-Party Defendant*.

Civil Case No. 19-CV-00736

Hon. Aleta A. Trauger

JURY DEMAND

## <u>SPOTIFY USA INC.'S THIRD-PARTY COMPLAINT</u>

  Defendant and Third-Party Plaintiff Spotify USA Inc. ("Spotify"), by and through its undersigned counsel, brings this Third-Party Complaint against Third-Party Defendant Kobalt Music Publishing America, Inc. (hereinafter "Kobalt"), and alleges as follows:

### <u>NATURE OF THE ACTION</u>

  1. This Third-Party Complaint for indemnification and other relief arises directly out of an action brought by two putative copyright owners, Eight Mile Style, LLC and Martin Affiliated, LLC (collectively, "Eight Mile"), which allege that Spotify infringed their copyrights

in 243 musical compositions (the "Compositions"). Many of the Compositions were written by Eminem (a/k/a Marshall Mathers), who is not a party to this lawsuit.

2.     Eight Mile is a sophisticated music publisher that acquired rights in musical works created by others and whose sole business it is to monetize those works. For almost a decade, Eight Mile observed that sound recordings embodying the Compositions were streamed billions of times on Spotify. It received substantial royalty payments from Spotify based on that streaming. ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ And while it received royalty payments and observed billions of streams, it never once questioned Spotify's authority to make music embodying those Compositions available on Spotify's service. Eight Mile instead suggests that it was somehow "duped" by Spotify into thinking the Compositions were properly licensed to explain away why it knowingly accepted and deposited royalty payments while remaining silent for years.

3.     Eight Mile's story defies logic. But its lawsuit fails from the start for an even simpler reason: Spotify was, in fact, licensed by Eight Mile's agent, Kobalt, to reproduce and distribute the Compositions. Specifically, Kobalt executed a direct "Mechanical License Agreement" with Spotify, ████████████████████████████████████ ██████████████████████████████ agreeing to indemnify Spotify for claims by any third party (such as Eight Mile) alleging that Spotify infringed the third party's rights. Those basic facts are why Spotify is now compelled to bring this third-party complaint against Kobalt.

4.     Although the underlying infringement claim by Eight Mile lacks merit, it is Kobalt that bears ultimate responsibility should Eight Mile prevail.

5.     For years, Kobalt granted licenses to Spotify for musical compositions allegedly owned by Eight Mile.  Kobalt had the express or apparent authority of Eight Mile to do so on Eight Mile's behalf, and certainly (at the very least) led Spotify to believe that it had such authority.

6.     Kobalt not only entered into a direct "Mechanical License Agreement" with Spotify for all compositions that Kobalt administered, including the ones at issue in this case, but for years before that:

- accepted statements of account and royalty payments for Spotify's use of the Compositions and, on information and belief, reported and distributed those royalties to Eight Mile; and

- ███████████████████████████████████████████████████
  ███████████████████████████████████████████████████
  ███████████████████████████████████████

7.     ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

8.     If Spotify were deemed liable to Eight Mile, the responsibility for such liability rests with Kobalt because, through its contractual representations and course of conduct, Kobalt caused Spotify to believe that Kobalt had granted valid licenses to the Compositions, and Spotify made sound recordings available on its service on the basis of that reasonable belief.  Kobalt agreed to indemnify Spotify for precisely this type of claim.

9.     Particularly in light of Kobalt's words and deeds, it is clear that Eight Mile's claims in this case reflect its cynical strategy to reap the benefits of Spotify's streaming service while lying in wait to later seek (improperly) windfall statutory damages based on allegations that

3

Spotify was infringing copyrights allegedly owned by Eight Mile. Acting as Eight Mile's agent, Kobalt has participated in that effort, and is liable to Spotify as a result.

10.     Accordingly, Spotify has, reluctantly, found it necessary to implead Kobalt into this Action.

## PARTIES

11.     Defendant and Third-Party Plaintiff Spotify is a corporation organized and existing under the laws of the State of Delaware with its headquarters located in New York, New York. Spotify is a digital music streaming service that allows users to stream music (and other content) over the Internet and through mobile applications.

12.     Third-Party Defendant Kobalt Music Publishing America, Inc. is a music publishing company organized and existing under the laws of the State of Delaware with its principal place of business in New York, New York.

## JURISDICTION AND VENUE

13.     Eight Mile commenced this Action for infringement of its alleged copyright interests in 243 musical compositions (the "Compositions") against Spotify.

14.     This Court has subject-matter jurisdiction over the Action pursuant to 28 U.S.C. §§ 1331 and 1338(a) because the underlying claims arise under the Copyright Act and Copyright Revision Act of 1976 (17 U.S.C. § 101 et seq.), which is within the exclusive jurisdiction of federal courts pursuant to 28 U.S.C. § 1331.

15.     This Court has supplemental subject-matter jurisdiction over the claims set forth in this Third-Party Complaint pursuant to 28 U.S.C. § 1367 because they arise out of the same transaction or occurrence as the copyright-infringement claim asserted by Eight Mile in the Complaint.

4

16.     After this Court determined that the underlying action would proceed in this Court, rather than in federal district court in New York, counsel for Spotify sought to determine whether, if it were to assert a claim against Kobalt, Kobalt would object to such an action being venued in this Court.  On April 24, 2020, counsel for Kobalt advised counsel for Spotify that, while Kobalt reserved its rights, it did not intend to raise any such objection.

17.     In the event that Kobalt decides otherwise and the Court finds that Kobalt's joinder is infeasible, Spotify reserves the right to move to dismiss the underlying action for failure to join an indispensable party pursuant to Federal Rule of Civil Procedure 19.

## STATEMENT OF FACTS

## I.    KOBALT HAS PUBLICLY TOUTED ITS RELATIONSHIP WITH EIGHT MILE.

18.     Kobalt Music Publishing America, Inc., the third-party defendant here, and Kobalt Music Services America Inc., its affiliate, are both subsidiaries of Kobalt Music Group, Ltd., a London-based independent music publisher and rights administrator founded in 2000.

19.     Kobalt Music Group is among the top players in the music publishing and copyright administration business.  In 2015, it was deemed "the top independent music publisher in the UK and the second overall . . . in the U.S."  Kevin Gray, *Kobalt changed the rules of the music industry using data – and saved it*, WIRED (May 1, 2015), https://www.wired.co.uk/article/kobalt-how-data-saved-music.  Kobalt Music Group's CEO sits on the Board of Directors of the music publishing industry's principal trade association, the National Music Publishers' Association ("NMPA").  And Kobalt Music Group's Founder and Chairman (and former CEO) previously sat on that same board.  Kobalt is an affiliate publisher of The Harry Fox Agency ("HFA"), the leading mechanical rights licensing and administration agency in America.

20.     Music publishing administrators are empowered by songwriters, music publishers, and other composition copyright owners to manage their copyrights and account for the income

5

they earn. They register the copyright owners' compositions, monitor when and where the compositions are used, negotiate and license the compositions for use, collect the royalties that are generated from those uses, and distribute royalties and other licensing fees to the copyright owners. In exchange for these services, publishing administrators typically receive a percentage of the collected royalties and licensing fees.

21. As a publishing rights administrator, Kobalt is responsible for administering, registering, and licensing compositions and collecting publishing royalties on behalf of copyright owners.

22. As the *Wired* article cited above and Kobalt's promotional materials describe, Kobalt established a lengthy roster of artist and publisher clients whose catalogs of musical works it administers by claiming to offer a more direct and transparent platform for tracking usage of the works and collecting royalties owed for such usage. *See, e.g.*, Press Release, Kobalt, *Kobalt Continues Rapid Growth* (Mar. 28, 2019), https://www.kobaltmusic.com/press/kobalt-continues-rapid-growth.

23. From September 2004 to after this Action was commenced, Kobalt publicly and continuously listed Eight Mile on its website as a current client whose rights it administers. Kobalt's website included the following statements as of September 2004:



Kobalt's website included the following information regarding its roster as of November 2019:



24.     In 2016, Joel Martin, the sole member of Martin Affiliated, LLC and manager of Eight Mile Style, LLC,  filed a declaration concerning Eight Mile's relationship with Kobalt in another litigation.   According to the declaration, Mr. Martin had "negotiated and executed administration agreements" with Kobalt, and "[i]n each instance, the written administration agreement . . . refer[s] to Kobalt US as our 'agent.'"  *See* Nov. 3, 2016 Declaration of Joel Martin (Doc. 51), *HaloSongs, Inc. v. Edward Christopher Sheeran*, No. 8:16-cv-01062 (C.D. Cal.) (attached hereto as Exhibit A).

25.     Mr. Martin's declaration further explained that Eight Mile "granted to Kobalt US certain rights to administer the compositions and to grant certain licenses to use [its] copyrighted compositions."  In the redacted administration agreement appended to the declaration, Eight Mile "solely and exclusively license[d]" to Kobalt a wide variety of enumerated rights, including the rights to reproduce and distribute, as well as "all other rights of whatever kind and nature in the [c]ompositions."  *See* Exhibit to Nov. 3, 2016 Declaration of Joel Martin (Doc. 51-1), *HaloSongs, Inc. v. Edward Christopher Sheeran*, No. 8:16-cv-01062 (C.D. Cal.) (attached hereto as Exhibit B).

26.     Throughout its dealings with Spotify specifically, Kobalt made similarly overt, as well as implied, representations about its administration of Eight Mile's catalog of music.

## II.   SINCE BEFORE SPOTIFY'S LAUNCH, KOBALT GRANTED LICENSES AND ACCEPTED ROYALTY PAYMENTS ON EIGHT MILE'S BEHALF.

27.     Through its statements and conduct, Kobalt has for many years demonstrated that it had authority to represent Eight Mile with respect to Eight Mile's catalog of compositions.

28.     Pursuant to Section 115 of the United States Copyright Act, a digital streaming service like Spotify may obtain a compulsory license to reproduce and distribute musical

8

compositions by following certain procedures, including sending a "notice of intent" (or "NOI") to the owner or administrator of the mechanical rights to the composition.

29. Even before Spotify launched its U.S. service in 2011, and for several years thereafter, Spotify's third-party licensing administrator for mechanical rights in the U.S., HFA, issued NOIs to Kobalt that informed Kobalt of Spotify's intent to obtain a compulsory license covering the Compositions.

30. Many of these NOIs were issued by HFA to "Kobalt OBO EMS" (i.e. "Kobalt *on behalf of* EMS"). Others were issued by HFA to "Kobalt OBO Resto World" and "Kobalt OBO Dirty Steve," referring to publishing entities that are affiliated with writers of the Compositions other than Eminem (and identified in Exhibit A to Eight Mile's Complaint).

31. In total, Kobalt received more than 1,900 NOIs relating to the Compositions on Eight Mile's (or an affiliated publisher's) behalf over the course of approximately six years.

32. Because Spotify understood that Kobalt administered the compositions for which Kobalt accepted NOIs on Eight Mile's behalf, Spotify, through HFA, issued regular statements of account to Kobalt for on-demand streams and limited downloads of the Compositions. It also paid royalties owed on account of those streams and downloads to Kobalt on behalf of Eight Mile.

33. Without objection, Kobalt continued to accept royalties from Spotify for streams and limited downloads of sound recordings embodying the Compositions.

34. On information and belief, Kobalt remitted Eight Mile's share of these royalties to Eight Mile over the course of these approximately six years.

**III.** ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████

  35. ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████

  36. On March 17, 2016, Spotify and the NMPA entered into an agreement (the "2016 NMPA Agreement") concerning Spotify's usage of sound recordings embodying musical compositions for which an NOI may not have been issued because, despite Spotify's commercially reasonable efforts, the owner or administrator may not have been identified and royalties may have been accrued but not disbursed ("pending and unmatched usage"). The NMPA and Spotify publicly announced the deal, the general terms of which were also described in numerous media articles. *See* Press Release, NMPA, *NMPA and Spotify Announce Landmark Industry Agreement for Unmatched U.S. Publishing and Songwriting Royalties* (Mar. 17, 2016), http://nmpa.org/press_release/nmpa-and-spotify-announce-landmark-industry-agreement-for-unmatched-u-s-publishing-and-songwriting-royalties/; Ed Christman, *Spotify and Publishing Group Reach $30 Million Settlement Agreement Over Unpaid Royalties*, Billboard (March 17, 2016), https://www.billboard.com/articles/business/7263747/spotify-nmpa-publishing-30-million-settlement-unpaid-royalties.

  37. The purpose of the 2016 NMPA Agreement was to provide participating NMPA member publishers with the opportunity to obtain royalties that they may not have received for "unmatched" compositions they owned, controlled, or otherwise administered, and to resolve any and all claims related to Spotify's usage of those compositions.

  38. By doing so, Spotify would achieve full resolution with respect to any compositions owned, controlled, or administered by each participating publisher: If any sound recordings had

previously been matched to the embodied compositions, the publisher would have received the royalties to which it and its clients were entitled; if any sound recordings had, during any period covered by the agreement, not been matched to the embodied compositions, the publisher would receive accrued royalties and additional payments in return for, among other consideration, a release of all claims (including for copyright infringement) against Spotify associated with Spotify's usage of all compositions embodied in those sound recordings.

39.     The 2016 NMPA Agreement covered Spotify's usage of "pending and unmatched" compositions from the launch of the service in the U.S. through June 30, 2017.  Spotify created an online portal identifying all such compositions that would be subject to the agreement.  ████████

████████████████████████████████████████████████

████████████████████████

40.     ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

41.     ████████████████████████████████████████

████████████████████████████████████████████

42.     ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████

43.     ████████████████████████████████████████

████████████████████████████████████████████

44. ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████

45. ████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

46. ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████

47. ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████

48. ████████████████████████████████████████████████

████████████████████████████████████████████████

49.

50.

51.

52.

## IV.    FOLLOWING THE NMPA AGREEMENT, KOBALT GRANTED SPOTIFY A DIRECT LICENSE TO THE COMPOSITIONS.

53.    ████████████████████████████████████████

████████████████████████████████████████████

████████████

54.    The negotiations were successful, and on December 15, 2016, Spotify entered into a direct mechanical license agreement with Kobalt (the "Mechanical License Agreement"), pursuant to which Kobalt granted licenses to any and all musical compositions that Kobalt owned, controlled, or administered.

55.    Specifically, Kobalt "grant[ed] Spotify a non-exclusive, non-transferable . . . irrevocable license throughout the [United States] to [] reproduce and distribute the Publisher Compositions," defined to include "copyrighted, non-dramatic musical composition[s]" or "portions thereof that [Kobalt], whether now or during the Term, owns, controls, or administers."

56.    ████████████████████████████



57.    Consistent with its representations before entering the agreement, Kobalt never sought to exclude compositions, including the Compositions at issue, from the license it granted Spotify pursuant to the Mechanical License Agreement.

58.    As a result, Kobalt not only led Spotify to believe that Kobalt had granted Spotify a direct license for every composition it owned, controlled, or administered██████████████

███████████████████████████████████████████████████████

████████████████████████████████████████.

59. To the extent any third party brought a claim against Spotify on the basis of an "allegation that, if true, would constitute a breach of [Kobalt's] representations, warranties, or covenants," Kobalt agreed to "indemnify and hold [Spotify] . . . harmless." Thus, in the event Spotify were sued for copyright infringement because it allegedly lacked a mechanical license to a composition administered by Kobalt, Kobalt would be responsible for any resulting loss.

60. Through the consistent course of conduct described above, Kobalt clearly administered—and at the very least led Spotify to believe that it administered—Eight Mile's catalog. Spotify therefore reasonably believed that compositions within that catalog, including the Compositions at issue here, were covered by the Mechanical License Agreement.

61. After executing the Mechanical License Agreement, Kobalt continued to represent, and perpetuate the appearance, that it administered Eight Mile compositions, including the Compositions at issue, by accepting royalties from Spotify for streams and limited downloads of sound recordings embodying those compositions.

62. ███████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
████████████████████████

63. ███████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
████████████████████████

64.     ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████

## V.     ████████████████████████████████ **EIGHT MILE CLAIMS THAT KOBALT DID NOT HAVE AUTHORITY TO GRANT LICENSES AND THAT SPOTIFY INFRINGED ITS COPYRIGHTS.**

65.     Despite Kobalt's grant of licenses to Spotify for the Compositions at issue, Eight Mile filed this lawsuit.

66.     Eight Mile alleges that Spotify infringed its copyrights by making the Compositions available on Spotify's streaming service without (according to Eight Mile) a valid mechanical license.

67.     In its Complaint, Eight Mile alleges that it granted Kobalt "the right to receive income arising from licenses issued by Eight Mile" but not "the right or ability to license Eight Mile compositions for digital mechanical licenses, unless consented to by Eight Mile." Compl. (Doc. 1) at ¶ 20. Eight Mile asserts that it did not consent to Kobalt licensing any of the Compositions at issue. *Id.*

68.     Eight Mile's position defies logic because it knew that sound recordings embodying the Compositions were available on Spotify's service and continuously accepted the royalties that Kobalt received from Spotify for streams and limited downloads of those recordings—royalties for licensed activity.

69.     ████████████████████████████████████

████████████████████████████████████████████

16

███████████████████████████████████████████████

████████████████████████████████

70.    The allegations therefore trigger Kobalt's indemnification obligation under the Mechanical License Agreement, which provides that Kobalt must "indemnify and hold [Spotify] . . . harmless" from any claims "relating to any allegation that, if true, would constitute a breach" of Kobalt's representations and warranties.

71.    Kobalt's obligation to indemnify Spotify is "contingent upon" Spotify providing Kobalt "with prompt notice of [the claim] in writing."

72.    In satisfaction of that condition, on October 12, 2019, Spotify promptly served a formal written demand on Kobalt, seeking indemnification for the claims asserted against Spotify in this Action.

73.    In its October 29, 2019 response, Kobalt flatly refused to engage "in an analysis of the issues" surrounding the indemnification demand and expressly "reject[ed] Spotify's contention that such an indemnity obligation exists."

## FIRST CAUSE OF ACTION
### Breach of Contract (Mechanical License Agreement)

74.    Spotify repeats, re-alleges, and incorporates by reference each and every allegation contained in the foregoing paragraphs, as though fully set forth herein.

75.    The Mechanical License Agreement is a valid and existing contract between Spotify and Kobalt.

76.    Spotify fully performed its obligations in accordance with the terms and conditions of the Mechanical License Agreement.

77. ████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████

78.     Kobalt owned, controlled, or administered the Compositions at issue in this litigation.

79. ████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████

80.     In that event, Kobalt's breaches of representations and warranties will have caused Spotify significant damages in an amount to be determined at trial.

<u>**SECOND CAUSE OF ACTION**</u>
**Contractual Indemnity (Mechanical License Agreement)**

81.     Spotify repeats, re-alleges, and incorporates by reference each and every allegation contained in the foregoing paragraphs, as though fully set forth herein.

82.     In the Mechanical License Agreement, Kobalt agreed to indemnify and hold harmless Spotify from "any and all third party claims, damages, liability, costs and expenses (including reasonable legal expenses and counsel fees) relating to any allegation that, if true, would constitute a breach of" Kobalt's representations and warranties.

83. ████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████

18

84.     Kobalt must accordingly indemnify Spotify for all losses incurred in relation to this Action, no matter the result, including all fees and costs incurred in the defense of Eight Mile's claims and any damages awarded to Eight Mile in the event of an adverse judgment.

### THIRD CAUSE OF ACTION
**Anticipatory Repudiation (Mechanical License Agreement)**

85.     Spotify repeats, re-alleges, and incorporates by reference each and every allegation contained in the foregoing paragraphs, as though fully set forth herein.

86.     Upon being served with the Complaint, Spotify promptly sought indemnification from Kobalt pursuant to the Mechanical License Agreement.

87.     Kobalt expressly rejected the existence of any obligation to indemnify Spotify.

88.     By its categorical rejection of any indemnification obligation, Kobalt has clearly expressed its intention not to fulfill its indemnification obligation.

89.     Spotify does not have any reasonable expectation that Kobalt will honor its indemnification obligation.   Spotify is therefore entitled to treat Kobalt's repudiation of its indemnification obligation as an anticipatory breach of the indemnity provision of the Mechanical License Agreement.

### FOURTH CAUSE OF ACTION
**Breach of Contract** ███████████████████████████████

90.     Spotify repeats, re-alleges, and incorporates by reference each and every allegation contained in the foregoing paragraphs, as though fully set forth herein.

91.     ████████████████████████████████████████████
███████████████████████████████

92.     ████████████████████████████████████████████
█████████████████████

93. ██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

94. ██████████████████████████████████████████████

████████████████████████████████████████

95. ██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████

96. ██████████████████████████████████████████████

████████████████████

## **FIFTH CAUSE OF ACTION**
### **Negligent and/or Intentional Misrepresentation**

97.     Spotify repeats, re-alleges, and incorporates by reference each and every allegation contained in the foregoing paragraphs, as though fully set forth herein.

98.     By virtue of their contractual relationship, Kobalt was obligated to provide accurate information to, and to not mislead, Spotify.

99. ██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████

100.    To the extent the allegations in the Complaint are true, Kobalt's representations were false and misleading.

101.    Spotify reasonably relied on such representations in making sound recordings

embodying the Compositions available on its digital streaming service and paying royalties for resulting streams and limited downloads.

102. To the extent Spotify is held liable for copyright infringement, it will be a direct result of Kobalt's negligence in making those representations.

## **PRAYER FOR RELIEF**

WHEREFORE, Spotify respectfully requests that the Court order:

a. Kobalt to pay to Spotify all fees, costs, and other expenses that Spotify has incurred in defense of this Action;

b. Kobalt to pay any damages, fees, and costs awarded to Eight Mile in this Action; and

c. any other such relief the Court deems appropriate.

Dated: May 29, 2020

Respectfully submitted,

By: */s/ Aubrey B. Harwell III*

Kathleen M. Sullivan*
Carey R. Ramos*
Cory Struble*
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 895-2500
kathleensullivan@quinnemanuel.com
careyramos@quinnemanuel.com

Thomas C. Rubin*
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
600 University Street, Suite 2800
Seattle, WA 98101
Telephone: (206) 905-7000
tomrubin@quinnemanuel.com

Aubrey B. Harwell III (BPR #017394)
Marie T. Scott (BPR # 032771)
NEAL & HARWELL, PLC
1201 Demonbreun Street, Suite 1000
Nashville, Tennessee 37203
Telephone: (615) 244-1713
tharwell@nealharwell.com
mscott@nealharwell.com

Allison Levine Stillman*
Matthew D. Ingber*
Rory K. Schneider*
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 506-2500
mingber@mayerbrown.com
astillman@mayerbrown.com
rschneider@mayerbrown.com

Andrew J. Pincus*
Archis A. Parasharami*
MAYER BROWN LLP
1999 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 263-3328
apincus@mayerbrown.com
aparasharami@mayerbrown.com

*Counsel for Spotify USA Inc.*

*\*admitted pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was filed electronically on May 29, 2020 with the Clerk of the Court using the CM/ECF system.  Notice of this filing will be sent to all parties and counsel of record by operation of the Court's CM/ECF system.  All other parties will be served by regular U.S. Mail.  Parties may access this filing through the Court's electronic filing system.

James F. Blumstein
Of Counsel
Vanderbilt University
131 21st Avenue South
Nashville, TN 37203
(615) 343-393
james.blumstein@vanderbilt.edu

Mark H. Wildasin
U.S. Attorney's Office (Nashville Office)
Middle District of Tennessee
110 Ninth Avenue
Suite A961
Nashville, TN 37203
(615) 736-2079
mark.wildasin@usdoj.gov

Richard S. Busch
King & Ballow
315 Union Street
Suite 1100
Nashville, TN 37201
(615) 259-3456
rbusch@kingballow.com

*/s/ Aubrey B. Harwell III*