# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| EIGHT MILE STYLE, LLC; MARTIN AFFILIATED, LLC, | **Civil Case No. 19-CV-00736** |
| Plaintiffs, | **Hon. Aleta A. Trauger** |
| vs. | **FIRST AMENDED COMPLAINT FOR COPYRIGHT INFRINGEMENT** |
| SPOTIFY USA INC.; HARRY FOX AGENCY, LLC, | **JURY DEMAND** |
| Defendants. | |
| vs. | |
| KOBALT MUSIC PUBLISHING AMERICA, INC., | |
| Third-Party Defendant. | |

## FIRST AMENDED COMPLAINT

## NATURE OF THE ACTION

1.     This is an action for willful copyright infringement, and contributory and vicarious infringement brought by Plaintiff Eight Mile Style, LLC and Martin Affiliated, LLC ("Eight Mile" or "Plaintiff"), who own and control musical compositions written in whole or in part by Marshall Mathers p/k/a Eminem, and others, against Defendant Spotify USA Inc. ("Spotify") and Defendant Harry Fox Agency, LLC ("HFA") (collectively "Defendants"). These causes of action arise from, among other things, (1) Spotify's unauthorized reproduction and distribution of the musical compositions listed in the attached Exhibit A (the "Eight Mile Compositions") in blatant disregard of the exclusive rights vested in Eight Mile, and (2) HFA's material contributions to and

enablement of Spotify's infringement through a joint conspiracy with Spotify to distribute fraudulent documents and misrepresentations designed to conceal and enable Spotify's infringement of the Eight Mile Compositions.

2. As noted, this is, in part, an action for vicarious and contributory infringement brought by Plaintiff against HFA in connection with a scheme to conceal and materially enable Spotify's copyright infringement by circulating knowingly fraudulent documents (e.g., untimely, and otherwise ineffective Notices of Intention to obtain compulsory mechanical licenses ("NOI's") that were intentionally and knowingly backdated to appear as though they were issued on a timely basis, and the fraudulent rendering of purported "royalty" statements) with knowingly false representations to Kobalt Music Services America Inc. ("Kobalt"), the entity authorized to collect royalties from licenses validly made for the Eight Mile Compositions, and to Eight Mile. As discussed herein, Kobalt is not authorized to enter into such licenses for the Eight Mile Compositions for the United States and Canada.

3. Defendants engaged in their fraudulent scheme in a joint effort to (1) conceal Spotify's failure to acquire timely compulsory mechanical licenses for the Eight Mile Compositions, (2) deceive Kobalt and Eight Mile into accepting "royalties" that were based on statutory rates established for timely and valid compulsory licenses; rates that were much lower than the amounts that Eight Mile could have otherwise negotiated because of Spotify's failure to timely and properly obtain compulsory licenses, (3) deceive Kobalt and Eight Mile into accepting "royalties" that were based on false usage information, and (4) avoid the need for Spotify to negotiate and contract with Eight Mile for the more expensive direct voluntary mechanical licensing agreement while still reproducing and distributing the iconic Eight Mile Compositions,

2

which were essential for Spotify to have on its platform to be competitive after launching its service and in the run up to Spotify's initial public offering.

4.    As discussed more fully below, Spotify did not have any mechanical licenses, direct, affiliate, implied, or compulsory, to reproduce or distribute the Eight Mile Compositions. Nonetheless, HFA acted deceptively by, in concert with Spotify, circulating backdated NOI's purporting to constitute valid and timely compulsory mechanical licenses and pretending to have mechanical licenses through the issuance of fabricated mechanical "royalty statements" that purported to have accurate accounting while using an inapplicable royalty rate. Specifically, Spotify instructed HFA, as part of their joint conspiracy to infringe upon the Eight Mile Compositions, to distribute purported "royalty statements" with stream count calculations with the intent that those statements be relied upon by Kobalt, and by Eight Mile itself, as evidence that compulsory licenses were timely and validly in effect. These "royalty statements" included knowing and purposeful misrepresentations that (1) Spotify had acquired compulsory licenses for each of the Eight Mile Compositions, and (2) the royalties were calculated by multiplying the statutory mechanical licensing rate with Spotify's actual level of usage of the knowingly unlicensed Eight Mile Compositions. In fact, neither was true.

5.    As pleaded further below, under custom and practice in the music industry, royalty statements are prepared, sent, and distributed to a party where the distributor of a recorded composition has a valid license from the copyright owner of that work. By knowingly sending purported mechanical "royalty statements" to Kobalt, with the intent that Kobalt communicate the same by passing those royalties on to Eight Mile, HFA and Spotify furthered their scheme to commit mass copyright infringement by pretending to have in place compulsory mechanical licenses upon which those mechanical royalties were based, when, in fact, they did not. As HFA

is the predominant mechanical licensing and collection agent in the music industry, which historically worked exclusively for copyright owners, publishers and licensors for over 80 years until it began to work for the licensees (e.g. Spotify), Kobalt and Eight Mile reasonably and justifiably believed that those statements represented that Spotify had valid mechanical licenses in place. However, not only did Spotify not have valid licenses in place, but as pleaded herein, the purported "royalty statements" were themselves fraudulent.  They were neither accurate nor complete and did not account for literally billions of streams of the Eight Mile Compositions. As noted, they also falsely represented that the statutory royalty rate was applicable when they knew it was not.

6.      Defendants' scheme to engage in copyright infringement was a massive success. Kobalt, serving as the entity authorized to collect royalties from licenses validly made for the Eight Mile Compositions, was tricked into believing that Spotify had compulsory licenses and into accepting "royalty statements" distributed by HFA on behalf of Spotify. Kobalt was further tricked into believing that Eight Mile was being accounted to properly.

7.      The recordings of the Eight Mile Compositions have streamed on Spotify billions of times through the present date. Despite this, Spotify has not accounted to Eight Mile or paid Eight Mile for these streams but instead remitted random payments of some sort, through HFA, which only actually accounted for a fraction of those streams, and at the statutory rate not applicable because of the failure to obtain a compulsory license.

8.      The most egregious example of Spotify's willful infringement is with respect to the iconic musical composition "Lose Yourself."  In 2002, that song reached No. 1 on Billboard's Hot 100 Singles chart and remained in that position for 12 consecutive weeks. It later won the Academy Award for Best Original Song, making it the first hip hop song to receive the award. It

4

also won Grammy Awards for Best Rap Song and Best Solo Performance. Despite "Lose Yourself" being one of the most famous and popular songs in the world, HFA informed Eight Mile in February, 2019, that Spotify, and its agent HFA, had placed "Lose Yourself" in what they call "Copyright Control," an internal HFA designation reserved for songs that HFA does not license because HFA supposedly does not know who is the copyright owner or how to contact the copyright owner of the song. Putting one of the most well-known songs in the world in this category is objective evidence that Spotify, through HFA's contributions, engaged in willful copyright infringement.

9.       On information and belief, Spotify also sent untimely and ineffective NOI's to the United States Copyright Office with respect to "Lose Yourself" and potentially other Eight Mile Compositions, an indication, if not an outright admission, that the musical compositions were being used without licenses. To the extent Spotify claims it sent NOI's to the Copyright Office on the Eight Mile Compositions because it could not locate the copyright owners, that is not true. Spotify, and HFA, its agent, whose knowledge is imputed to Spotify as Spotify's agent, certainly knew that Eight Mile is the copyright owner of "Lose Yourself." Indeed, HFA acknowledged in a May 5, 2010 email that it *knew* that Eight Mile was the copyright owner of "Lose Yourself," and also knew who to contact with any questions. In the email with Eight Mile, HFA sought confirmation from Eight Mile on the revenue splits for "Lose Yourself." Eight Mile responded to this email by confirming the revenue splits indicated by HFA included a share published by Eight Mile.  Not only did HFA confirm receipt of Eight Mile's response, but HFA sought to confirm the revenue split for another song, "Superman," which was also provided. This email exchange is direct proof that HFA and Spotify knew exactly who the owner of "Lose Yourself" is, and who to contact to obtain information or to license the Eight Mile Compositions, and that they have that

information in their system. As such, it is simply false that HFA, and its principal Spotify, would claim that they were unable to locate the copyright owners for "Lose Yourself," when HFA themselves had received this information from Eight Mile back in 2010.

10.    Furthermore, Kobalt told HFA (via email in writing) in 2013 that it did not administer the licensing of reproductions for Eight Mile and who HFA should contact to acquire the required mechanical reproduction licenses. As also evidenced by their May 5, 2010 email with Eight Mile, this information was therefore not only available to them directly, and they knew where to get it, but HFA had already acquired this information.

11.    Despite "Lose Yourself" having therefore been matched to its sound recordings on Spotify, Spotify simply did not bother to get a license, committed willful copyright infringement, and, with HFA's willing and material participation and contributions, colluded with HFA to perpetuate the lie about licensing in royalty calculations while also not paying for the vast majority of the billions of  unlicensed streams of one of the most well-known songs in history.

12.    Recognizing that Spotify was not licensed for the Eight Mile Compositions, but to enable Spotify's further exploitation of the Eight Mile Compositions without a license, HFA, as Spotify's licensing agent, on information and belief, as discussed herein, not only sent untimely and ineffective backdated NOI's regarding the Eight Mile Compositions to Kobalt, but in 2019 sent to Eight Mile further untimely, ineffective, and fraudulently backdated NOI's which were designed to imply that they had been previously issued. Each of these sent and received purported NOI's, including for "Lose Yourself," bear an "expected" first date of distribution many years before the NOI's were issued.  The inclusion of an "*expected* date of distribution" in an NOI was clearly meant to convey that the copyrighted musical work for which the compulsory license is sought had not yet been distributed as of the time the NOI was issued.  It was only after initially

6

purporting to have licenses, that HFA ultimately came clean to Eight Mile in February, 2019 and admitted, as discussed above, that "Lose Yourself," and possibly other Eight Mile Compositions, were in "Copyright Control," a category that is used for compositions that are not being licensed.

13.     The only benefit of sending an NOI to a copyright owner is that it would provide a compulsory mechanical license for a distributor to exploit the owner's copyright pursuant to statutory requirements. However, for an NOI to be effective, the NOI must be sent by the distributor to the copyright owner prior to any distribution of the copyrighted work to be licensed. Spotify failed however to issue any NOI's prior to its distribution of the Eight Mile Compositions, thus foreclosing its ability to obtain compulsory mechanical licenses. As such, there would be no reason for HFA to issue these purported NOI's except to mislead Kobalt and Eight Mile into believing Spotify had a compulsory license when it did not. In fact, the sending of these backdated NOI's actually represents an admission by Spotify that it knows it was not licensed and has committed willful copyright infringement.

14.     Off the back of these songs, Spotify would have gained the financial benefit of tens of millions of Eminem fans becoming Spotify users and subscribers. As discussed above, having the Eight Mile Compositions on Spotify was essential to Spotify being competitive. The value of these subscribers and the market share they brought to Spotify has also been realized by Spotify not only in its multiple fundraising activities exceeding $2.5 billion and pre-public offering valuations, but also in its direct listing in the stock market that now has Spotify's market cap at approximately $44.96 billion. This windfall has made its way into the pockets of Spotify's equity holders who not only were aware they were unlicensed but chose to operate unlicensed in a rush to get their company to a financial exit. Notably, music publishers like Eight Mile, and songwriters

like Eminem, whose songs were critical to Spotify attracting the users that increased Spotify's value, were excluded from sharing in these billions of dollars.

15.     In other words, as alleged more fully below, Spotify, through it and HFA's fraudulent contributions, has built a multi-***billion*** dollar business with no assets other than the recordings of songs by songwriters like Eminem made available to stream on demand to consumers on its digital platform. Yet, as the *Lowery* and *Ferrick* class action lawsuits and the settlement with the National Music Publishers' Association ("NMPA") have firmly established, Spotify built its behemoth by willfully infringing on the copyrights of creators of music worldwide without building the infrastructure needed to ensure that songs appearing on the Spotify service were properly licensed or that appropriate royalties were paid on time (or at all) in compliance with the United States Copyright Act. Spotify's apparent business model from the outset was to commit willful copyright infringement first, ask questions later, and try to settle on the cheap when inevitably sued.  It later included, as discussed below, working (with their equity holders, such as the major music publishers) to pass legislation that would purport to get them off the hook scot-free.

16.     Spotify's online interactive music streaming service is offered to end users in the United States on a paid, subscription basis or at no cost to consumers through an advertiser-supported, non-subscription basis. Spotify reproduces and distributes phonorecords embodying musical compositions to its end users through interactive streaming and limited downloads available on their computers and mobile devices ("Spotify's interactive streaming service"). Upon information and belief, Spotify also makes server copies, in the United States, of phonorecords embodying the musical compositions at issue in this litigation.

17.     For the reasons discussed below, the financial resolution agreed to by the NMPA was woefully inadequate and failed to hold Spotify adequately accountable due, on information and belief, to the interests of the three largest dues paying members of the NMPA owning massive equity in Spotify and working to get Spotify public so that they could reap billions through the sale of their equity interests. The Spotify "Settlement" waived all the other NMPA music publishers' rights to sue for statutory damages in an attempt to limit the liability to help propel Spotify to its financial exit. In addition, the settlement also compelled them to license to Spotify the very compositions Spotify appears not to have licensed in the first place, which HFA was attempting to pretend were licensed. The waiving of the right by NMPA members to sue in the future for statutory damages and the forced licensing of NMPA members appears now in hindsight to be the strategy of the NMPA on behalf of its three largest dues paying members that owned equity in Spotify, and Spotify itself, to attempt to eliminate the ability of all of the victims of Spotify's willful infringement to be able to hold Spotify liable for its unlawful activity.

18.     Spotify has also disingenuously tried to use the NMPA settlement to attempt to avoid liability to Eight Mile and possibly others for copyright infringement. Spotify knew undoubtedly from HFA's 2013 correspondence with Kobalt, discussed above, that Kobalt advised it did not administer licensing functions for Eight Mile, and therefore did not have the ability to license the Eight Mile Compositions domestically. It was therefore not the intention of any of the parties to the NMPA settlement to include Eight Mile in the settlement, since, on information and belief,  Kobalt only entered into it on behalf of those clients it licensed for in the United States, and *not* on behalf of those clients it only acted for as a royalty collector. Although Spotify may have wrongfully attempted to include Eight Mile's market share in a settlement payment to Kobalt so it could claim that Eight Mile was part of the settlement, upon information and belief, Kobalt

Case 3:19-cv-00736   Document 97   Filed 07/01/20   Page 9 of 52 PageID #: 791

never communicated to Defendants that it had licensing authority over the Eight Mile Compositions. In fact, as discussed herein, Kobalt advised the opposite.

19.     After settling with Spotify, the NMPA helped write with Spotify, and others, what ultimately became the Music Modernization Act of 2018 (the "MMA"), which became law on October 11, 2018, and which, among other things, provides retroactively that, if a Digital Music Provider ("DMP") can meet certain requirements, a plaintiff may not receive profits attributable to the infringement, statutory damages, or attorneys' fees for copyright infringement if the lawsuit was not filed by December 31, 2017. The only recourse a copyright owner (such as Plaintiff) has against a DMP complying with the MMA for its copyright infringement is to receive undefined "royalties" that should have been paid as though there had been no infringement.

20.     As discussed below, however, with respect to Eight Mile, Spotify does not meet the requirements for MMA damage limitations. Further, and in the alternative, the retroactive elimination of the right of a successful plaintiff to receive profits attributable to the infringement, statutory damages, and attorneys' fees is an unconstitutional denial of substantive and procedural due process and an unconstitutional taking of a vested property right.

21.     Specifically, under the MMA, a copyright owner may commence an action under 17 U.S.C. § 501 against a DMP for the exclusive rights provided by paragraph (1) or (3) of Section 106 arising from the unauthorized reproduction or distribution of a musical work by such DMP prior to the license availability date (i.e., January 1, 2021).

22.     Because Spotify, upon information and belief, will be unable to demonstrate its compliance with 17 U.S.C. § 115 (d)(10)(B), the limitation of liability set forth in paragraph (d)(10)(A) of the MMA, for copyright infringement liability, does not apply. As discussed more fully below Spotify (1) knew that Plaintiff was the copyright owner of the Eight Mile Compositions

and how to locate Eight Mile prior to enactment of the MMA, and in fact matched the Eight Mile Compositions with the sound recordings embodying those compositions, so the limitation of liability under the MMA for previously unmatched compositions does not apply; or in the alternative (2) did not engage in the required commercially reasonable efforts to match sound recordings with the Eight Mile Compositions as required by the MMA so the MMA's liability limitations do not apply; and (3) did not engage in timely good faith efforts in accordance with paragraphs (d)(10)(B)(i) &(ii), by not timely providing to Eight Mile the reports and payments required pursuant to paragraphs (d)(10)(B)(iii)&(iv), so the MMA's liability limitations do not apply for this reason as well. Each of these points are discussed in turn below.

23. First, by its terms, the MMA liability limitation section for copyright infringement liability only applies to compositions for which the copyright owner was not known, and to previously unmatched works (compositions not previously matched with sound recordings), and not to "matched" works for which the DMP knew who the copyright owner was and just committed copyright infringement. This conclusion is borne out by the language of the MMA. Specifically, Paragraph B entitled "requirements for limitation of liability" (i) provides that "not later than 30 calendar days after first making a particular sound recording of a musical work available through its service via one or more covered activities, or 30 calendar days after the enactment date, whichever occurs earlier, a Digital Music Provider shall engage in good faith commercially reasonable efforts to *identify and locate* each copyright owner of such musical work (or share thereof)." (Emphasis added). The MMA goes on to identify the matching efforts required following the identification of the copyright owner. 17 U.S.C. § 115(d)(10)(B)(iii) & (iv). Then, Section (v) of Paragraph B, reinforces that this limitation of liability section only applies to previously unmatched works by stating that: "a digital music provider that complies with the

Case 3:19-cv-00736   Document 97   Filed 07/01/20   Page 11 of 52 PageID #: 793

requirements of this subparagraph with respect to unmatched musical works . . ."   Spotify and its agent HFA knew that Eight Mile was the owner of the Eight Mile Compositions prior to the MMA's enactment, and had, on information and belief, matched those compositions prior to the MMA's enactment, as is evidenced by the random payments that were made, or at minimum had the information to match. As noted above, HFA acknowledged in a May 5, 2010 email that it *knew* that Eight Mile Style was the copyright owner of at least some of the Eight Mile Compositions, and specifically "Lose Yourself."   Moreover, since Spotify had actually paid Plaintiff some money prior to the enactment of the MMA [albeit woefully and incompletely and without a license], it clearly knew that Eight Mile was the copyright owner of the Eight Mile Compositions and had matched the Eight Mile Compositions prior to the enactment of the MMA.  Nowhere does the MMA limitation of liability section suggest that it lets a DMP off the hook for copyright infringement liability for matched works where the DMP simply committed copyright infringement.  The same should also be true where the DMP had the information, or the means, to match, but simply ignored all remedies and requirements and committed copyright infringement instead. Spotify does not therefore meet the requirements for the liability limitations of the MMA with respect to Eight Mile for this reason alone.

24.     Furthermore, even if some or all of the Eight Mile Compositions were not matched prior to enactment of the MMA, upon information and belief, Spotify has not engaged in the good-faith, commercially reasonable efforts to identify and locate the copyright owner of the Eight Mile Compositions (or share thereof) under Section 115, paragraphs (d)(10)(B)(i)&(ii). Upon information and belief, Spotify's matching efforts failed to meet the required good-faith, commercially reasonable efforts to obtain from the owner of the corresponding sound recordings made available through Spotify's service, among other things, musical work ownership

12

information, including each songwriter and publisher name, percentage ownership share, and international standard musical work code. Nor has Spotify employed adequate bulk electronic matching processes, nor has it adequately repeated such efforts on a monthly basis as required by law or industry custom and practice. Spotify knew from the class action lawsuits and the NMPA settlement that HFA did not have the means to adequately match but continued using HFA as its agent. For example, upon information and belief, using HFA for the NMPA settlement yielded a less than 15% match rate on the prior unmatched sound recordings (85% of the recordings went unmatched) causing the revenue from these 85% of unmatched recordings to be paid out by market share with the bulk of the revenue going to Universal, Sony, and Warner, who were also Spotify equity owners, , and whose officers represented the majority control of the NMPA, which itself had owned HFA prior to being sold to SESAC less than one year earlier. Spotify's conduct in continuing to use HFA to match was not commercially reasonable. Spotify therefore does not have the MMA liability limitations for all of the reasons listed in this paragraph as well.

25. Moreover, Spotify's joint activity with HFA to obscure its copyright infringement through falsified "royalty statements" and backdated NOI's would certainly remove it from the MMA's limitation on liabilities as such efforts are opposite to the MMA's requirement of making good-faith, commercially reasonable efforts to obtain a mechanical license from composition rightsholders. HFA is also not a covered entity under the MMA and does not enjoy provisional immunity for any of the claims set forth against it herein.

26. Spotify has also not timely provided to Plaintiff the reports and payments required pursuant to 17 U.S.C. § 115 paragraphs (d)(10)(B)(iii)&(iv). Where the required matching efforts were successful in identifying and locating the copyright owner of an Infringed Work (or share thereof) by the end of the calendar month in which the digital music provider first makes use of

the work, Spotify must provide statements of account and pay royalties to Plaintiff in accordance with law and applicable regulations. Spotify failed to send the required monthly statements, monthly payments, or the annual statements of account as required by law and regulation.

27.     Specifically, Spotify failed to: (aa) not later than 45 calendar days after the end of the calendar month during which [Eight Mile] was identified and located, pay [Eight Mile] all accrued royalties, and accompany such payment with a cumulative statement of account that includes all of the information that would have been provided to [Eight Mile] had Spotify been providing monthly statements of account to [Eight Mile] from initial use of the [Eight Mile Compositions] in accordance with this section and applicable regulations, including the requisite certification and annual statements of account under subsection (c)(2)(I); and to (bb) beginning with the accounting period following the calendar month in which [Eight Mile] was identified and located, and for all other accounting periods prior to the license availability date, provide monthly statements of account and pay royalties to the copyright owner as required under this section and applicable regulations.

28.     Eight Mile has been expressing its concerns to HFA, Spotify's agent, about failure to license and non-payment since at least 2018. As mentioned herein, through other communications between 2010 and 2018 with Eight Mile and Kobalt, HFA knew then that Eight Mile was the copyright owner of the Eight Mile Compositions and that Kobalt did not handle licensing on behalf of Eight Mile with respect to the Eight Mile Compositions in the United States. HFA's knowledge as Spotify's agent is imputed to Spotify. There is absolutely no doubt that Spotify and its agent, HFA, had the information needed to match or the ability to find the copyright owner. The failure to comply with the matching, statement, and payment obligations of the MMA means that Spotify does not qualify for the MMA damage limitation.

14

29.     In addition, the retroactive elimination of the right to profits attributable to infringement, statutory damages, and attorneys' fees under the MMA is an unconstitutional denial of substantive and procedural due process, and an unconstitutional taking of Eight Mile's vested property right, and this Court should so declare. It is settled law that an infringement claim is a property right that vests in a plaintiff the moment the infringement occurs. The Bill that ultimately became the MMA, written by the NMPA, with input from Spotify, became law in October 2018, but provides retroactively that a plaintiff who did not file an action by December 31, 2017, could lose any right to profits attributable to infringement, statutory damages, and attorneys' fees if successful in a case against Spotify or other DMPs of interactive streams. On information and belief, the MMA, according to the NMPA's own announcements, lobbyist spending, and congressional testimony on Capitol Hill, was jointly crafted by members of the NMPA (whose three top markets shares and dues-paying affiliated companies own equity in Spotify) and Spotify, DiMA, and other interactive streaming companies. They knew what they were doing. Given the fraction of a penny rate for streaming paid to songwriters, the elimination of the combination of profits attributable to infringement, statutory damages, and attorneys' fees would essentially eliminate any copyright infringement case as it would make the filing of any such action cost prohibitive, and ensure that any plaintiff would spend more pursuing the action than their recovery would be. In addition, with the removal of these remedies, it cleared the last hurdle for Spotify to go public, thereby reaping tens of billions of dollars for its equity owners, including the major music companies as mentioned above. The unconstitutional taking of Eight Mile's and others' vested property right was not for public use but instead for the private gain of private companies.

30.     As discussed below, the elimination of profits attributable, statutory damages, and the ability to recoup attorneys' fees leaves a plaintiff with no real remedy against Spotify for

copyright infringement. The elimination of these damages thus goes too far, and makes the copyright right valueless, and DMPs like Spotify essentially immune from liability if they adhere to the requirements of the MMA. The proof is in the pudding: Spotify was sued many times prior to December 31, 2017, for similar acts of copyright infringement as alleged herein, but not once since December 31, 2017. This is because the Bill that ultimately became the MMA first publicly leaked shortly before December, 2017, leaving music publishers with little or no time to investigate or file a lawsuit for infringement, even if they somehow became aware of the Bill at that time.

31.     As far back as 2013, Spotify was on record in sworn testimony before the United States Copyright Board saying that the "crushing" statutory damages available for copyright infringement was the biggest obstacle it faced. The NMPA, whose three largest dues payers were owners of Spotify, used the threat of statutory damages to resolve its complaints with Spotify and get equity in the company, but, having done so, then sold out all smaller publishers not affiliated with the NMPA in helping to craft the MMA and eliminate the only meaningful thing that could ensure Spotify's attempt to comply with the United States Copyright Act. As stated, the combination of eliminating profits attributable to infringement, statutory damages, and attorneys' fees deprives copyright plaintiffs of any true remedy, gives Spotify and others essential and practical immunity from suit, and should be declared unconstitutional. The remaining availability of "royalties" that would have been paid is no remedy at all. Had Eight Mile known it was not licensed, it never would have agreed to allow its Eminem compositions on Spotify for the statutory rate under the compulsory license. As Spotify lost the right to the compulsory licenses due to its infringing activities, the only way for Spotify to get a license to the compositions would have been via a direct voluntary license. Like others received, Eight Mile would have demanded equity in Spotify and demanded a much higher mechanical royalty rate for the direct license, or it would not

have allowed its musical compositions to stream on Spotify. The only practical or realistic remedies in these cases is the statutory damage remedy, and profits attributable, together with the ability to receive attorneys' fees, and the drafters of the MMA knew it. The elimination of these remedies takes away from Eight Mile and others who may be similarly situated any practical or realistic remedy, immunizes complying DMP's from suit, and should be declared an unconstitutional deprivation of due process and a taking of a vested property right. There are 243 copyrighted works involved in this action that are collectively listed on Exhibit A attached hereto. Spotify made unlawful server copies of each of these musical compositions and they were all unlawfully reproduced and distributed by Spotify.

## PARTIES

32.     Eight Mile is a Michigan Corporation with its principal place of business located at 1525 East Nine Mile Road, Ferndale, Michigan. Eight Mile co-owns and administers the 243 musical compositions at issue in this case identified on Exhibit A hereto. Eight Mile and Martin Affiliated have conveyed certain limited rights to Kobalt, which has an office in Nashville, Tennessee, at 907 Gleaves Street, allowing Kobalt the right to receive income arising from licenses issued by Eight Mile and Martin Affiliated, such right to issue digital mechanical licenses being specifically reserved to Eight Mile and Martin Affiliated. Kobalt is not an HFA affiliate for digital rights, and does not have the right or ability to license Eight Mile compositions for digital mechanical licenses, unless consented to by Eight Mile and Martin Affiliated.  Eight Mile and Martin Affiliated did not consent to the licensing of the Eight Mile Compositions to Spotify. Each of the compositions identified in Exhibit A have been duly registered with the United States Copyright Office.

33.     Martin Affiliated, LLC is a Michigan Corporation with its principal place of business located at 1525 East Nine Mile Road, Ferndale, Michigan. Martin Affiliated also co-owns and

exclusively administers the 243 musical compositions at issue in this case identified on Exhibit A hereto as discussed above. Eight Mile and Martin Affiliated are collectively referred to hereinafter as "Eight Mile."

34.     Eight Mile has standing to bring this action for copyright infringement because they co-own the Eight Mile Compositions involved in this action, and have the exclusive rights under Section 106 of the United States Copyright Act to grant nonexclusive licenses to other parties, as well as the exclusive right to print, publish, sell, dramatize, use and license the use of the Compositions, to execute in its own name any and all licenses and agreements whatsoever affecting or respecting the Composition(s), including but not limited to licenses for mechanical reproduction, public performance, dramatic uses, synchronization uses and sub publication, and to assign or license such rights to others. Eight Mile also has the right to prosecute, defend, settle, and compromise all suits and actions with respect to the Compositions.

35.     Defendant Spotify USA Inc. is a Delaware corporation with its principal place of business at 45 W. 18th Street, 7th Floor, New York, New York 10011. Spotify maintains a corporate office in Nashville, Tennessee located at 1033 Demonbreun Street, Nashville, Tennessee 37203.

36.     Defendant Harry Fox Agency is a Delaware limited liability company with its principal place of business at 40 Wall Street, 6th Floor, New York, New York 10005-1344.  HFA is owned by SESAC, which has its headquarters in Nashville, Tennessee.  HFA is registered to do business with the Tennessee Secretary of State.

## JURISDICTION AND VENUE

37.     The jurisdiction of this Court with respect to the copyright infringement claims is based upon 28 U.S.C. §§ 1331 and 1338(a) in that the controversy arises under the Copyright Act

and Copyright Revision Act of 1976 (17 U.S.C. § 101 *et seq.*), which is within the exclusive jurisdiction of federal courts pursuant to 28 U.S.C. § 1331.

38.     This Court has general personal jurisdiction over Defendants because Defendants have continuous and systematic contacts within the Middle District of Tennessee such that they can be found to be essentially at home within this Judicial District.

39.     This Court has specific personal jurisdiction over Spotify for numerous reasons, including, but not limited to, the following:

40.     Upon information and belief, Spotify has maintained a strong presence in Nashville, including its Nashville office, since 2013 and is dedicated to building Spotify's brand and relationships within the Nashville music community. Upon information and belief, Spotify's Nashville office is designed to broker deals with, as well as secure licenses for its interactive streaming services from, record labels, music publishers, and others in Nashville and elsewhere.

41.     Upon information and belief, Spotify specifically targets Tennessee through its licensing and distribution agreements. Upon information and belief, Spotify provides targeted ads to individuals in Tennessee and Tennessee residents, including those who have streamed the Eight Mile Compositions in Tennessee. Upon information and belief, Spotify provides its interactive streaming service and platform to individuals in Tennessee and Tennessee residents, who have used such platform to stream the Eight Mile Compositions at issue in this case.

42.     Upon information and belief, Spotify has hired top executives from within the music industry to head its streaming operations in the Nashville office. Spotify's Nashville office includes an impressive list of executives that includes but is not limited to: John Marks, Spotify's Global Head of Country Music Programming (previously with SiriusXM); Brittany Schaffer, Spotify's Head of Artist & Label Services (an attorney previously with Nashville firm Loeb & Loeb); Alison

19

Junker, Spotify's Manager for Artist & Label Marketing (previously with Warner/Chappell); James Clauer, Spotify's Creative Producer (previously with CMT); and other employees, including employees directly involved in songwriter relations.

43. In January 2019, *Rolling Stone* magazine published an online article stating that "To Spotify, Nashville is an oil-rich frontier." In the article, John Marks of Spotify was quoted as saying, "[Y]ou have to have a presence in Nashville . . . [T]here's nothing like having a presence in Nashville to be able to connect with the artist and with industry people." Marks further stated that, for Spotify, Nashville is "a music territory for us. The primary component is country music, but we know that's going to adjust over time and we want to be at the ready for that."

44. Additionally, Spotify's interactive app and website includes subscription-based users located in Tennessee. Upon information and belief, Spotify has thousands of registered users in Tennessee, and the musical compositions involved in this action have been streamed to users throughout Tennessee. As a result, the brunt of the harm caused by Spotify's actions is felt in Tennessee.

45. As noted, Eight Mile has a limited collection agreement with Kobalt, which has an office in Nashville, Tennessee.

46. Spotify was also well aware of its infringing activities prior to this action through other complaints, lawsuits, and otherwise, including lawsuits in this Court brought by Tennessee residents, but has continuously refused to comply with United States Copyright law.

47. This Court has specific personal jurisdiction over HFA for numerous reasons, including, but not limited to, the following:

48. Upon information and belief, HFA has maintained a strong presence in Tennessee to develop its rights management and licensing business with music publishers in Tennessee.

Upon information and belief, HFA specifically targets the Nashville music community to reach music publishers in the area. HFA is also registered to do business with the Tennessee Secretary of State. Further, upon information and belief, SESAC, the owner of HFA, has its headquarters in Nashville, Tennessee and oversees HFA's activities targeted towards Tennessee residents.

49.     This Court also has specific personal jurisdiction over HFA pursuant to its joint conspiracy with Spotify to commit and conceal the direct copyright infringement of the Eight Mile Compositions in Tennessee. HFA directly, and materially contributed to and facilitated this infringement through its distribution of fraudulent documents and misrepresentations to copyright owners in an effort designed, in part, to conceal Spotify's infringement of the Eight Mile Compositions on its interactive website in Tennessee. In addition to the discussion above, it has been HFA's practice to receive comprehensive reports from its music service clients that detailed which sound recordings, and musical works embodied in them, the music service sought to add to its platform (hereinafter, "License Request Report") and the distributions (e.g., downloads or streams) that these recordings and musical works generated after being added to the music service's platform (hereinafter, "Usage Report"). It was also HFA's practice to provide its music service clients with reports containing responsive information that informed the client of which musical works for which mechanical reproduction licenses had been procured (hereinafter, "License Status Report"). Upon information and belief, Spotify generated and sent to HFA Usage Reports and License Request Reports and HFA generated and sent to Spotify License Status Reports. As such, among the other reasons set forth herein, HFA always had specific knowledge during Spotify's infringement of the Eight Mile Compositions that Spotify intended to infringe and actual did infringe musical compositions, which included the Eight Mile Compositions.

21

50.     Further, HFA contributed to the concealment and perpetration of Spotify's copyright infringement through its acts pursuant to its licensing administration agreement with Spotify, which has an office in Nashville, Tennessee.  Through these actions, HFA has materially contributed to the infringing activities directed at Tennessee residents, and further directly and materially contributed to the infringement of the Eight Mile Compositions in Tennessee. Upon information and belief, the victims of Defendants' direct, vicarious, and contributory copyright infringement included copyright owners residing in the State of Tennessee in addition to Eight Mile.  As with Spotify, HFA's actions are directed to, occur, and are felt in Tennessee.

51.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400(a) because Spotify and HFA are subject to personal jurisdiction in this Judicial District and have committed unlawful acts of infringement and fraudulent acts in furtherance of that infringement in this Judicial District by directing their illegal activities against Tennessee citizens and others with a presence in Tennessee.

**FACTS**

52.     Eight Mile is an independent music publisher and copyright administration company that owns and administers some of the most iconic and successful musical compositions in the world by recording artist Eminem.

53.     Eight Mile owns and exclusively administers the Eight Mile Compositions for interactive streaming in the United States and Canada. The Eight Mile Compositions are listed on Exhibit A, attached hereto, all of which have been duly registered with the United States Copyright Office and have an IP number.

22

54.     Spotify does not have a license to display, reproduce, and/or distribute the Eight Mile Compositions through its interactive streaming service due to not procuring an appropriate license as required.

55.     Prior to bringing this action, Eight Mile spoke to Spotify's admitted agent, HFA, and others, between 2018 and 2019 to confirm that Spotify does not have a license to stream the Eight Mile Compositions. HFA acknowledged in July 2019 that "Lose Yourself" and certain other Eight Mile Compositions were in a category called "Copyright Control," and as such, those works were not being licensed.  HFA did claim however to have generally secured licenses for the Eight Mile Compositions by means of NOI's sent to Kobalt and a direct deal between Kobalt and Spotify that covered the last three years. Again, as discussed above, neither is true. Not only did Kobalt not have the authority to enter into a licensing deal on behalf of Eight Mile, a fact known to HFA and Spotify, but no such deal was entered into with respect to Eight Mile. Further, when HFA attempted to show examples of previously issued NOI's, those NOI's were backdated to appear as if they had been sent prior to their original "expected date of distribution". While NOI's were in fact not sent timely, and were ineffective, NOI's sent to Kobalt would have been ineffective regardless of when they were issued as Kobalt does not have licensing authority over the Eight Mile Compositions, and the Copyright Act requires that NOIs be sent to the "copyright owner" in order to be effective.  Prior to this time, Spotify and HFA had successfully covered up their wrongdoing through their use of backdated NOI's and falsified "royalty statements". As discussed herein, HFA ultimately acknowledged that "Lose Yourself" was placed in the aforementioned "Copyright Control."

56.     Kobalt did not enter into a direct or affiliate license with HFA with respect to any of the Eight Mile Compositions (as it did not have the authority or ability to do so), and as HFA

and Spotify were aware, no other party had any right (other than Eight Mile), to enter into a direct license with Spotify for the musical compositions involved herein. Spotify also does not have a compulsory license because any NOI's that were sent by HFA were, on information and belief, sent well after the Eight Mile Compositions began streaming on Spotify and were therefore never effective for that and the other reasons set forth herein. On information and belief, the sending of late and misleading NOI's was done to make music publishers believe that Spotify was licensed when it was not and knew that it was not. The sending of incomplete, purported "royalty statements" was also done for the same purpose since Spotify (and HFA) knew that they were not licensed and were not paying out hundreds of millions of dollars for Spotify's use of the compositions. As Spotify's admitted agent, HFA's knowledge is imputed to Spotify. For this conduct, Spotify is liable for direct infringement, while HFA is liable for contributory and vicarious infringement.

57. Spotify is an interactive music streaming service (among other business services) that allows its users to access and enjoy a library of musical recordings using its downloadable application and web-based platform. In fact, Spotify identifies itself as the "largest interactive streaming music service in the United States." As an interactive service, Spotify must obtain either a direct or compulsory license allowing for the reproduction and/or distribution of each musical composition on its interactive streaming service. Spotify's business model offers tiered participation levels to its users, including a "premium" subscription level that allows users to interactively stream "any song" without ads, and a lower tier, non-subscription level that is supported by advertisements which play at regular intervals during use in exchange for providing users the ability to interactively stream nearly the entire Spotify library of music for free. In 2020, Spotify claims that it has more than 286 million global active users, users that have streamed songs

hundreds of billions of times, including both paying subscribers as well as users that utilize its free, ad-supported platform. In April of 2020, Spotify announced it has more than 130 million paid subscribers.

58.    Spotify also allows its users to download specific songs. On Spotify's website, Spotify urges consumers, "With Spotify Premium, you can download music so it's available everywhere you go. You can listen without an internet connection . . . ." Spotify Website, https://support.spotify.com/sk/using_spotify/the_basics/listen-offline/ (last visited Aug. 20, 2019).

59.    Spotify must obtain either a direct or compulsory license in order to make, reproduce, and/or distribute phonorecords embodying the musical compositions offered through its interactive service, including by means of digital phonorecord deliveries ("DPDs"), interactive streaming, and/or limited downloads.

60.    To better understand Spotify and its service, and its willfully infringing behavior, as well as how it has been able to grow in value despite the music industry's awareness of its non-existent and non-compliant systems, it is important to understand the background of the ever-evolving music industry and how enforcement of copyright law has grown from an industry of illegal downloads to a history of sanctioned illegal streaming.

61.    In the late 1990's and early 2000's, peer-to-peer (P2P) file sharing companies became popular and allowed individuals to share music over the Internet. In response to these companies allowing users to share copyrighted works without proper licenses, the Recording Industry Association of America ("RIAA"), a trade organization comprised of United States record companies, filed lawsuits against major P2P file sharing companies, including Napster, Scour, Aimster, Audiogalaxy, Morpheus, Grokster, Kazza, iMesh, and LimeWire.

25

62.     On September 8, 2003, the RIAA sued 261 American music fans for sharing music on P2P file sharing networks. Within five years, the recording industry had filed, settled, or threatened legal actions against at least 30,000 individuals, including children, grandparents, unemployed single mothers, and college professors, and sought and obtained judgments in many cases for the maximum $150,000 statutory damage award per illegal download. These same major music companies and their trade organizations who were so vigilant in protecting their copyrights now own part of Spotify and put in motion a successful plan to make billions through Spotify's public offering.

63.     Once P2P file sharing networks were effectively shut down, major music companies turned to so-called legal download and streaming services as a way to generate revenue from their sound recordings. This income became the major source of revenue from the recordings that the labels controlled.

64.     Spotify was established in 2005 by Daniel Ek and Martin Lorentzon in Stockholm, Sweden. Mr. Ek's background was in illegal file sharing through the company called uTorrent using the BitTorrent protocol. The company released its first public beta version in 2007. Spotify then launched on the Apple operating system in 2007. Spotify began advertising through its interactive applications in 2008 and officially launched in the United States in June 2011. Upon information and belief, at the time of its United States launch, Spotify had between 15,000,000 and 25,000,000 sound recordings available through its interactive streaming service. Upon information and belief, the number of sound recordings in its service is now over 35,000,000.

65.     By 2011, Spotify had reached 1,000,000 paid subscribers. By 2013, Spotify had 24,000,000 active users who had streamed 4.5 billion hours of music in 2013 alone. Spotify's articulated goal was to gain as much market share as possible to dominate the interactive streaming

market, and to fend off potential newcomers to the market. In that regard, it was essential, as Spotify admitted, to its business plan to have all musical compositions on its platform so it could say the consumer needed to go nowhere else, even if it meant infringing to do so. Having Eminem's musical compositions on its platform was, needless to say, crucial to its planned domination. Spotify simply did not care if it did not have the appropriate licenses to do so.

66. By that time, Spotify had raised enormous amounts of money to support its business. Spotify originally raised two hundred million dollars ($200,000,000.00), and then, by the end of 2013, raised another three hundred fifty million dollars ($350,000,000.00), bringing its total raised at that time to over half a billion dollars ($500,000,000.00).

67. By 2015, Spotify announced it had 75,000,000 users overall, which included 20,000,000 paying users.

68. By the middle of 2016, Spotify raised yet another two billion dollars ($2,000,000,000.00) on top of the aforementioned five hundred million dollars ($500,000,000.00), bringing its total capital raised to over two billion five hundred million dollars ($2,500,000,000.00).

69. In 2018, Spotify went public in the United States. It now has a market cap of approximately $44.96 billion.

70. Under the United States Copyright Act, the owner of a copyright is entitled to certain exclusive rights, including the exclusive right to reproduce and distribute a musical work. Every sound recording contains two separate and distinct copyrights–one copyright for the sound recording itself and one copyright for the underlying musical composition. Spotify will often make different recordings of a composition available for streaming on-demand, which Spotify displays through an interface in conjunction with the name of the artist performing the recording, the name

27

of the recording and other "metadata," and a "play" button that the user can click to play the song. In all cases, to allow for the on-demand interactive stream of a song, Spotify must have two separate licenses and pay two separate royalties. One license is for the sound recording and the second, separate license, is for the embodied musical composition. The former generates revenue for the record label, while the latter generates revenue for songwriters and their music publishers.

71. A mechanical license grants the right to reproduce and distribute copyrighted musical compositions for use on compact discs, records, tapes, ringtones, permanent digital downloads, interactive streams, and other digital formats. Anyone wishing to use a musical work is required to license the composition separately from the recording either through a direct voluntary mechanical license secured by negotiating with individual copyright owners, or, in the United States, through a compulsory mechanical license.

72. Spotify has expressly and repeatedly acknowledged that Spotify, an *interactive* streaming service, must secure rights to reproduce and distribute the musical works embodied in its sound recordings, or else face the "crushing statutory damages" available under the United States Copyright Act. In its comments before the United States Copyright Office, Spotify has acknowledged that in order "[t]o operate the Spotify Service, Spotify needs to secure multiple rights from multiple copyright owners. These rights include, among others, the right to reproduce sound recordings and the musical works embodied therein, the right to distribute sound recordings and the musical works embodied therein, and the right to publicly perform sound recordings and the musical works embodied therein by means of digital audio transmissions."

73. In order to obtain a compulsory license under the Copyright Act, as detailed in Section 115, a distributor or prospective licensee, such as Spotify, is required to send an NOI to each copyright owner before or within thirty (30) days after making a phonorecord embodying the

28

musical composition, and before distributing the work. If the name and address of the copyright owner is not known, the distributor or prospective licensee, after putting effort into finding them, is then required to file the NOI in the Licensing Division of the Copyright Office, and then submit the statutory filing fee for each title listed in the notice in a single payment and make checks payable to the Register of Copyrights or authorize deduction from a deposit account for the filing fee.

74.     The NOI serves the important role of requiring the music service to connect the sound recording to the composition before it makes the sound recording live so when it generates revenue the service knows whom to pay and alerts the copyright owner(s) to the use of their musical compositions and the right to legally required compensation for that use. Under United States Copyright law, the failure to timely file or serve an NOI forecloses the possibility of a compulsory license and, in the absence of a negotiated license, renders the making and distribution of phonorecords an act of copyright infringement with respect to the underlying musical composition.

75.     According to Section 115 of the Copyright Act, once a license for the musical composition is obtained, the licensee must follow the terms of a direct license or the statutory requirements for a compulsory license which include, but are not limited to: (1) making accurate royalty payments accompanied by a compliant monthly accounting statement, (2) providing itemized details as to how the per stream rate was calculated, (3) rendering annual certified accountings to the copyright owner or authorized agent, (4) making timely payments to the administrator on or before the 20th day of each month for every phonorecord/recording made and distributed in accordance with the license, and (5) curing any breach of these requirements within

29

30 days of the notification. Spotify, like every other person or entity, must obtain a license and comply with the requirements of the license for the works it includes in its service.

76.     Subpart B of the Code of Federal Regulations § 385 "establishes rates and terms of royalty payments for interactive streams and limited downloads of musical works by subscription and non-subscription digital music services in accordance with the provisions of 17 U.S.C.§ 115." § 385.10(a). Spotify, a licensee that, pursuant to 17 U.S.C. § 115, makes or authorizes interactive streams or limited downloads of musical works must comply with the requirements of 17 U.S.C. § 115; § 385.10(b).

77.     Prior to launching in the United States, Spotify made some efforts to license sound recordings by reaching out to labels and distributors for the metadata of each recording, but did not attempt to collect any information about the compositions that each recording embodied. Spotify built no infrastructure capable of collecting compositional information and failed to ask for such information. Additionally, in a race to be the first to market (before the launch of similar services being prepared by Apple, Amazon, and Pandora), Spotify made the deliberate decision to distribute sound recordings without building any internal infrastructure to license compositions properly or comply with the requirements of Section 115 of the Copyright Act.

78.     Spotify did not build proper infrastructure or require sound recording rights holders to provide data as to what specific composition the sound recording embodies. Upon information and belief, Spotify makes recordings live for interactive streaming and/or limited download without, in many cases: (1) knowing the identity of songwriters and publishers that should be receiving royalties; and (2) knowing or caring whether the compositions have been licensed. Songwriters and publishers are therefore placed in the very difficult position of identifying the compositions streaming on Spotify and whether licenses exist or royalties are owed.

79.     Instead of attempting to comply with United States Copyright law and build a proper system to identify the compositions available through its service, Spotify contracted with HFA. HFA is a provider of rights management, licensing, and royalty services for the United States music publishing industry that specifically issues licenses and collects and distributes royalties on behalf of musical copyright owners. At the time of contracting with Spotify, HFA was owned by the aforementioned NMPA, a trade group representing the interests of its members, including, but not limited to, the major music companies that have reaped the financial benefits of the Spotify public offering. In October 2015, the NMPA sold HFA for a reported twenty million dollars ($20,000,000.00) to the private equity owned United States performing rights organization SESAC. SESAC was acquired by the private equity firm The Blackstone Group for a reported $1 billion. Upon information and belief, approximately ten to fifteen percent (10% to 15%) of the sale price was held in an "escrow" account to be liquidated at a future date if there were no unforeseen financial liabilities against HFA, for example, not getting licenses or paying inaccurately as it did for Spotify.

80.     At the time that Spotify hired HFA, HFA had a database with less than the number of recordings and compositions available in the Spotify library. Between this insufficient database, Spotify's piecemeal system, and HFA's own lack of a system capable of complying with the statutory requirements for compulsory licensing, copyright infringement was assured. Despite knowledge of these deficiencies, Spotify moved forward with a non-compliant system that allowed for massive infringement from its launch in the United States in June 2011. To the extent they did not know it initially, which they did, Spotify certainly was aware of HFA's inability to match musical compositions with sound recordings as a result of the massive litigation, or threats of litigation, brought against Spotify for copyright infringement. Spotify nonetheless continued with

31

HFA despite other options available to it. Spotify has continued with HFA even after enactment of the MMA and has continued to fail to engage in commercially reasonable efforts to match musical compositions with sound recordings.

81. Upon information and belief, there were approximately 35 billion (35,000,000,000) unpaid streams that occurred from June of 2011 to the end of 2015. This means Spotify failed to pay approximately fifteen million dollars ($15,000,000.00) in royalties. According to an NMPA communication with its members, this figure was estimated to increase by now to another 140 billion (140,000,000,000) to 280 billion (280,000,000,000) unpaid streams totaling between sixty million dollars ($60,000,000.00) to one hundred twenty million dollars ($120,000,000.00). Spotify has not only admitted to its failure to pay out these royalties, but also has shown it knew it was unlicensed for many of them and, if licensed, was not paying them accurately, on time, or in compliance with any of the other Section 115 requirements, thereby making the "royalty statements" non-compliant.

82. Nevertheless, despite raising over two and one-half billion dollars ($2,500,000,000.00), and now public with a market cap at approximately $44.96 billion, Spotify has still failed to invest in building a compliant solution. To make matters worse, when Spotify's scheme is discovered by a rights holder, and Spotify is notified of lack of a license or termination of licenses due to the failure to comply with legal requirements, Spotify has nonetheless continued to willfully and knowingly exploit the compositions.

83. Spotify's history is riddled with these notifications. Spotify has previously been pursued for failure to properly license compositions or pay for licenses, most notably by the NMPA on behalf of its membership. Spotify was quick to enter into a settlement agreement (Participating Publisher Pending and Unmatched Usage Agreement) that required it to pay out the fifteen million

seven hundred thousand dollars ($15,700,000.00) in unpaid royalties it was holding onto along with an additional five million dollars ($5,000,000.00) penalty to those NMPA members who voluntarily participated in the settlement. Sadly, this "settlement" was woefully insufficient financially and nothing more than a way to allow the major music companies, who are the largest members of the NMPA, to help Spotify move forward to a public offering as, upon information and belief, collectively their affiliated record labels owned over sixteen percent (16%) of Spotify and with Spotify going public each generated close to or more than $1 billion dollars through Spotify's public offering.

84.    In addition, the NMPA settlement did nothing to resolve the outstanding issues with the Spotify licensing and royalty payment system as the settlement allowed Spotify to continue to not pay accurately and did not require it to build any systems moving forward. Add to this that the NMPA settlement only applies to the select members of the NMPA. Finally, the settlement itself encouraged the continued infringement by Spotify as evidenced by the NMPA's June 2017 email that indicated that the amount of unpaid royalties would grow after the settlement agreement was entered into (meaning Spotify was not required to put in the needed compliance systems).

85.    In addition to the NMPA settlement for non-compliance and infringement, Spotify agreed to settle a class action lawsuit for forty-three million four hundred thousand dollars ($43,400,000.00). The stated intent of the settlement is to compensate rights holders for Spotify's years of infringing actions. However, the settlement is also woefully insufficient to pay songwriters and publishers for the infringement by Spotify. Upon information and belief, there are over 100,000 unique individuals who meet the criteria to be in the class with an interest in approximately 8,000,000 compositions. Upon information and belief, the class attorneys will be taking approximately twenty-five percent (25%) of the settlement payout, which leaves, approximately, a mere thirty-two million

dollars ($32,000,000.00) to be divided between the composition owners. Averaging the payout for each owner, Spotify will be allowed to walk away after paying approximately four dollars ($4.00) per infringed composition. Such a settlement is essentially an empty gesture that encourages infringement and is entirely insufficient to remedy years of illegal activity. Eight Mile opted out of the class action.

86.    The non-financial terms of the class action settlement are also unacceptable as they force class members to license their works to Spotify moving forward whether they wish to do so or not. In addition, if Spotify breaches the terms of the license, which it has already indicated it will do in the NMPA settlement, the rights-holder can never terminate the license as the class settlement is forcing the rights-holder to grant a license "in perpetuity." Therefore, even if Spotify breaches and does not cure, Spotify can never be held liable for infringement. Spotify now has a license and no incentive to build the required systems as there is no penalty if they continue to operate without doing so. In effect, Spotify is being rewarded for willfully infringing on copyrights.

87.    Upon information and belief, a number of major record labels, including Sony Music, Universal Music Group, Warner Music, and EMI, allowed Spotify to use their sound recordings in its service in exchange for being allowed to purchase a stake in Spotify at below market value. In some cases, equity in Spotify was provided to sound recording rights holders for no additional compensation. As a result of these deals, upon information and belief, the major record labels owned an approximate sixteen percent (16%) stake in Spotify. With the successful Spotify public offering, this allowed the labels to generate billions of dollars, none of which they need to share with the copyright creators, performing artists, or songwriters. These record labels, who control their affiliated publishing companies, who were members of the NMPA, and which

34

owned HFA until July 7, 2015, therefore had no incentive to pursue or truly hold Spotify accountable for its actions.

88.     Spotify's illegal behavior and its willful and deliberate disregard of United States Copyright laws is clearly demonstrated in Eight Mile's case, which shows no license and the non-payment/incorrect payment/inadequate payment of money over many years, at an inapplicable royalty rate, with respect to some of the most famous songs ever written. As noted above, this failure to pay came in spite of Spotify knowing since at least 2010 that Eight Mile was the owner of some, if not all, of the Eight Mile Compositions. Indeed, as discussed herein, HFA acknowledged in a May 5, 2010 email that it knew that Eight Mile was the copyright owner of "Lose Yourself" and "Superman," which are among the Eight Mile Compositions.

89.     Even when HFA, at Spotify's direction, did distribute untimely and ineffective NOI's in an attempt to conceal Spotify's willful infringement of the Eight Mile Compositions, the purported NOI's were sent to the wrong party despite years of communications between Kobalt and Eight Mile with Defendants informing them that Kobalt did not have the authority or ability to issue licenses on Eight Mile's behalf.  This also made those purported NOI's ineffective.

90.     For example, in 2013, Kobalt communicated to HFA that "[t]he 8 Mile Style catalog is no longer administered by Kobalt for licensing." In fact, Kobalt hasn't administered licensing for Eight Mile in the United Stated and Canada since December 2010, which is several months before Spotify launched in the United States in July 2011. Eight Mile also informed HFA as part of a July 12, 2018 email that it maintained control over the copyrights to the musical compositions, that it was not an affiliate of HFA, and that HFA had not been authorized to grant licenses on its behalf. Eight Mile further communicated in a June 27, 2019 email to HFA that, "Licensing [is handled] directly with EMS, [while] Kobalt collects income."

91.     However, even beyond these communications, Defendants were provided notice that Kobalt did not have licensing authority for the Eight Mile Compositions, upon information and belief, through the negotiation and execution of a sub agreement to the 2016 Participating Publisher Pending and Unmatched Usage Agreement between Spotify and Kobalt ("sub agreement"). Upon information and belief, the sub agreement required Kobalt to disclose the works for which it served as the licensing administrator. Upon further information and belief, Kobalt did not claim that it had licensing authority for the Eight Mile works for which it collected royalties ("Eight Mile Catalog"). As such, Spotify would have had no basis for believing that the sub agreement conferred any rights to Spotify pertaining to the Eight Mile Catalog. Also, upon information and belief, Kobalt understood, when signing the sub agreement, that the agreement only covered material that Kobalt controlled for licensing administration and not works like the Eight Mile Catalog for which it only collected royalties.

92.     Defendants' improper transmission of untimely NOI's to Kobalt, and the sending of "royalty statements" even though no license was in place, evidences Defendants' total indifference to securing mechanical licenses for the sound recordings on Spotify's platform, and was meant to trick Kobalt, receiving purported "royalties" on Eight Mile's behalf, into believing that valid licenses were in place in order to enjoy the statutory royalty rate allowed for compulsory licenses, while trying to ensure that the vital Eight Mile Compositions were available on Spotify's platform. Further, when Eight Mile sought answers from HFA to questions regarding the status of Spotify's licensing of the Eight Mile Compositions, HFA again sent these purported NOI's to Eight Mile in an effort to deceive them into believing that Spotify had timely secured mechanical licenses for the Eight Mile Compositions.

93.     In addition to the foregoing, Spotify further failed to comply with 37 C.F.R. § 210.16 by failing to file a detailed annual statement of account, certified by a certified public accountant. Instead of complying with copyright law and sending a timely NOI or obtaining a proper license, Spotify chose to willfully infringe Eight Mile's rights.

94.     Moreover, Spotify took active steps, through its appointed agent HFA, to fraudulently conceal its infringement of the Eight Mile Compositions and to avoid required payments to Plaintiff of millions of dollars for billions of streams. Like Spotify, HFA was certainly aware, or at least willfully blind, of Spotify's willful infringement of the Eight Mile Compositions throughout its contractual relationship with Spotify.

95.     Upon information and belief, Spotify provides HFA, as part of their contractual relationship, License Request Reports that detail the sound recordings that have been recently added to Spotify's platform for which it requires mechanical licenses. HFA then attempts to match these recordings to underlying compositions, for which it then seeks mechanical licenses. However, regardless of whether HFA is successfully able to match and secure these licenses, HFA provides a License Status Report to Spotify that updates it on its efforts.

96.     Upon further information and belief, Spotify also provides HFA with periodic Usage Reports that detail which sound recordings are being streamed on Spotify's platform, including the date and quantity of these streams. By comparing the Usage Reports to the License Request Reports, HFA can immediately discover if Spotify is streaming sound recordings that embody unlicensed compositions. In this way, HFA knew, absent willful blindness, that Spotify was willfully infringing upon the Eight Mile Compositions. This is of course not the only way that HFA's knowledge is demonstrated. By placing the Eight Mile Compositions in "Copyright Control", while issuing "royalty statements" for some of the streams, HFA knew of and facilitated

37

the copyright infringement. As HFA undoubtedly knew, as evidenced by a 2010 email, referenced above, that Eight Mile was the publisher of the Eight Mile Compositions, "Lose Yourself" specifically, and was told in 2013 by Kobalt that it did not license for Eight Mile, HFA, and by extension, Spotify, knew that the Eight Mile Compositions were not licensed and how to contact Eight Mile. HFA and Spotify's sending of NOI's to the United States Copyright Office is another admission of knowing infringement.

97.     To be clear, because HFA was Spotify's sole licensing agent and administrator during the time that sound recordings embodying the Eight Mile Compositions were streamed on Spotify's platform, and its knowledge is imputed to Spotify. HFA would have known that its failure to secure mechanical licenses for the Eight Mile Compositions extended to Spotify. As such, any review of the Usage Reports, and the other information discussed above, would have immediately revealed to HFA that Spotify was unlawfully streaming sound recordings that embodied the Eight Mile Compositions.

98.     Further, because HFA is Spotify's agent not only for purposes of administering licenses but also for handling its calculation and distribution of mechanical royalties, HFA's duties require it to compare the Usage Reports to its licensing records for purposes of calculating and distributing royalty payments. Had HFA attempted to accurately calculate royalties payable to Eight Mile for the Eight Mile Compositions, as opposed to fabricating amounts owed, there would be no explanation for how HFA could remain unaware of Spotify's willful infringement of the Eight Mile Compositions.

99.     As noted above, HFA, as part of its joint actions with Spotify to engage in copyright infringement, sent false "royalty statements" to Kobalt on a regular basis, from 2011 to the present, with the intent that the information therein  be recommunicated to and relied upon by Eight Mile,

which they were. Upon information and belief, these statements were sent by HFA to Kobalt on a monthly basis between 2011 and 2016, and a quarterly basis from 2016 to 2019. In each of these "royalty statements," HFA indicates that royalties are being provided pursuant to a previously acquired mechanical license and that the "royalty statement" accurately reflects the royalties attributable to Eight Mile. Both of these representations were of course untrue given HFA's failure to obtain a mechanical license on behalf of Spotify. Nonetheless, Kobalt, acting on Eight Mile's behalf, relied on the truthfulness of these statements.

100.    As Kobalt was not the licensing administrator for the Eight Mile Composition within the United States or Canada, a fact which was communicated to HFA on numerous occasions, Kobalt had no duty or reason to inquire into the veracity of these representations. Rather, Kobalt trusted that HFA, who promotes itself on its website as "America's premiere licensing agent for issuing mechanical licenses" was being truthfully forthcoming in its statements. After all, unlike HFA, Kobalt (and Eight Mile) did not have access to the Usage Reports provided by Spotify to HFA, and therefore had no way to ascertain the truthfulness of the royalty information being provided to them.

101.    Further, the industry custom and practice in the record business is that by sending royalty statements, the sender is representing that a valid license is in place. This is especially true of HFA, which since the 1930's has sent royalty statements and payments to music publishers based on mechanical licenses in place. For decades, HFA had been in the business ensuring that distributors who would reproduce and distribute musical works in phonorecords and digital phonorecord deliveries first have a mechanical license in place. So, when music publishers like Kobalt or Eight Mile receive mechanical "royalty statements" and payments from HFA, it expects that the mechanical licenses upon which such royalties are based to already be in place.

102. Additionally, on information and belief, HFA has issued fraudulent, backdated NOI's for the Eight Mile Compositions to Kobalt. Each of these purported NOI's contained an "Expected Date of Distribution" that occurred several years prior to the date the NOI was actually issued. As such, the NOI's sent to Kobalt were intentionally designed to imply that (1) they were only copies of NOI's previously provided to Eight Mile and (2) they were being provided to Kobalt only to serve as evidence that the "royalty statements" provided to it by HFA were accurate. Kobalt reasonably relied on these NOI's as proof that Spotify had mechanical licenses for the Eight Mile Compositions and of the veracity of the "royalty statements" it received because, as noted above, (1) HFA was informed on numerous occasions that Kobalt did not have licensing authority for the Eight Mile Compositions, (2) the NOI's were designed to imply that they were only copies of NOI's previously sent to Eight Mile, and (3) HFA had established over many decades a course of dealing such that it would only prepare and send royalty statements to copyright owners with respect to songs that had a valid mechanical license in place.

103. As noted above, beginning in 2019, HFA began sending backdated NOI's to Eight Mile, which were designed to deceive Eight Mile into believing that HFA had previously issued the NOI's before Spotify's exploitation of the identified compositions, and has continued to forward such NOI's since. In other words, HFA, as part of wrongful actions with Spotify to commit copyright infringement and under its supervision, attempted to deceive both Kobalt and Eight Mile into believing that NOI's had been timely issued.

104. Like the NOI's that HFA sent to Kobalt, the NOI's that it sent to Eight Mile contained an "Expected Date of Distribution" that occurred several years prior to the date the NOI was actually issued. Upon information and belief, the "Expected Date of Distribution" that HFA included in both the Kobalt and Eight Mile NOI's was provided to it by Spotify. In other words,

40

not only did HFA make these representations despite active knowledge of Spotify's infringing activities, but Spotify was also an active orchestrator of these activities despite its knowledge of its own infringement. With respect to both the fraudulent NOI's and "royalty statements", Spotify would have known that it did not have mechanical licenses in place for the Eight Mile Compositions for the many reasons discussed herein, including the License Status Reports provided to it by HFA. HFA could have refused to send out the backdated NOI's or "royalty statements" for unlicensed works. It did not and is liable for contributory and vicarious infringement for this among other reasons discussed herein.

105.    It is clear that HFA and Spotify conspired to distribute the "royalty statements" and NOI's to conceal Spotify's infringement from Kobalt and Eight Mile and enable Spotify to continue its infringing activities. HFA's actions not only contributed to the sustainability of Spotify's infringement, but directly induced and enabled the continued infringement of the Eight Mile Compositions by Spotify.

106.    It should also be noted that HFA's ability to conceal Spotify's infringement of the Eight Mile Compositions was especially vital to Spotify's financial success. As already noted, Spotify's ability to raise capital in the run up to its initial public offering was heavily dependent upon its ability to stream iconic compositions like "Lose Yourself" on its platform. Without these investments, Spotify may have not become the industry juggernaut that it is today, with a reported current market cap at approximately $44.96 billion. However, because of Spotify's failure to issue an NOI prior to exploiting the Eight Mile Compositions, Spotify was required to contract into a direct agreement with Eight Mile before it could stream recordings made by Eminem that embodied the Eight Mile Compositions on its platform.

107.     Eight Mile, who is the only party capable of granting a license for the Eight Mile Compositions, would have never voluntarily granted direct mechanical licenses to Spotify for these works based upon a statutory rate, had it uncovered that Spotify had failed to timely acquire a compulsory mechanical license for the Eight Mile Compositions. Rather, Eight Mile would demand, like others have received, equity in Spotify, and it would have required a much higher mechanical royalty rate for the direct license, or else it would not have allowed its musical compositions to stream on Spotify. However, through Defendants' fraudulent acts in support of their scheme of willful copyright infringement, Spotify, with HFA's support, was able to conceal its infringement and circumvent the need to contract with Eight Mille during Spotify's capital raising during the run up to its public offering. Had a licensing agreement been entered into between Spotify and Eight Mile during this time, Eight Mile would have benefited from a substantially superior bargaining position than if such an agreement were entered into today.

108.     Throughout the entirety of Spotify's willful infringement of the Eight Mile Compositions, HFA maintained the right and ability to supervise the infringing activity and possessed the ability to prevent or limit the infringing activity from occurring. HFA could have, at any time during Spotify's infringement, sought a licensing arrangement with Eight Mile for the Eight Mile Compositions, refused to continue to send out the aforementioned "royalty statements" and backdated NOI's, or informed Eight Mile of Spotify's willful infringement of the Infringed Work. However, rather than prevent this infringement from occurring, HFA actively assented to and contributed in the infringement through its acts described herein in exchange for monetary compensation by Spotify. These acts directly violate HFA's equitable duty, pursuant to its distribution of royalty payments and statements to Kobalt, to provide accurate and material

Case 3:19-cv-00736   Document 97   Filed 07/01/20   Page 42 of 52 PageID #: 824

information pertaining to its calculation of the royalties. This information includes the status of Spotify's mechanical licenses and its exploitation of the Eight Mile Compositions.

109.　Spotify, with HFA's support, has continued to exploit compositions, including the Eight Mile Compositions, without a license to do so and has therefore engaged in continuous actionable acts of copyright infringement. As a result of the wrongdoing alleged herein, Plaintiff has suffered millions of dollars in lost royalty revenues and contractual opportunities.

110.　Spotify's public defense as to its wrongdoing has been to claim that the data are simply not available to track the compositions and the sound recordings that embody them on its service in order to prevent wholesale copyright infringement. Yet, as will be shown, that position is simply untrue. In fact, as noted above, Defendants failed to seek mechanical licenses even when composition information was directly provided to them.

111.　Spotify's business practices are reminiscent of the primitive illegal file sharing companies. This is shocking considering the record companies that once made headlines for vigorously pursuing claims against Napster, children, grandparents, and others, are the same companies that have invested in Spotify with a knowledge of Spotify's lack of systems necessary to properly license and properly pay for the use of music. However, the fact that the major music companies collectively stood to make (and now have made) billions of dollars with Spotify's initial public offering may explain their actions (or lack thereof).

112.　By knowingly reproducing and distributing musical compositions without the licenses necessary to legally reproduce and distribute the music, Spotify has been and is willfully infringing upon the copyrights Eight Mile owns and administers, as well as the copyrights of music publishers that are not party to this litigation. As Spotify has admitted, being the market leader in number of compositions available through its interactive streaming service is important for Spotify

43

to be competitive, and the Eight Mile Compositions have a direct impact on Spotify's market value, advertising, and other revenues, and profits.

113.    All of the wrongdoing alleged herein is continuing, and the wrongful acts described herein have all continued within the three years of the filing of this First Amended Complaint.

## CAUSES OF ACTION

## COUNT I

## DIRECT COPYRIGHT INFRINGEMENT

## (Against Spotify)

114.    Eight Mile repeats and re-alleges each of the foregoing paragraphs, as though fully set forth herein.

115.    Under § 106 of the Copyright Act, the copyright owner of a musical composition has the exclusive rights to reproduce and distribute the composition in phonorecords. 17 U.S.C. § 106(1) and (3). This includes the exclusive rights to make or authorize DPDs, interactive streams, and limited downloads of the musical composition through subscription or non-subscription online digital music services. *See* 17 U.S.C. § 115(d), 37 C.F.R. §§385.10, 385.11.

116.    Eight Mile owns and administers the Eight Mile Compositions and has standing to bring this action for copyright infringement because of its ownership interest in the musical compositions at issue. Each of the musical compositions administered by Eight Mile has been reproduced and/or distributed by Spotify through its interactive streaming service (including interactive streaming and limited downloads), and Spotify has also made server copies thereof during the last three years, all without the required reproduction licenses.

117.    Spotify has thus made unauthorized reproductions and engaged in unauthorized distributions of the Eight Mile Compositions. The infringement of these copyrights is in violation of 17 U.S.C. § 106, *et seq.* and § 501.

118.    Spotify has violated many of the exclusive rights enumerated under Section 106 of the United States Copyright Act by its activities discussed above. Among other things, each interactive stream and/or limited download of the Eight Mile Compositions reproduced by Spotify and/or distributed to end-users constitutes a separate and distinct act of infringement, for which Spotify is a direct infringer.

119.    Spotify's conduct has at all times been knowing, willful, and with complete disregard of Eight Mile's rights.

120.    The infringement by Spotify has been, and continues to be, willful and knowing.

121.    As discussed and alleged fully above, Spotify has not met the requirements of the MMA to enjoy immunity from damages for profits attributable to the infringement, statutory damages, or attorneys' fees.

122.    Pursuant to 17 U.S.C. § 504(b), Eight Mile is entitled to actual damages, including the substantial profits of Spotify, as will be proven at trial. In the alternative, Eight Mile requests the maximum amount for willful statutory damages, one hundred and fifty thousand dollars ($150,000), for each of the 243 of the Eight Mile Compositions involved in this action identified on Exhibit A hereto.

123.    To the extent that the MMA bars Eight Mile from asserting already vested claims and pre-existing remedies under the Copyright Act, Eight Mile also requests that the MMA's retroactive elimination of profits attributable, statutory damages and attorneys' fees be declared unconstitutional

45

as a denial of procedural and substantive due process, and an unconstitutional taking of vested property rights.

124.    Eight Mile also asks to be awarded its costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505.

## COUNT II

## CONTRIBUTORY COPYRIGHT INFRINGEMENT

### (Against HFA)

125.    Eight Mile repeats and re-alleges each of the foregoing paragraphs, as though fully set forth herein.

126.    As discussed and alleged fully above, Spotify engaged in the willful and knowing copyright infringement of the Eight Mile Compositions in violation of 17 U.S.C. § 106, et seq. and § 501.

127.    HFA was at all times knowledgeable of, or had reason to know of, Spotify's direct infringement of the Eight Mile Compositions. This is because, as discussed and alleged fully above, among other things, HFA, among the other reasons discussed herein, receives Usage Reports from Spotify which detail which sound recordings are being streamed on Spotify's platform, including the date and quantity of these streams. Through either the comparison of these files, or through HFA's duties administering licenses for Spotify and managing the calculation and distribution of mechanical royalties, HFA would have known that Spotify was directly infringing the Eight Mile Compositions. HFA also had direct communications with Eight Mile and Kobalt, discussed herein, which would have alerted it to the fact that the Eight Mile Compositions were unlicensed.

46

128.    HFA materially contributed to Spotify's infringement by sending the aforementioned "royalty statements" all the way to the present as discussed fully above, and backdated NOI's to Kobalt and Eight Mile that it knew to be ineffective. Through these actions, HFA enabled Spotify's direct infringement of the Eight Mile Compositions and ensure that such infringement was substantially certain to continue. HFA's actions further guaranteed with substantial certainty that Spotify would expand upon its direct infringement of the Eight Mile Compositions in the future. HFA distributed these statements and backdated NOI's within three years of the filing of this Amended Complaint, and materially contributed to the infringement by Spotify by doing so.

129.    HFA's material contributions to Spotify's direct infringement of the Eight Mile Compositions, as well as its role as a practical partner with Spotify, as that term is understood under the law, subjects it to joint and several liability for damages and profits of Spotify and HFA resulting from the infringement, or in the alternative statutory damages of $150,000 per composition infringed. HFA is not a covered entity under the MMA, and does not enjoy any provisional immunity from liability under the MMA.

## COUNT III

## VICARIOUS COPYRIGHT INFRINGEMENT

### (Against HFA)

130.    Eight Mile repeats and re-alleges each of the foregoing paragraphs, as though fully set forth herein.

131.    As discussed and alleged fully above, Spotify engaged in willful and knowing copyright infringement of the Eight Mile Compositions in violation of 17 U.S.C. § 106, et seq. and § 501.

47

132.    Throughout the entirety of Spotify's infringement of the Eight Mile Compositions, HFA maintained the right and ability to supervise the infringing activity and possessed the ability to prevent or limit the infringing activity from occurring. At any time during this infringement, HFA could have sought a licensing arrangement with Eight Mile for the Eight Mile Compositions, refused to continue to send out the aforementioned "royalty statements" and backdated NOI's, or informed Eight Mile of Spotify's willful infringement of the Eight Mile Compositions. However, rather than prevent this infringement from occurring, HFA actively assented to and contributed in the infringement through its fraudulent acts in exchange for monetary compensation by Spotify.

133.    HFA also enjoyed a direct financial benefit from Spotify's infringement of the Eight Mile Compositions in the form of monetary compensation in exchange for its supervision of the infringing activities and its cooperation with Spotify.

134.    HFA's role as a vicarious infringer, as well as its role as a practical partner with Spotify, as that term is understood under the law, subjects it to joint and several liability for damages and profits of Spotify and HFA resulting from the infringement,  or in the alternative statutory damages of $150,000 per composition infringed. HFA is not a covered entity under the MMA, and therefore does not enjoy any provisional immunity from liability under the MMA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants and for the following relief:

A.    A declaration that Spotify has willfully infringed the Eight Mile Compositions in violation of the Copyright Act;

B.    A declaration that Spotify is directly liable for copyright infringement;

C.    A declaration that HFA is contributorily and/or vicariously liable for copyright infringement;

48

D.      A declaration that Spotify does not qualify for the MMA limitation from damages;

E.      A declaration that HFA does not qualify for the MMA limitation from damages;

F.      A declaration that the MMA's retroactive elimination of damages for profits attributable to infringement, statutory damages, and attorneys' fees is unconstitutional as applied to Eight Mile's circumstances;

G.      A declaration that Eight Mile is entitled to receive all revenue associated with all exploitations of the Eight Mile Compositions, commencing from the date of judgment and for all amounts not taken into consideration in the judgment;

H.      An award of damages pursuant to 17 U.S.C. § 504(b), including actual damages, inclusive of the injury to the market value of their copyright in the Eight Mile Compositions, and the profits of Defendants as will be proven at trial, including advertising revenue and the value of the equity interest Eight Mile was deprived of by virtue of the infringement, or, in the alternative, the maximum amount of statutory damages pursuant to 17 U.S.C. § 504(c), one hundred and fifty thousand dollars ($150,000.00) for each act of willful infringement with respect to each of the musical compositions involved in the action;

I.      An award of attorneys' fees and full costs pursuant to 17 U.S.C. § 505 and under other applicable law;

J.      For pre-judgment and post-judgment interest according to law, as applicable; and

K.      For such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to the Federal Rules of Civil Procedure Rule 38(b), and otherwise, Plaintiff respectfully demands a trial by jury.

49

Dated: July 1, 2020

By: /s/ Richard S. Busch
Richard S. Busch (TN Bar # 14594)
KING & BALLOW
315 Union Street, Suite 1100
Nashville, TN 37201
Telephone:     (615) 726-5422
Facsimile:     (615) 726-5417
rbusch@kingballow.com


James F. Blumstein (TN Bar # 004147)
Of Counsel
Vanderbilt University
131 21st Avenue South
Nashville, TN 37203
Telephone:     (615) 343-3939
Facsimile:     (615) 322-6631

*Attorneys for Plaintiffs*

50

# CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing First Amended Complaint has been served upon the following parties in this matter using the ECF system this 1st day of July, 2020. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt, including the following:

NEAL & HARWELL, PLC
Aubrey B. Harwell III (BPR #017394)
Marie T. Scott (BPR # 032771)
1201 Demonbreun Street, Suite 1000
Nashville, Tennessee 37203
Telephone: (615) 244-1713
Facsimile: (615) 726-0573
tharwell@nealharwell.com
mscott@nealharwell.com

Allison Levine Stillman*
Matthew D. Ingber*
Rory K. Schneider*
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 506-2500
mingber@mayerbrown.com
astillman@mayerbrown.com
rschneider@mayerbrown.com

Andrew J. Pincus*
Archis A. Parasharami*
MAYER BROWN LLP
1999 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 263-3328
apincus@mayerbrown.com
aparasharami@mayerbrown.com

Carey R. Ramos*
Kathleen M. Sullivan*
Cory Struble*
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor

51

New York, NY 10010
Telephone: (212) 895-2500
kathleensullivan@quinnemanuel.com
careyramos@quinnemanuel.com
corystruble@quinnemanuel.com

Thomas C. Rubin*
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
600 University Street, Suite 2800
Seattle, WA 98101
Telephone : (206) 905-7000
tomrubin@quinnemanuel.com

Robert P. Vance, Jr.*
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
bobbyvance@quinnemanuel.com

*Attorneys for Spotify USA Inc.*

/s/ Richard S. Busch
*Attorney for Plaintiffs*