## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| EIGHT MILE STYLE, LLC; MARTIN AFFILIATED, LLC, *Plaintiffs*, v. SPOTIFY USA INC., *Defendant.* | **Civil Case No. 19-CV-00736** **Hon. Aleta A. Trauger** **JURY DEMAND** |
| SPOTIFY USA INC., *Third-Party Plaintiff,* v. KOBALT MUSIC PUBLISHING AMERICA, INC., *Third-Party Defendant.* | |

## MEMORANDUM IN OPPOSITION TO DEFENDANT HARRY FOX AGENCY LLC'S MOTION TO DISMISS PLAINTIFFS' CLAIMS FOR FAILURE TO STATE A CLAIM FOR RELIEF AND FAILURE TO PLEAD FRAUD WITH PARTICULARITY

Plaintiff Eight Mile Style, LLC and Martin Affiliated, LLC ("Eight Mile") submits the following Opposition to Defendant Harry Fox Agency LLC ("HFA")'s Motion to Dismiss. ("Motion") (Dkt. No. 127).

## **OVERVIEW**

HFA has moved to dismiss Counts II (contributory copyright infringement) and III (vicarious copyright infringement) of Eight Mile's First Amended Complaint ("FAC") pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure. HFA erroneously argues that 1) Counts II and III fail to state a claim upon which relief can be granted, and 2) to the extent Counts II and III plead fraud, that

1

Eight Mile has failed to plead such fraud with sufficient particularity.

HFA has premised its Motion on a mixture of wildly false statements and patent mischaracterizations of law, each of which is addressed below. As an overview of its Motion, HFA states in its Memorandum in Support of its Motion ("Memorandum") (Dkt. No. 128) that its Motion should be granted because Eight Mile has sought to impose a duty upon HFA to police Eight Mile's copyrights, and that the only action that Eight Mile has accused HFA of is sending Notices of Intention to Obtain a Compulsory License for Making and Distributing Phonorecords ("NOIs"), on Spotify's behalf, which contained true and accurate information. This overview is a complete mischaracterization of Eight Mile's pleadings and the facts underlying this litigation.

As noted in the FAC, Defendants Spotify USA, Inc. ("Spotify") and HFA ("collectively "Defendants") jointly conspired to engage in mass copyright infringement with respect to 243 musical compositions owned and exclusively administered by Eight Mile ("Eight Mile Compositions").[1] (Dkt. No. 97, ¶¶4, 31). Between 2011 and present, pursuant to its conspiracy with HFA, Spotify illegally streamed sound recordings embodying the Eight Mile Compositions billions of times across its platform. (Dkt. No. 97, ¶94). HFA was Spotify's sole licensing agent and administrator during the entirety of this time. (Dkt. No. 97, ¶97). However, neither Spotify nor HFA ever acquired any mechanical licenses, direct, affiliate, implied, or compulsory, to reproduce or distribute the Eight Mile Compositions. (Dkt. No. 97, ¶4). Rather, HFA worked in tandem with Spotify to distribute "backdated NOIs and falsified 'royalty statements'" designed to cover up Spotify's widespread copyright infringement. (Dkt. No. 97, ¶55).

Under the United States Copyright Act, the owner of a copyright is entitled to certain exclusive rights, including the exclusive rights to reproduce and distribute a musical work. (Dkt. No. 97, ¶115). Every sound recording contains two separate and distinct copyrights–one copyright for the sound

---

[1] Of course, Eight Mile herein is not the only victim of this conspiracy. As pleaded throughout the FAC, basically the entire music industry were victims of this wrongdoing. (Dkt. No. 97, ¶¶15, 81, 109)

recording itself and one copyright for the underlying musical composition. (Dkt. No. 97, ¶70). Spotify will often make different recordings of a composition available for streaming on-demand, which Spotify displays through an interface in conjunction with the name of the artist performing the recording, the name of the recording and other "metadata," and a "play" button that the user can click to play the song. (*Id*.). In all cases, to allow for the on-demand interactive stream of a song, Spotify must have two separate licenses and pay two separate royalties. (*Id*.). One license is for the sound recording and the second, separate license, is for the embodied musical composition. (*Id*.). The former generates revenue for the record label, while the latter generates revenue for songwriters and their music publishers. (*Id*.)

A mechanical license grants the right to reproduce and distribute copyrighted musical compositions for use on compact discs, records, tapes, ringtones, permanent digital downloads, interactive streams, and other digital formats. (Dkt. No. 97, ¶71). Anyone wishing to use a musical work is required to license the composition separately from the recording either through a direct voluntary mechanical license secured by negotiating with individual copyright owners, or, in the United States, through a compulsory mechanical license. (*Id*.).

In order to obtain a compulsory license under the Copyright Act, as detailed in Section 115, a distributor or prospective licensee, such as Spotify, is required to send an NOI to each copyright owner before or within thirty (30) days after making a phonorecord embodying the musical composition, and before distributing the work. (Dkt. No. 97, ¶73). If the name and address of the copyright owner is not known, the distributor or prospective licensee, after putting effort into finding them, is then required to file the NOI in the Licensing Division of the Copyright Office, and then submit the statutory filing fee for each title listed in the notice in a single payment and make checks payable to the Register of Copyrights or authorize deduction from a deposit account for the filing fee. (*Id*.).

Under United States Copyright law, the failure to timely file or serve an NOI forecloses the possibility of a compulsory license and, in the absence of a negotiated license, renders the making and

distribution of phonorecords an act of copyright infringement with respect to the underlying musical composition. (Dkt. No. 97, ¶74). Here, Spotify reproduced and distributed each of the Eight Mile Compositions without first acquiring a mechanical license, whether voluntary or compulsory. (Dkt. No. 97, ¶¶12, 31, 55-56, 109, 116). As such, Spotify not only engaged in direct copyright infringement, but its actions barred it from being able to secure compulsory licenses in the Eight Mile compositions subsequent to the respective dates of infringement.

Even if Defendants had timely obtained licenses for the reproduction and distribution of the Eight Mile Compositions, which they did not, Section 115 of the Copyright Act requires that the licensee follow the terms of a direct license or the statutory requirements for a compulsory license, whichever is applicable. (Dkt. No. 97, ¶75). The statutory requirements for a compulsory license include, but are not limited to: (1) making accurate royalty payments accompanied by a compliant monthly accounting statement, (2) providing itemized details as to how the per stream rate was calculated, (3) rendering annual certified accountings to the copyright owner or authorized agent, (4) making timely payments to the administrator on or before the 20th day of each month for every phonorecord/recording made and distributed in accordance with the license, and (5) curing any breach of these requirements within 30 days of the notification. (*Id*.).

At no point did HFA, acting as Spotify's agent, provide accurate and timely royalty payments and statements of account. (Dkt. No. 97, ¶¶98-99). Afterall, it would have been impossible to calculate such royalties as Spotify was barred from obtaining compulsory licenses in the Eight Mile Compositions and Eight Mile never granted mechanical licenses to Spotify for the reproduction or distribution of the Eight Mile Compositions. As such, there was no rate for HFA to base its royalty calculations. Nonetheless, HFA created and distributed sham royalty statements and accompanying royalties to Kobalt Music Publishing America, Inc. ("Kobalt"), the entity authorized to collect royalties from licenses validly made for the Eight Mile Compositions. (Dkt. No. 97, ¶¶2-5, 98-99).

4

HFA created and distributed the false royalty statements and associated (albeit woefully inadequate) royalties with the intent of deceiving Kobalt and Eight Mile into believing that (1) Spotify had acquired licenses for each of the Eight Mile Compositions, and (2) Spotify was meeting its Section 115 obligations to provide accurate and timely royalty payments and statements of account royalties. (Dkt. No. 97, ¶¶4, 99). HFA's intent to deceive Kobalt and Eight Mile is demonstrated by the fact that even had Defendants properly acquired compulsory licenses through the issuance of NOIs, the royalties accounted for and paid to Kobalt by HFA were significantly less than what Spotify would have been required to pay based on the statutory rate. (Dkt. No. 97, ¶3). This means that not only was HFA basing its royalty statements on a non-existent licensing rate but also that it was basing said reports on false usage information. (Dkt. No. 97, ¶3).

HFA has been the preeminent mechanical licensing entity in the United States, representing music publishers and songwriters for more than ninety years. (Dkt. No. 97, ¶, 5, 101). It has been the practice of HFA to only send out royalty statements when proper licenses are in place. (Dkt. No. 97, ¶102). As a result, Spotify, having hired HFA—a licensing entity with which publishers and songwriters had become so familiar, knew that publishers and songwriters, including Eight Mile herein, would believe that mechanical or proper compulsory licenses were in place when receiving such royalty statements. It was through these actions, as well as through the issuance of backdated and false NOIs, that HFA materially contributed to Spotify's infringement, and is also liable for vicarious infringement.

As noted, HFA's efforts to deceive Kobalt and Eight Mile were not limited to the creation and distribution of sham royalty statements, but such efforts also included the distribution of fraudulently backdated NOIs to Kobalt for the Eight Mile Compositions. (Dkt. No. 97, ¶102). These NOIs, each of which was, upon information and belief, distributed after Spotify's date of first distribution, contained an "Expected Date of Distribution" that occurred several years **prior** to the date the NOI was actually issued. (*Id.*) As such, the NOIs sent to Kobalt were intentionally designed to imply that (1) they were

5

only copies of NOIs previously provided to Eight Mile and (2) they were being provided to Kobalt only to serve as evidence that the "royalty statements" provided to it by HFA were accurate. (*Id.*) Kobalt reasonably relied on these NOIs as proof that Spotify had mechanical licenses for the Eight Mile Compositions. (*Id.*)[2]

Although HFA has attempted in its Memorandum to shift the burden of providing accurate NOIs and royalty statements solely onto Spotify, HFA was the entity that prepared and distributed the fraudulent documents despite knowing at all times that Spotify was engaged in the direct infringement of the Eight Mile Compositions and that the royalty statements and NOIs were fraudulent. (Dkt. No. 97, ¶127). Contrary to HFA's contentions, Eight Mile's claims against HFA are not premised on a failure by HFA to "police its copyrights." (Dkt. No. 128, Page 15). Rather, Eight Mile's claims against HFA are based on HFA's willful enablement of Spotify's infringement of the Eight Mile Compositions and HFA's scheme and actions to conceal such infringement.

In exchange for its coverup of Spotify's copyright infringement, HFA received monetary compensation from Spotify. (Dkt. No. 97, ¶108). Even if Spotify was the actor who carried out the reproduction and distribution of the Infringing Works, HFA's actions, which directly enabled, encouraged, induced, and materially contributed to Spotify's copyright infringement, nonetheless subjects it to contributory liability.

HFA is also vicariously liable for Spotify's infringement due to 1) its right and ability to supervise and prevent the infringing conduct as Spotify's sole licensing agent and administrator during the time that sound recordings embodying the Eight Mile Compositions were streamed on Spotify's

---

[2] Beginning in 2019, HFA also began sending backdated NOIs to Eight Mile designed to appear that they were copies of NOIs previously issued to Kobalt. (Dkt. No. 97, ¶12). In addition, on information and belief, any NOIs previously sent to Kobalt also were backdated and ineffective because they were sent well after the Eight Mile Compositions began streaming on Spotify's service. (Dkt. No. 97, ¶56). Those NOIs were also sent to deceive Kobalt and Eight Mile into believing that effective compulsory licenses were in place. (Dkt. No. 97, ¶¶3, 12, 13, 92, 102, 103, 104, 105). Furthermore, any such NOIs were also ineffective because Kobalt had no authority to issue mechanical licenses on behalf of Eight Mile for Spotify's exploitation of the Eight Mile Compositions in the United States.

platform, and 2) its direct financial benefit from Spotify's infringement of the Eight Mile Compositions in the form of monetary compensation in exchange for its supervision of the infringing activities and its cooperation with Spotify.

However, should this Court find that Eight Mile has not sufficiently pled either of its claims with sufficient particularity, which it believes it has, Eight Mile requests that this Court provide it leave to amend the FAC as justice so requires.

## **STANDARD OF REVIEW**

### I.     **Rule 12(b)(6)**

"A motion to dismiss a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure only tests whether a cognizable claim has been pled. To determine whether a motion to dismiss should be granted, the court examines the complaint, which must contain a short and plain statement of the claim showing that the pleader is entitled to relief. It must also provide the defendant with fair notice of the plaintiff's claim as well as the grounds upon which it rests. While the complaint need not present detailed factual allegations, to be cognizable it must provide more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not suffice." *Jacobs v. Memphis Convention & Visitors Bureau*, 710 F. Supp. 2d 663, 666 (W.D. Tenn. 2010) (citations omitted).

"Likewise, the complaint must contain factual allegations sufficient 'to raise a right to relief above the speculative level[.]' The mere possibility that some set of undisclosed facts will support recovery is insufficient to overcome a 12(b)(6) challenge." *Id.* "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1950, 173 L. Ed. 2d 868 (2009). "On a motion to dismiss under Rule 12(b)(6), the court accepts as true all factual allegations made in the complaint and construes them in the light most favorable to the plaintiff. The court, however, only takes as true well-pled facts, and it will not accept legal conclusions or unwarranted factual inferences." *Jacobs*, 710 F. Supp. 2d at 666-67.

## II.    Rule 9(b)

"Rule 9(b) provides, 'In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.'" *United States ex rel. Hinkle*, No. 3:14-CV-212-TAV-HBG, 2017 U.S. Dist. LEXIS 144187, at *9 (E.D. Tenn. May 30, 2017) (citations omitted). "In complying with Rule 9(b), a plaintiff must minimally 'allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud.' Rule 9(b) is not to be read in isolation, however, but is to be interpreted in conjunction with Rule 8. *See United States ex rel. Bledsoe v. Cmty. Health Sys., Inc*., 501 F.3d 493, 503 (6th Cir. 2007) ("When read against the backdrop of Rule 8, it is clear that the purpose of Rule 9 is not to reintroduce formalities to pleading, but is instead to provide defendants with a more specific form of notice as to the particulars of their alleged misconduct." (internal citations omitted)); *Michaels Bldg. Co. v. Ameritrust Co*., 848 F.2d 674, 679 (6th Cir. 1988) ("[T]he two rules must be read in harmony."). Thus, it is inappropriate to focus exclusively on the fact that Rule 9(b) requires particularity in pleading fraud. This is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules." *Id*. (citations omitted)

"The main purpose of Rule 9(b) is to ensure that defendants receive fair notice of what the claim is and the grounds upon which the claim rests. See *id*. at 680 ("Rule 9(b) does not require omniscience; rather, the Rule requires that the circumstances of the fraud be pled with enough specificity to put defendants on notice as to the nature of the claim."); *Bledsoe*, 501 F.3d at 504 ("Essentially, [a complaint] should provide fair notice to Defendants and enable them to prepare an informed pleading responsive to the specific allegations of fraud."); *United States v. NHC Healthcare Corp*., 115 F. Supp. 2d 1149, 1152 (W.D. Mo. 2000) ("Rule 9(b) was meant to require detailed pleadings in cases of fraud so as to aid a defendant in supporting its case. It was never meant to require a plaintiff to set forth every

factual detail supporting its claim, nor was it meant to fuse the stages of pretrial investigation and discovery."). Consequently, because 'providing the defendant with sufficient information to respond is Rule 9's overarching purpose,' a complaint 'sufficiently pleads the time, place, and content of the alleged misrepresentation so long as it ensures that the defendant possesses sufficient information to respond to an allegation of fraud.'" *Id*. (citations omitted).

"Rule 9(b) 'should not be read to defeat the general policy of "simplicity and flexibility" in pleadings' and should not be construed to impose a policy of pure 'formalism . . . decoupled from the general rule that a pleading must only be so detailed as is necessary to provide a defendant with sufficient notice to defend against the pleading's claims.' The court is permitted to consider the nature and circumstances of the cause of action to determine what is necessary to provide the defendant sufficiently particularized notice, as well as what a plaintiff can reasonably be expected to know at the pleading stage." *Ciccio v. SmileDirectClub, LLC*, No. 3:19-cv-00845, 2020 U.S. Dist. LEXIS 96568, at *30 (M.D. Tenn. June 2, 2020).

## ARGUMENT

### I.    Count II: HFA Is Liable for Contributory Copyright Infringement

#### A.  Legal Standard

As noted in HFA's Memorandum, the Sixth Circuit has recognized dual standards for contributory infringement. The first of these standards is governed by M*etro-Goldwyn-Mayer Studios, Inc. v. Grokster*, wherein the Supreme Court held that "[o]ne infringes contributorily by intentionally inducing or encouraging direct infringement." 545 U.S. 913, 930 (2005). There are two branches: (1) "actively encouraging or inducing infringement through specific acts;" or (2) "distributing a product distributees use to infringe copyrights, if the product is not capable of 'substantial' or 'commercially significant' noninfringing uses." *Id.* at 942.[3]

---

[3] Active inducement exists if the defendant distributes the product "with the object of promoting its use to infringe copyright." *Grokster*, 545 U.S. at 942. Merely knowing of the existence of infringing

The Sixth Circuit has also recognized that contributory infringement occurs when one "with knowledge of the infringing activity, induces, causes, or materially contributes to the infringing conduct of another." *Design Basics, LLC v. Landmark Cmtys., Inc.*, No. 1:17-cv-449, 2019 U.S. Dist. LEXIS 92896, at *17 (S.D. Ohio June 4, 2019) (quoting *Bridgeport Music, Inc. v. Rhyme Syndicate Music*, 376 F.3d 615, 621 (6th Cir. 2004)).

Although *Bridgeport* predates *Grokster*, Courts in this Circuit have recognized a co-existence between the two tests. See e.g. *Gray-El v. Jennifer Lopez/Nuyorican Prods.*, No. 19-10952, 2019 U.S. Dist. LEXIS 230908, at *41-42 (E.D. Mich. Dec. 18, 2019) (states that the *Grokster* test applies to "inducement of copyright infringement claims," while the Bridgeport test applies to "contributory copyright infringement" claims.); *Bell v. Worthington City Sch. Dist.*, No. 2:18-cv-961, 2020 U.S. Dist. LEXIS 96424, at *30-31 (S.D. Ohio June 2, 2020) (recognizes the applicability of both the *Grokster* and *Bridgeport* tests for contributory copyright infringement).

This co-existence approach is consistent with the approaches taken by other Circuits. *See e.g. 43 N. Broadway LLC v. Essential Media Grp. LLC*, No. 17-24518-CV, 2018 U.S. Dist. LEXIS 97497, at *6 (S.D. Fla. June 11, 2018) (citation omitted) ("The Eleventh Circuit 'has stated the well-settled test for a contributory infringer as "one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another."'"); *Cobbler Nev., LLC v. Gonzales*, 901 F.3d 1142, 1147 (9th Cir. 2018) (citations omitted) ("We have adopted the well-settled rule that '[o]ne infringes contributorily by intentionally inducing or encouraging direct infringement.' Stated differently, 'liability exists if the defendant engages in personal conduct that encourages or assists the infringement.' A claim for contributory infringement requires allegations that the defendant is 'one

_____

material on the accused secondary infringer's system and failing to take action to remove can be enough. Where "a computer system operator learns of specific infringing material available on his system and fails to purge such material from the system, the operator knows of and contributes to direct infringement." *Id.* at 1022.

who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another.'"); *Oppenheimer v. Scarafile*, Civil Action No. 2:19-cv-3590-BHH, 2020 U.S. Dist. LEXIS 213742, at *13 (D.S.C. Nov. 16, 2020) (citation omitted) ("Under a theory of contributory infringement, 'one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another' is liable for the infringement, too.'"; *Merchdirect LLC v. Cloud Warmer, Inc.*, No. 17-CV-4860 (RRM) (ARL), 2019 U.S. Dist. LEXIS 173971, at *13 (E.D.N.Y. Sep. 30, 2019) (citation omitted) ("A contributory infringer is 'one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another.'"); *Infodeli v. W. Robidoux*, No. 4:15-CV-00364-BCW, 2017 U.S. Dist. LEXIS 228985, at *9 (W.D. Mo. Aug. 31, 2017) (citation omitted) ("One who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another may be liable as a 'contributory' copyright infringer.").

These cases clearly demonstrate that the *Grokster* test did not supersede the *Bridgeport* test as HFA claims in its Memorandum. However, irrespective of which standard applies, HFA would nonetheless be liable for contributory copyright infringement.

**B. HFA Has Actively Encouraged, Induced, and Contributed to Spotify's Infringement Through Its Actions**

As noted above, Spotify has illegally streamed sound recordings embodying the Eight Mile Compositions billions of times across its platform since 2011, and throughout the entirety of this time, HFA was both aware of this infringement and was Spotify's sole licensing agent and administrator. Although it is presently unclear, absent discovery, when HFA and Spotify first conspired to conceal Spotify's copyright infringement of the Eight Mile Compositions[4], it is indisputable that absent HFA's

---

[4] Upon information and belief, Spotify provides HFA, as part of their contractual relationship, License Request Reports that detail the sound recordings that have been recently added to Spotify's platform for which it requires mechanical licenses. (Dkt. No. 97, ¶95). Upon further information and belief, Spotify also provides HFA with periodic Usage Reports that detail which sound recordings are being streamed on Spotify's platform, including the date and quantity of these streams. (Dkt. No. 97, ¶96).

11

creation and distribution of fraudulent NOIs and royalty statements that Spotify would have been unable to conceal its infringements for more than a short period after launching in the United States in 2011, and thus would have been unable to commit the vast majority of infringing acts alleged in the FAC. This is significant because this case does not involve an isolated incident of infringement that occurred in 2011 but rather billions of independently actionable infringing reproductions and distributions that continued through the filing of this litigation. *See e.g. Castronuovo v. Sony Music Entm't*, No. 3:10-cv-0428, 2013 U.S. Dist. LEXIS 123785, at *7 (M.D. Tenn. Aug. 29, 2013) ("[E]ach act of infringement is a distinct harm."

In order for Spotify to engage in its scheme to commit copyright infringement, Spotify needed a co-conspirator who was both 1) willing to create and distribute the fraudulent NOIs and royalty statements and 2) had a trusted industry reputation that would dissuade third-party inquiry into the legitimacy of the fraudulent documents.[5] HFA, who has cultivated a reputation since the 1930's of only sending royalty statements and payments to music publishers and copyright owners with respect to songs that had a valid mechanical license in place, and who promotes itself on its website as "America's premiere licensing agent for issuing mechanical licenses," was the cohort Spotify needed to enact its widespread infringement of the Eight Mile Compositions without detection. (Dkt. No. 97, ¶¶100-102).

---

Because HFA was Spotify's sole licensing agent and administrator during the time that sound recordings embodying the Eight Mile Compositions were streamed on Spotify's platform, HFA would have known whether Spotify was licensed to stream each of its works at all times. (Dkt. No. 97, ¶97).

Additionally, because HFA was required to issue monthly statements of account for each of the Eight Mile Compositions, HFA would have been fully aware when it created its monthly statements of account that 1) the Eight Mile Compositions were unlicensed and 2) that there was no agreed upon royalty rate that would enable HFA to calculate royalties. As such, even if HFA didn't know about Spotify's intent to upload an Infringing Work prior to its upload, HFA would have known about the work's infringing nature immediately upon learning about the upload.

[5] This is due in part to the numerous litigations for copyright infringement in which Spotify has found itself, notably the *Lowery* and *Ferrick* class action lawsuits discussed in the FAC. It should be noted however that those matters are distinct from the facts here as those matters concerned general copyright infringement by Spotify without the added element of Defendants creating and distributing fraudulent NOIs and royalty statements.

It was HFA's reputation that allowed Defendants to deceive music publishers like Kobalt or Eight Mile into believing that when they received purported mechanical royalty statements and payments from HFA that those statements and payments were based upon valid mechanical licenses being in place. (Dkt. No. 97, ¶101).

Courts have recognized that acts taken to prevent a copyright owner from "learn[ing] of and stop[ing] the infringing activities" is sufficient to subject an individual to liability for those infringing activities. *Johnson v. Salomon*, No. 4-73 Civ 536, 1977 U.S. Dist. LEXIS 15735, at *105 (D. Minn. May 25, 1977); *See also Coach, Inc. v. Gata Corp.*, No. 10-cv-141-LM, 2011 U.S. Dist. LEXIS 62317, at *27 (D.N.H. June 9, 2011) ("The fact that a Flea Market employee actually taught a vendor how to conceal infringing merchandise drifts perilously close to, and may well cross, the line between allowing known infringers to use the Flea Market's services and actually inducing infringement.") [6]

If not for HFA's willingness to send the fraudulent NOIs and royalty statements on behalf of Spotify in exchange for monetary contribution, Spotify would not have been enabled to engage in the long-term infringement of the Eight Mile Compositions. Even if Spotify had the technical ability to engage in the limited infringement of musical compositions prior to its infringement being detected, Spotify certainly wouldn't have been able to carry out its scheme long term. As such, it is unlikely that Spotify would have risked engaging in even the short-term infringement of the Eight Mile Compositions without HFA's encouragement to do so.

At the very least, HFA's actions contributed to Spotify's infringing activities. As HFA itself

---

[6] Although *Coach* is a trademark infringement case, this only means that the case required a higher bar to find contributory infringement than in a comparable copyright infringement action, which is satisfied here. *Coach*, 2014 DNH 140 n.6 ("Although the two standards are similar, '[contributory] trademark infringement liability is more narrowly circumscribed than [contributory] copyright infringement.' My statement in *Sapatis* remains true here: 'If a reasonable jury could find that [Plaintiff's] actions satisfied the . . . contributory trademark infringement standard, it could similarly find that they satisfied the less stringent 'material contribution' standard for contributory copyright infringement.'")

acknowledges in its Memorandum, HFA's creation and distribution of fraudulent documents is directly connected to Spotify's own reproduction and distribution of infringing materials. *See* Dkt. No. 128, Pages 17-18 ("Plaintiffs allege HFA 'distributed fraudulent documents,' 'fraudulently' rendered royalty statements, 'fraudulently backdated NOIs,' committed 'fraudulent acts in furtherance of infringement,' and 'fraudulently concealed infringement' by Spotify. (Am. Compl. ¶¶ 1, 2, 5, 12, 51, 94). [...] [T]he fraudulent acts alleged are merely acts of copyright infringement...")

As such, regardless of whether the *Grokster* or *Bridgeport* standard for copyright infringement is applied, Eight Mile has more than sufficiently pled facts, taken as true, to bind HFA for contributory copyright infringement.

## C. HFA Did Not Provide Accurate and Required Information to Eight Mile and Spotify

HFA's Memorandum falsely states that "Plaintiffs do not contend that the expected dates of distribution they received via the NOIs were themselves inaccurate." (Dkt. No. 128, Page 13). This falsity is clearly demonstrated throughout this brief and by even a cursory review of the FAC. For example, the FAC notes,

> "Each of these sent and received purported NOIs, including for 'Lose Yourself,' bear an 'expected' first date of distribution many years before the NOIs were issued. The inclusion of an 'expected date of distribution' in an NOI was clearly meant to convey that the copyrighted musical work for which the compulsory license is sought had not yet been distributed as of the time the NOI was issued. It was only after initially purporting to have licenses, that HFA ultimately came clean to Eight Mile in February, 2019 and admitted, as discussed above, that 'Lose Yourself,' and possibly other Eight Mile Compositions, were in 'Copyright Control,' a category that is used for compositions that are not being licensed." (Dkt. No. 97, ¶12).

Eight Mile further notes,

> "The only benefit of sending an NOI to a copyright owner is that it would provide a compulsory mechanical license for a distributor to exploit the owner's copyright pursuant to statutory requirements. However, for an NOI to be effective, the NOI must be sent by the distributor to the copyright owner prior to any distribution of the copyrighted work to be licensed. Spotify failed however to issue any NOIs prior to its distribution of the Eight Mile Compositions, thus foreclosing its ability to obtain compulsory mechanical licenses. As such, there would be no reason for HFA to issue

14

these purported NOIs except to mislead Kobalt and Eight Mile into believing Spotify had a compulsory license when it did not. In fact, the sending of these backdated NOIs actually represents an admission by Spotify that it knows it was not licensed and has committed willful copyright infringement." (Dkt. No. 97, ¶13).

Given these quotes and others appearing throughout the FAC, it is unclear why HFA has attempted to distort the contents of the FAC. It is similarly bewildering as to why HFA claims that it "cannot be liable for EMS's failure to understand accurate information required by Copyright Office regulations contained in NOIs" (Dkt. No. 128, Page 13) given that the primary basis of Eight Mile's contributory infringement claim against HFA is that it encouraged Spotify to engage in prolonged copyright infringement by creating and distributing fraudulent royalty statements and NOIs intended to deceive Kobalt and Eight Mile. At no point did Eight Mile claim in its FAC, as HFA alleges, that HFA passed along accurate information. (Dkt. No. 128, Page 13).[7]

### D. Eight Mile's Claim Against HFA for Contributory Infringement is Not Based on a Failure by HFA to Police Its Copyrights

HFA's memorandum falsely states that "Plaintiffs allege no such purposeful, culpable expression and conduct by HFA" and that "Plaintiffs improperly seek to impose a duty on HFA to police Plaintiffs' copyrights." (Dkt. No. 128, Page 13). These statements are complete nonsense. As discussed throughout this brief and repeated here, the FAC is full of "purposeful, culpable expression[s] and conduct by HFA." Such examples include the following:

Recognizing that Spotify was not licensed for the Eight Mile Compositions, but to enable Spotify's further exploitation of the Eight Mile Compositions without a license, HFA, as Spotify's licensing agent, on information and belief, as discussed herein, not only sent untimely and ineffective backdated NOIs regarding the Eight Mile Compositions to Kobalt, but in 2019 sent to Eight Mile further untimely, ineffective, and fraudulently

---

[7] HFA's Memorandum also discusses the reasonableness of Kobalt's and Eight Mile's reliance on the information provided to them by HFA. However, the reasonableness of Kobalt's and Eight Mile's reliance is not a matter subject to review for the purposes of HFA's Motion. *See e.g. Jacobs*, 710 F. Supp. 2d at 666-67. ("On a motion to dismiss under Rule 12(b)(6), the court accepts as true all factual allegations made in the complaint and construes them in the light most favorable to the plaintiff. The court, however, only takes as true well-pled facts, and it will not accept legal conclusions or unwarranted factual inferences.") As Kobalt's and Eight Mile's reliance is a statement of fact, rather than a legal conclusion or unwarranted factual inference, the allegations must be accepted as fact for the purposes of HFA's Motion.

backdated NOIs which were designed to imply that they had been previously issued. (Dkt. No. 97, ¶12).

HFA directly, and materially contributed to and facilitated this infringement through its distribution of fraudulent documents and misrepresentations to copyright owners in an effort designed, in part, to conceal Spotify's infringement of the Eight Mile Compositions on its interactive website in Tennessee. (Dkt. No. 97, ¶49).

HFA always had specific knowledge during Spotify's infringement of the Eight Mile Compositions that Spotify intended to infringe and actual[ly] did infringe musical compositions, which included the Eight Mile Compositions. (Dkt. No. 97, ¶49).

HFA actively assented to and contributed in the infringement through its acts described herein in exchange for monetary compensation by Spotify. (Dkt. No. 97, ¶108).

As already noted, it is unclear why HFA has attempted to falsify the contents of Eight Mile's FAC so drastically. This falsification appears to be a disrespectful desperation move made in hopes that this Court will not review the contents of the FAC.

### E. Eight Mile's Claim Against HFA for Contributory Copyright Infringement is Not Pre-empted

HFA's Memorandum notes that Eight Mile's FAC does not state a claim against it for fraud but observes that had such a claim been raised, that the claim would be pre-empted as "the fraudulent acts alleged are merely acts of copyright infringement, are not qualitatively different from its copyright infringement claim and are, thus, preempted by the Copyright Act." (Dkt. No. 128, Pages 17-18). Eight Mile is unsure what if anything there is to respond to here as HFA seems to be discussing a non-existent fraud claim while agreeing that Eight Mile's contributory infringement claim is proper so long as the underlying allegations of fraud are properly pled. HFA's discussion of an unpled claim is inappropriate and thus does not warrant a response at this time.

However, should this court agree with HFA's position that the distribution of fraudulent royalty statements and NOIs constitute copyright infringement, Eight Mile would request leave to amend its FAC to allege direct copyright infringement against HFA. Such an amendment would cause no

prejudice to HFA or any other party as both the allegations raised in the FAC and the relevant discovery sought and relevant to this action would remain unchanged.[8] It would also not result in the need to amend case deadlines. Eight Mile likewise has good cause for any perceived delay to amend its FAC due to the significant time spent by the Parties attempting to resolve this matter through mediation.

### F. Eight Mile's Claim Against HFA for Contributory Copyright Infringement Satisfies the Pleading Requirements of Rule 9(b)

Although HFA's Memorandum makes the conclusory statement that Eight Mile's allegations of fraud lack the particularity required by Rule 9(b), HFA never articulates in what manner Eight Mile's allegations are deficient. As noted above, "Rule 9(b) provides, 'In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.'" *Hinkle*, 2017 U.S. Dist. LEXIS 144187, at *9. Although Rule 9(b) also requires that a plaintiff allege the time, place, and content of the alleged misrepresentation on which he or she relied, a complaint "sufficiently pleads the time, place, and content of the alleged misrepresentation so long as it ensures that the defendant possesses sufficient information to respond to an allegation of fraud." *Id.* at *12.

"Rule 9(b) was meant to require detailed pleadings in cases of fraud so as to aid a defendant in supporting its case. It was never meant to require a plaintiff to set forth every factual detail supporting its claim, nor was it meant to fuse the stages of pretrial investigation and discovery." *Id.* at *11 (citation omitted). For this reason, "[w]here a complaint alleges 'a complex and far-reaching fraudulent scheme,' then that scheme must be pleaded with particularity and the complaint must also 'provide examples of specific' fraudulent conduct that are 'representative samples' of the scheme." *United States ex rel. Goodman v. Arriva Med., LLC*, No. 3:13-cv-0760, 2020 U.S. Dist. LEXIS 50783, at *12 (M.D. Tenn.

---

[8] "In determining what constitutes prejudice, the court considers whether the assertion of the new claim or defense would: require the opponent to expend significant additional resources to conduct discovery and prepare for trial; significantly delay the resolution of the dispute; or prevent the plaintiff from bringing a timely action in another jurisdiction." *Ross v. Kopocs*, No. 1:14-cv-60-SKL, 2015 U.S. Dist. LEXIS 38159, at *4 (E.D. Tenn. Mar. 26, 2015).

Mar. 24, 2020) (citation omitted).

As documented throughout this brief, Eight Mile's FAC clearly identifies with particularity the circumstances surrounding HFA's fraudulent acts, including precise descriptions of HFA's fraudulent representations, HFA's knowledge of the falsity of its representations, and HFA's willful intent to deceive Eight Mile.[9] The FAC also clearly articulates the timing of HFA's misrepresentations, to the extent that it is able[10], and provides representative samples of HFA's scheme to deceive it.[11] The FAC further identifies each of the compositions for which HFA supported Spotify's infringement by sending fraudulent documents. As such, Count II of the FAC clearly satisfies the pleading requirements of Rule

---

[9] E.g.: "Recognizing that Spotify was not licensed for the Eight Mile Compositions, but to enable Spotify's further exploitation of the Eight Mile Compositions without a license, HFA, as Spotify's licensing agent, on information and belief, as discussed herein, not only sent untimely and ineffective backdated NOIs regarding the Eight Mile Compositions to Kobalt, but in 2019 sent to Eight Mile further untimely, ineffective, and fraudulently backdated NOIs which were designed to imply that they had been previously issued. Each of these sent and received purported NOIs, including for 'Lose Yourself,' bear an "expected" first date of distribution many years before the NOIs were issued." (Dkt. No. 97, ¶12); *See also* Dkt. No. 97, ¶¶2, 3, 5, 6, 7, 9, 11, 11, 13, 14, 15, 25, 28, 49, 50, 55, 56, 88, 89, 90, 91, 92, 94, 95, 96, 97, 98, 99, 100, 101, 102, 103, 104, 105, 106, 107, 108, 109, 126, 27, 128, 129, 131, 132, 133, 134.

[10] With respect to the fraudulent NOIs and royalty statements sent to Kobalt, the FAC states "Upon information and belief, these statements were sent by HFA to Kobalt on a monthly basis between 2011 and 2016, and a quarterly basis from 2016 to 2019. In each of these 'royalty statements,' HFA indicates that royalties are being provided pursuant to a previously acquired mechanical license and that the 'royalty statement' accurately reflects the royalties attributable to Eight Mile. Both of these representations were of course untrue given HFA's failure to obtain a mechanical license on behalf of Spotify. Nonetheless, Kobalt, acting on Eight Mile's behalf, relied on the truthfulness of these statements." (Dkt. No. 97, ¶99) The FAC further states that "Spotify also does not have a compulsory license because any NOIs that were sent by HFA were, on information and belief, sent well after the Eight Mile Compositions began streaming on Spotify and were therefore never effective for that and the other reasons set forth herein." (Dkt. No. 97, ¶57).

This Circuit has repeatedly held that plaintiffs are not required to plead with a particularity beyond their ability. *See e.g. Alsbrook v. Concorde Career Colls*., No. 2:19-cv-02583, 2020 U.S. Dist. LEXIS 111551, at *70 (W.D. Tenn. June 25, 2020) (Court recognized that pleading on information and belief satisfies the requirements of 9(b) "where the facts are peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible."

[11] *See e.g.* fn. 9 and 10.

9(b).

## II. Count III: HFA Is Liable for Vicarious Copyright Infringement

### A. Legal Standard

"Vicarious liability exists when (1) a defendant has the right and ability to supervise the infringing conduct and (2) the defendant has an obvious and direct financial interest in the infringement." *Gordon v. Nextel Communs.*, 345 F.3d 922, 925 (6th Cir. 2003) (citing *Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 307 (2d Cir. 1963)). These two elements are independent requirements, meaning each must be present to hold a defendant vicariously liable, and a lack of knowledge of the infringement is irrelevant. *Id.*; *see also Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd*, 545 U.S. 913, 931 n. 9 (2005) (finding liability for vicarious copyright infringement arises "when the defendant profits directly from the infringement and has a right and ability to supervise the direct infringer, even if the defendant initially lacks knowledge of the infringement"). "Thus, '[t]urning a blind eye to detectable acts of infringement for the sake of profits gives rise to liability.'" *Bennett v. Navarre Corp.*, 2008 U.S. Dist. LEXIS 133091, at *21 (M.D. Tenn. Jan. 17, 2008) (citing *A & M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1023 (9th Cir. 2001)). Although vicarious liability is an outgrowth of the doctrine of *respondeat superior*, as long as the required elements are present, a defendant may be held vicariously liable even in the absence of a traditional employer-employee relationship. *Id.*

### B. HFA Had the Right and Ability to Supervise the Infringing Conduct

Under the first requirement, "[w]hat matters is whether [the defendant] had 'the right and ability' to supervise the infringement, not whether [the defendant] in fact supervised it." *Broadcast Music, Inc. v. Meadowlake, Ltd.*, 754 F.3d 353, 355 (6th Cir. 2014).

As noted in the FAC, "HFA was Spotify's sole licensing agent and administrator during the time that sound recordings embodying the Eight Mile Compositions were streamed on Spotify's

platform." (Dkt. No. 97, ¶97). Subject to this role, Spotify provides HFA with full authority and responsibility for entering into licenses and sending Notices of Intent on Spotify's behalf. (Dkt. No. 97, ¶¶97, 98, 132) .

Additionally, "Upon information and belief, Spotify provides HFA, as part of their contractual relationship, License Request Reports that detail the sound recordings that have been recently added to Spotify's platform for which it requires mechanical licenses." (Dkt. No. 97, ¶95). "Upon further information and belief, Spotify also provides HFA with periodic Usage Reports that detail which sound recordings are being streamed on Spotify's platform, including the date and quantity of these streams." (Dkt. No. 97, ¶96). Given that Spotify not only provided HFA with a list of compositions requiring mechanical licenses, but also usage reports, which HFA would have had to regularly refer to when preparing statutorily required monthly royalty statements, it is indisputable that HFA had the right and ability to supervise Spotify's infringing activity. (Dkt. No. 97, ¶108).

Moreover, Spotify's infringement of the Eight Mile Compositions would not have occurred if only HFA had entered into valid mechanical licenses authorizing Spotify's exploitation of the works and followed up with accurate royalty statements and associated royalties, a role which, on paper, HFA was contracted by Spotify to do. Even if HFA were to allege that it had no knowledge of Spotify's infringement of the Eight Mile Compositions, which as discussed herein is impossible given the information that HFA received from Spotify and the fraudulent royalty statements and NOIs it prepared, such knowledge is not required to subject HFA to vicarious liability. *See Gordon v. Nextel Communs*., 345 F.3d 922, 925 (6th Cir. 2003) ("Regardless of the defendants' actual knowledge of the removal or alteration of the copyright information, a party may be held vicariously liable for the actions of others under certain circumstance within the copyright context. Vicarious liability exists when (1) a defendant has the right and ability to supervise the infringing conduct and (2) the defendant has an obvious and direct financial interest in the infringement.").

20

All that matters is that HFA had the right and ability to supervise the infringing conduct, which it did as Spotify's sole licensing agent and administrator during the time that sound recordings embodying the Eight Mile Compositions were streamed on Spotify's platform. As noted in the FAC, HFA was "a practical partner with Spotify" (Dkt. No. 97, ¶134), and as such, had all the information and authority it needed to supervise Spotify's infringing activities.

### C. HFA Had an Obvious and Direct Financial Interest in the Infringement

Under the second requirement, "[f]or vicarious liability to exist, the financial benefit need not be substantial. Instead, there must only be a causal relationship between the infringing activity and any financial benefit defendant reaps." *Bennett*, 2008 U.S. Dist. LEXIS 13309, at *21 (citing *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004)).

HFA's willingness to prepare and send fraudulent NOIs and royalty statements, which were essential to Spotify's ability to engage in the widespread infringement of musical compositions, was an essential component of its relationship with Spotify. (Dkt. No. 97, ¶50). If not for HFA's willingness to oversee Spotify's infringing operations, it is unlikely that Spotify would have agreed to contract with HFA. As the FAC notes, "HFA also enjoyed a direct financial benefit from Spotify's infringement of the Eight Mile Compositions in the form of monetary compensation in exchange for its supervision of the infringing activities and its cooperation with Spotify." (Dkt. No. 97, ¶133). This connection establishes a financial interest in the infringement sufficient to meet the very limited requirement that HFA have a financial interest with a causal relationship to the infringing activity.

## III. Allegations of a Conspiracy

Eight Mile has not alleged an independent cause of action against HFA for conspiracy. Rather, Eight Mile has noted HFA's participation in a conspiracy with Spotify to conceal its widespread infringement of the Eight Mile Compositions as context for Eight Mile's contributory infringement claim against HFA and to aid in the satisfaction of Rule 9(b)'s pleading requirements. As such, HFA's

discussion of an unpled claim does not warrant a response at this time.

**IV. As Discussed Above, The Court Should Not Grant HFA's Motion, But Eight Mile Protectively Requests Leave to Amend in the Event that this Court Grants Any Portion of HFA's Motion to Dismiss**

As discussed above, HFA's Motion is meritless and should be denied. Nonetheless, protectively, Eight Mile requests leave to amend in the event that any portion of HFA's Motion is granted.

"The general rule is that leave to amend is "freely given when justice so requires."" *Brege v. Lakes Shipping Co.*, 225 F.R.D. 546, 549-50 (E.D. Mich. 2004) (citation omitted). "That rule applies especially when a complaint does not allege fraud with particularity." *Id.* (citing *Morse v. McWhorter*, 290 F.3d 795, 799-800 (6th Cir. 2002)). Should this Court find that Eight Mile has not sufficiently pled either of its claims with sufficient particularity, Eight Mile requests that this Court provide it leave to amend the FAC as justice so requires.[12]

**V. Even If HFA's Motion is Granted, this Court Has No Basis to Award HFA Its Costs, Pursuant to 17 U.S.C. § 505, Including Attorneys' Fees**

HFA's Memorandum concludes with a request that this Court award its costs, pursuant to 17 U.S.C. § 505, including attorneys' fees. However, this relief is neither appropriate for a Motion to Dismiss, nor is it requested in HFA's Motion. *See* Local Rule 54.01. Such relief is therefore inappropriate to award regardless of the outcome of HFA's Motion.

## CONCLUSION

For the reasons set forth above, HFA's Motion should be dismissed. If necessary, Eight Mile respectfully requests leave to amend the FAC.

---

[12] Should the Court deem it necessary to require Eight Mile to file a Second Amended Complaint, Eight Mile would be able to cite directly to examples of fraudulently dated NOIs and dated royalty statements issued by HFA, which are all discussed herein and in the FAC. In fact, HFA has represented that it has already collected copies of each of these NOIs and royalty statements and has agreed to produce them. Not once during HFA's collection of these documents has HFA ever communicated confusion about which NOIs or royalty statements are at issue or the scope of Eight Mile's claims against it. However, as mentioned above, further citation to these documents is not necessary, at all, in order for Eight Mile to comply with the required pleading standard.

Dated: November 25, 2020

By: /s/ Richard S. Busch_____
Richard S. Busch (TN Bar # 14594)
KING & BALLOW
315 Union Street, Suite 1100
Nashville, TN 37201
Telephone: (615) 726-5422
Facsimile: (615) 726-5417
rbusch@kingballow.com

*Attorneys for Eight Mile Style, LLC*
*and Martin Affiliated, LLC*

## CERTIFICATE OF SERVICE

This is to certify that on November 25, 2020, a copy of the foregoing Memorandum In Opposition To Defendant Harry Fox Agency LLC's Motion To Dismiss Plaintiffs' Claims For Failure To State A Claim For Relief And Failure To Plead Fraud With Particularity was served upon the following parties in this matter using the ECF system. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt, including the following:

Timothy L. Warnock (BPR # 12844)
Keane A. Barger (BPR # 33196)
RILEY WARNOCK & JACOBSON, PLC
1906 West End Avenue
Nashville, TN 37203
Telephone: (615) 320-3700
twarnock@rwjplc.com
kbarger@rwjplc.com

Brian D. Caplan (*pro hac vice*)
Robert W. Clarida (*pro hac vice*)
REITLER KAILAS & ROSENBLATT LLC
885 Third Avenue, 20th Floor
New York, NY 10022
Telephone: (212) 209-3050
bcaplan@reitlerlaw.com
rclarida@reitlerlaw.com

*Attorneys for Third-Party Defendant*
*Kobalt Music Publishing America, Inc.*

Jay S. Bowen (BPR # 02649)
Lauren E. Kilgore (BPR # 030219)
SHACKELFORD, BOWEN, MCKINLEY
& NORTON, LLP
1 Music Circle South
Suite 300
Nashville, TN 37203
Telephone: (615) 329-4440
jbowen@shackelford.law
lkilgore@shackelford.law

*Attorneys for Defendant Harry Fox Agency, LLC*
Mark H. Wildasin
U.S. Attorney's Office (Nashville Office)

Aubrey B. Harwell III (BPR #017394)
Marie T. Scott (BPR # 032771)
NEAL & HARWELL, PLC
1201 Demonbreun Street, Suite 1000
Nashville, TN 37203
Telephone: (615) 238-3526
Facsimile: (615) 726-0573
tharwell@nealharwell.com
mscott@nealharwell.com

Matthew D. Ingber (*pro hac vice*)
Rory K. Schneider (*pro hac vice*)
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 506-2500
mingber@mayerbrown.com
rschneider@mayerbrown.com

Andrew J. Pincus (*pro hac vice*)
Archis A. Parasharami (*pro hac vice*)
MAYER BROWN LLP
1999 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 263-3328
apincus@mayerbrown.com
aparasharami@mayerbrown.com

Kathleen M. Sullivan (*pro hac vice*)
Carey R. Ramos (*pro hac vice*)
Cory Struble (*pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 895-2500
kathleensullivan@quinnemanuel.com

Middle District of Tennessee
110 Ninth Avenue
Suite A961
Nashville, TN 37203
(615) 736-2079

mark.wildasin@usdoj.gov

*Attorney for Interested Party, United States of America*

careyramos@quinnemanuel.com

Thomas C. Rubin (*pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
600 University Street, Suite 2800
Seattle, WA 98101
Telephone: (206) 905-7000
tomrubin@quinnemanuel.com

Allison L. Stillman (*pro hac vice*)
Latham & Watkins LLP
885 Third Avenue
New York, New York 10022
Telephone: (212) 906-1200
Facsimile: (212)751-4864

*Attorneys for Defendant and Third-Party Plaintiff Spotify USA Inc.*


*/s/ Richard S. Busch*
Richard S. Busch