# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| EIGHT MILE STYLE, LLC and ) <br> MARTIN AFFILIATED, LLC, ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> SPOTIFY USA INC. and ) <br> HARRY FOX AGENCY, LLC, ) <br> ) <br> Defendants. ) <br> ) <br> ) <br> SPOTIFY USA INC., ) <br> ) <br> Third-Party Plaintiff, ) <br> ) <br> v. ) <br> ) <br> KOBALT MUSIC PUBLISHING ) <br> AMERICA, INC., ) <br> ) <br> Third-Party Defendant ) | Case No. 3:19-cv-0736 <br> Judge Aleta A. Trauger |

## **MEMORANDUM**

Harry Fox Agency, LLC ("HFA") has filed a Motion to Dismiss (Doc. No. 127), to which Eight Mile Style, LLC ("Eight Mile Style") and Martin Affiliated, LLC ("Martin Affiliated") have filed a Response (Doc. No. 142), and HFA has filed a Reply (Doc. No. 144). HFA has also filed a Request for Oral Argument. (Doc. No. 145.) For the reasons set out herein, the Motion to Dismiss will be granted in part and denied in part, and the Request for Oral Argument will be denied as moot.

# I. BACKGROUND

HFA is an American company that has provided rights management, licensing, and royalty services to the owners and publishers of copyrighted musical works for a period spanning, not only many decades, but also many stages in the development and evolution of the music industry in the United States. (Doc. No. 97 ¶ 101.) *See, e.g.*, *Duchess Music Corp. v. Stern*, 331 F. Supp. 127, 128 (D. Ariz. 1971) (discussing HFA). In the early years of this century, HFA, like many others, found itself an interested bystander to, and eventually a participant in, a massive, technology-driven reconfiguration of how individual listeners accessed, enjoyed, and paid for (or did not pay for) musical recordings. These changes first took the form of widespread piracy of sound recordings through peer-to-peer file-sharing networks, which allowed listeners to access recordings—and software developers to reap the benefits of having those listeners as users—without any remuneration being sent to the lawful owners of the recordings and musical compositions at issue. Because this sharing was fundamentally illicit under U.S. copyright law, HFA itself had very little direct role to play and was shut out of the process altogether. (Doc. No. 97 ¶ 61.)

Eventually, aggressive litigation by the music industry largely stifled this illegal exchange of copyrighted works, but the technological advancements that made pirating possible remained. As a result, ostensibly more law-abiding technology companies raced to establish themselves in the newly growing world of lawful streaming and downloading of musical recordings. Around that time, HFA was contacted and ultimately hired by Spotify, an upstart music streaming and downloading service that had been founded in Sweden. By 2015, Spotify had grown from a fledgling venture to a giant in the world of streaming, boasting over 286 million "global active users." Spotify USA Inc. is the service's U.S. arm, and HFA is its agent for the purposes of obtaining and administering the licenses that Spotify needs in order to offer its U.S. users the

comprehensive catalog that they require, or at least expect, from a streaming service. (*Id.* ¶¶ 12, 57, 61–64)

Plaintiffs Eight Mile Style and Martin Affiliated are entities that own the rights to compositions by Marshall Mathers, commonly known to the public under his recording and performing name, Eminem. Specifically, the plaintiffs own the rights to an identified list of compositions referred to, for the purposes of this case, as the Eight Mile Compositions. (*Id.* ¶ 1.) As an example of the reach and value of the Eight Mile Compositions, the plaintiffs cite one composition, the Eminem song "Lose Yourself." As the plaintiffs explain,

> [i]n 2002, that song reached No. 1 on Billboard's Hot 100 Singles chart and remained in that position for 12 consecutive weeks. It later won the Academy Award for Best Original Song, making it the first hip hop song to receive the award. It also won Grammy Awards for Best Rap Song and Best Solo Performance.

(*Id.* ¶ 8.) In short, "Lose Yourself" is, according to the plaintiffs, "one of the most famous and popular songs in the world," and, while not every Eight Mile Composition has attained as many accolades, it is undisputed that Mathers is an artist who has enjoyed extraordinary commercial success and has built a large, dedicated fanbase, such that his omission from a major streaming platform might discourage some meaningful number of potential users from subscribing. (*Id.*)

Spotify has avoided that problem by including Mathers' popular recordings of the Eight Mile Compositions in its streaming library, from which the songs have been streamed "billions" of times. (*Id.* ¶ 94.) The parties appear to agree that all of those streams at least *could have* been performed legally, if Spotify and/or its agents had taken the appropriate steps ahead of time and continued to comply with the law as the streaming occurred. Under ordinary principles of copyright law, a person or entity who wants to reproduce and distribute a copyright-protected musical composition, including by distributing a recording of that composition, must obtain a "mechanical license" for that composition. (*Id.* ¶ 71.) In the United States, however, a party that

3

wants a mechanical license is not at the mercy of the copyright holder's willingness to grant one—at least, not at first. "Once a copyright owner distributes the musical work to the public, . . . anyone may obtain a compulsory license in the musical work by serving [a notice of intent ('NOI')] on the copyright owner within the applicable time frame and following other specific requirements set out in the copyright regulations." *Yesh Music, LLC v. Amazon.com, Inc.*, 249 F. Supp. 3d 645, 651 (E.D.N.Y. 2017) (citing 17 U.S.C. § 115(a), (b)) (internal quotation omitted). The compulsory license functions like an ordinary license but is available at a predetermined rate without the rights owners' consent. For a compulsory license to be available, however, the NOI must be sent before, or no more than 30 days after, the first distribution of the composition. (Doc. No. 97 ¶ 73.)

The plaintiffs allege that Spotify streamed recordings of the Eight Mile Compositions as if it had obtained compulsory mechanical licenses—and indeed fostered the impression that it had obtained those licenses—when, in fact, it had missed its chance to timely complete the required steps and therefore needed to obtain a negotiated license to render its ongoing actions non-infringing. Because no valid license was ever obtained, the plaintiffs argue, all of Spotify's streams of the recorded Eight Mile Compositions were infringing. At issue in the current motion, however, is not ultimately whether the plaintiffs have a plausible chance of establishing that Spotify itself acted illegally. The only question presently before the court is whether the plaintiffs have adequately alleged that HFA committed actionable violations of the law in its capacity as Spotify's agent. The court, accordingly, will focus on the details of HFA's alleged role, rather than the scheme in its totality.

The plaintiffs allege that HFA engaged in "vicarious and contributory infringement . . . in connection with a scheme to conceal and materially enable Spotify's copyright infringement," specifically, "by circulating knowingly fraudulent documents (e.g., untimely, and otherwise

4

ineffective [NOIs] that were intentionally and knowingly backdated to appear as though they were issued on a timely basis, and the fraudulent rendering of purported 'royalty' statements)" to the plaintiffs and to Kobalt Music Services America Inc. ("Kobalt"), an entity that was authorized to collect royalties on the plaintiffs' behalf. (*Id.* ¶ 2.) Those backdated NOIs, the plaintiffs claim, "purport[ed] to constitute valid and timely compulsory mechanical licenses," when, in fact, they did not. (*Id.* ¶ 4.) The backdated NOIs were, according to the plaintiffs, "designed to imply that they had been previously issued." (*Id.* ¶ 12.) Specifically, the backdated NOIs included "an 'expected' first date of distribution many years before the NOI's were issued." (*Id.*) However, the plaintiffs believe, based on the information available to them, that "any NOI's that were sent by HFA [regarding the Eight Mile Compositions] were, on information and belief, sent well after the Eight Mile Compositions began streaming on Spotify and were therefore never effective . . . ." (*Id.* ¶ 58.)

With regard to the allegedly fraudulent royalty statements, the plaintiffs allege that "Spotify instructed HFA, as part of their joint conspiracy to infringe upon the Eight Mile Compositions, to distribute purported 'royalty statements' with stream count calculations with the intent that those statements be relied upon by Kobalt, and by Eight Mile itself, as evidence that compulsory licenses were timely and validly in effect." (*Id.* ¶ 4.) The allegedly fraudulent statements "included knowing and purposeful misrepresentations that (1) Spotify had acquired compulsory licenses for each of the Eight Mile Compositions, and (2) the royalties were calculated by multiplying the statutory mechanical licensing rate with Spotify's actual level of usage of the knowingly unlicensed Eight Mile Compositions," when, in fact, neither contention was accurate. (*Id.*) HFA sent the statements on a monthly basis from 2011 until 2016, when it began sending them quarterly. In each statement, "HFA indicate[d] that royalties [were] being provided pursuant to a previously acquired

5

mechanical license and that the 'royalty statement' accurately reflect[ed] the royalties attributable to Eight Mile." (*Id.* ¶ 99.)

According to the plaintiffs, "the industry custom and practice in the record business is that by sending royalty statements, the sender is representing that a valid license is in place." (*Id.* ¶ 101.) Moreover, HFA, in particular, "had established over many decades a course of dealing such that it would only prepare and send royalty statements to copyright owners with respect to songs that had a valid mechanical license in place." (*Id.* ¶ 102.) As a result, the recipient of an HFA royalty statement would reasonably believe that there was a valid mechanical license underlying the statements. (*Id.* ¶ 5.) HFA, moreover, enjoyed significant credibility in the industry, and with rights holders in particular, because it had "worked exclusively for copyright owners, publishers and licensors for over 80 years" before adjusting its business model to lend its services and reputation to distributors like Spotify. (*Id.*)

Because the plaintiffs are not themselves parties to the relationship between HFA and Spotify, their knowledge of how information was exchanged between those two entities is indirect and possibly incomplete. On information and belief, however, the plaintiffs allege that HFA routinely received two types of "comprehensive reports" from Spotify. The first, "License Request Reports," "detailed which sound recordings, and musical works embodied in them, the music service sought to add to its platform." (*Id.* ¶ 49.) "Usage Reports," on the other hand, detailed "the distributions (e.g., downloads or streams) that these recordings and musical works generated after being added to the music service's platform." (*Id.*) A simple comparison of the reports, the plaintiffs explain, would allow a party to "immediately discover if Spotify [was] streaming sound recordings that embod[ied] unlicensed compositions." (*Id.* ¶ 96.) Accordingly, the plaintiffs allege, "HFA always had specific knowledge . . . that Spotify intended to infringe and actual[ly] did

6

infringe musical compositions, which included the Eight Mile Compositions." (*Id.* ¶ 49) Furthermore, if HFA had taken the necessary steps to accurately calculate the royalties owed to the plaintiffs—which was one of its duties—its review of the underlying documents would have necessarily revealed the lack of an effective license. (*Id.* ¶ 98.)

In February 2019, HFA finally admitted to the plaintiffs that Spotify did not, in fact, have mechanical licenses for at least "Lose Yourself" and possibly other of the Eight Mile Compositions. *(Id.* ¶ 12.) Rather, the songs had been placed into HFA's "Copyright Control"—a category for songs with unknown rights holders—despite the fact that HFA's conduct had long confirmed that it was, in fact, aware of the plaintiffs' rights. (*Id.*) This misclassification, the plaintiffs allege, was yet another way that HFA should have known (and did know) about Spotify's lack of a valid mechanical license for the Eight Mile Compositions. (*Id.* ¶ 96.)

On August 21, 2019, Eight Mile Style and Martin Affiliated filed a Complaint in this court against Spotify, alleging that Spotify committed copyright infringement of the Eight Mile Compositions. (Doc. No. 1.) On July 1, 2020, the plaintiffs filed a First Amended Complaint, which, among other things, added HFA as a defendant. (Doc. No. 97.) The First Amended Complaint states two counts against HFA—one for contributory infringement (Count II) and one for vicarious infringement (Count III). (*Id.* ¶¶ 125–34.) HFA now moves the court to dismiss both counts. (Doc. No.127.)

## II. LEGAL STANDARD

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal

Rules of Civil Procedure require only that the plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

Rule 9(b) of the Federal Rules of Civil Procedure states that, when alleging fraud, "a party must state with particularity the circumstances constituting fraud." That particularity requirement applies not only to claims that explicitly go under the name "fraud" but also to any "claims *sounding in* fraud." *Smith v. Bank of Am. Corp.*, 485 F. App'x 749, 751 (6th Cir. 2012) (emphasis added). The parties in this case appear to agree that, given the nature of the allegations leveled against HFA—namely, that it engaged in deceptive conduct in an attempt to conceal copyright infringement—those allegations are subject to Rule 9(b).

The Sixth Circuit has explained that, while Rule 9(b) imposes a heightened standard, the underlying purpose of the rule is to serve the same ends as the general pleading requirements of Rule 8:

> [Rule 9(b)] should not be read to defeat the general policy of "simplicity and flexibility" in pleadings contemplated by the Federal Rules. Rather, Rule 9(b) exists predominantly for the same purpose as Rule 8: to provide a defendant fair notice of the substance of a plaintiff's claim in order that the defendant may prepare a responsive pleading. Rule 9(b), however, also reflects the rulemakers' additional understanding that, in cases involving fraud and mistake, a more specific form of notice is necessary to permit a defendant to draft a responsive pleading

*United States ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir. 2008) (citations and quotation marks omitted).

"So long as a [plaintiff] pleads sufficient detail—in terms of time, place, and content, the nature of a defendant's fraudulent scheme, and the injury resulting from the fraud—to allow the defendant to prepare a responsive pleading, the requirements of Rule 9(b) will generally be met." *Id.* "Where a complaint alleges 'a complex and far-reaching fraudulent scheme,' then that scheme must be pleaded with particularity and the complaint must also 'provide examples of specific' fraudulent conduct that are 'representative samples' of the scheme." *United States ex rel. Marlar v. BWXT Y–12, LLC*, 525 F.3d 439, 444–45 (6th Cir. 2008) (quoting *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 510 (6th Cir. 2007)).

### III. ANALYSIS

#### A. Nature of Secondary Liability Under the Copyright Act

"Although 'the Copyright Act does not expressly render anyone liable for infringement committed by another,'" courts have long recognized certain "doctrines of secondary liability" drawn from "common law principles" and imputed to the Act. *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930–31 (2005) (quoting *Sony Corp. of Am. v. Universal City*

*Studios, Inc.*, 464 U.S. 417, 434 (1984)). Specifically, "[o]ne infringes *contributorily* by intentionally inducing or encouraging direct infringement, and infringes *vicariously* by profiting from direct infringement while declining to exercise a right to stop or limit it." *Id.* at 930 (citing *Gershwin Pub. Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971); *Shapiro, Bernstein & Co. v. H. L. Green Co.*, 316 F.2d 304, 307 (2d Cir. 1963)) (emphasis added). The plaintiffs have pleaded both theories of secondary liability with regard to HFA, and HFA alleges that neither is supported by the allegations in the First Amended Complaint.

The Supreme Court's most recent treatment of these doctrines in depth came in the context of unauthorized file-sharing and the potential liability of the developers of software that enables widespread peer-to-peer infringement. *Id.* at 931 (noting that, "[d]espite the currency of these principles of secondary liability," the Supreme Court had only occasionally considered them). That guidance, therefore—set forth in the Supreme Court's famous *Grokster* case—has only an imperfect applicability to allegations such as these, which involve, not the use of third-party technology to create a plainly illicit piracy-based marketplace parallel to the lawful market for sound recordings, but, rather, alleged wrongdoing by individual actors within the course of the ostensibly licit marketplace. The parties disagree regarding how and to what degree the reasoning of *Grokster* should apply here. The situation at issue in this case is, in one sense, novel, in that it involves a new phase in the development of how music is distributed electronically. In another sense, however, the situation is, compared to *Grokster*, comparatively archaic, involving conventional licensing and rights management in a way that file sharing does not.

HFA suggests that *Grokster* "reformulated" the applicable law of secondary copyright liability, particularly with regard to contributory infringement, and that, therefore, such liability can only exist within the boundaries contemplated by that case. (Doc. No. 130 at 11.) The Supreme

10

Court's reasoning in *Grokster*, however, was plainly focused on the narrower core problem of infringement-enabling technology, not necessarily the entire range of situations in which secondary liability might occur. The Court spoke in terms of analogy to patent law and analyzed the case largely against the background of *Sony Corporation of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984), which involved another then-new form of infringement-friendly technology, VCR devices. *Grokster*, 541 U.S. at 931–32. The Court, moreover, expressly recognized that its situation-specific holdings in this area should not be assumed to "displace other theories of secondary liability." *Id.* at 934 (discussing *Sony*). Rather, if the case at issue is not directly covered by a relevant precedent, courts may still look to "rules of fault-based liability derived from the common law" and apply those in the copyright context. *Id.* at 932. Moreover, the Court stressed that it viewed its own analysis in *Grokster* as merely the application of well-established principles of secondary liability to a new situation. *See id.* at 936 ("The rule on inducement of infringement as developed in the early cases is no different today."). All of these statements suggest that the Supreme Court did not intend *Grokster* to be the holistic rewriting of caselaw that HFA suggests, but rather simply an outgrowth of already longstanding doctrines of secondary liability.[1]

This court, therefore, will treat *Grokster* as binding and instructive, but not as the sole source for defining the boundaries of secondary liability for copyright infringement. If a case falls

---

[1] HFA puts a great deal of weight on the fact that another judge sitting by designation on this court has also used the word "reformulated" to describe the holding in *Grokster* and treated *Grokster* as having superseded prior Sixth Circuit precedent. *Average Joe's Ent. Grp., LLC v. SoundCloud, LTD.*, No. 3:16-CV-3294-JPM-JB, 2018 WL 6582829, at *3 (M.D. Tenn. Oct. 17, 2018) (McCalla, J.). The allegations at issue in that case were more analogous to the allegations in *Grokster* than those here, making the case for applying the *Grokster* analysis alone significantly more persuasive. In any event, as counsel for HFA are no doubt aware, "[a] decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." *Camreta v. Greene*, 563 U.S. 692, 709 (2011) (quoting 18 Moore's Federal Practice § 134.02[1][d] (3d ed. 2011)).

squarely within *Grokster*, then *Grokster*, of course, applies. And if a case does not fall squarely within *Grokster*, then *Grokster* may still provide meaningful and helpful guidance. But insofar as the caselaw of this circuit, which has addressed a much broader range of situations than the Supreme Court has, recognizes rules that govern issues that *Grokster* does not, this court will not treat those precedents as implicitly overruled unless there is a strong basis for doing so.

**B. Contributory Infringement**

As HFA points out, the plaintiffs' allegations regarding HFA's role in Spotify's actions do not fit neatly within the analysis used by the Supreme Court to discuss contributory infringement in *Grokster*. Even when one construes the First Amended Complaint in the manner most favorable to the plaintiffs, it would be a stretch to say that HFA has been accused of *inducing* copyright infringement. The better description would probably be that HFA allegedly *facilitated* or *assisted in* ongoing infringement and the efforts to conceal that infringement. "Induce" and "encourage" are both somewhat vague words, and one could certainly argue that actions such as HFA's might fall within the edges of their meanings, particularly with regard to encouragement. Just as easily, though, one could argue that HFA is correct and that mere assistance is neither inducement nor encouragement of infringement that an infringer is already set on performing.

As the plaintiffs point out, however, the Sixth Circuit has recognized another test for considering contributory infringement claims that bears much more clearly on the case at hand. Specifically, in addition to liability based on inducement, the Sixth Circuit has recognized liability for contributory infringement where a party knowingly "causes . . . or materially contributes to the infringing conduct of another." *Bridgeport Music, Inc. v. WM Music Corp.*, 508 F.3d 394, 398 (6th Cir. 2007) (quoting *Bridgeport Music, Inc. v. Rhyme Syndicate Music*, 376 F.3d 615, 621 (6th Cir. 2004)). Courts in this circuit—including the Sixth Circuit itself—have cited that test since

12

Case 3:19-cv-00736   Document 165   Filed 04/22/21   Page 12 of 18 PageID #: 1464

*Grokster*. *See, e.g.*, *NCR Corp. v. Korala Assocs., Ltd.*, 512 F.3d 807, 816 (6th Cir. 2008); *Bell v. Worthington City Sch. Dist.*, No. 2:18-CV-961, 2020 WL 2905803, at *11 (S.D. Ohio June 2, 2020). Courts in other circuits have agreed that similar principles of secondary liability can be applied under the Copyright Act, including post-*Grokster*. *See, e.g.*, *Dream Games of Arizona, Inc. v. PC Onsite*, 561 F.3d 983, 995 (9th Cir. 2009); *Oppenheimer v. Scarafile*, No. 2:19-CV-3590-BHH, 2020 WL 6710864, at *5 (D.S.C. Nov. 16, 2020). This court agrees. *Grokster* itself emphasized that secondary liability under the Copyright Act is derived from principles established in the common law, and there is no reason to think that the Sixth Circuit's past attempts to import those principles should be discarded.[2] The plaintiffs, moreover, have plausibly pleaded facts suggesting that HFA, through its actions, helped Spotify abuse industry conventions and HFA's own reputation to launder Spotify's infringing activity and prevent rights holders and their affiliates, including the plaintiffs and Kobalt, from realizing that infringement was occurring and moving to stop that ongoing infringement.

HFA protests that all it is accused of doing is sending letters based on information it received from Spotify. At this stage, however, the court is required to take the plaintiffs' allegations as true, and those allegations include the plaintiffs' claims about how and why industry practice and HFA's own reputation allowed HFA's actions to conceal Spotify's lack of a valid mechanical license for the Eight Mile Compositions. The purpose and effect of that concealment, moreover, was not simply to prevent past infringement from being discovered, but to allow infringement to continue. Even if HFA was innocent in Spotify's first alleged instances of infringement, the

---

[2] The court also notes that, if it were to adopt HFA's reading of *Grokster*, the primary difference in the law would be that that concept of contributory infringement would, somewhat strangely, no longer include a party's causing or materially *contributing* to *infringement*.

plaintiffs have plausibly alleged that its actions contributed to Spotify's ability to continue infringing over time.

HFA objects that it was under no obligation to police Spotify's in-house decisions regarding infringement. Whether that is true or not, the plaintiffs have not merely alleged that HFA failed to affirmatively police Spotify's conduct; they have alleged both that HFA knew and, through the ordinary fulfillment of its duties, should have known that the infringement was occurring and that HFA was helping to conceal it. (*See, e.g.*, Doc. No. 97 ¶¶ 49, 55–56, 108.[3]) There is little doubt, moreover, that those allegations of knowledge were pleaded sufficiently. Even when a claim is governed by the heightened pleading requirements of Rule 9(b), "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). The Supreme Court, moreover, has recognized a party's "aiming to satisfy a known source of demand for copyright infringement" as evidence of an improper purpose in the contributory infringement analysis. *Grokster*, 545 U.S. at 939. That circumstantial evidence is only heightened when the defendant, knowing of the capacity for infringement, fails to take steps to avoid it. *See id.* (citing *Groskter*'s lack of "attempt[s] to develop filtering tools or other mechanisms to diminish the infringing activity using their software"). The plaintiffs have plausibly alleged that HFA became aware of Spotify's licensing predicament and offered services that directly filled its need to maintain an illusion of lawfulness while continuing to infringe.

Similarly unavailing—at least at this stage—is HFA's argument that its actions should not reasonably have deceived the plaintiffs because the plaintiffs themselves should have known, from their own records and experience, that Spotify had not obtained a mechanical license and that its

---

[3] Indeed, HFA itself admits that, "[a]ccording to the Amended Complaint, HFA was aware that Spotify was streaming unlicensed Compositions throughout its contractual relationship with Spotify . . ." (Doc. No. 130 at 9.)

streams were, accordingly, infringing. The plaintiffs may ultimately have trouble addressing this argument as this case proceeds. For now, however, the court is required to take their allegations as true, and the plaintiffs have alleged that, in the context of music industry practice, such deception was not only possible but both intended and expected by Spotify and HFA. At some point, the plaintiffs will have to establish, with evidence, how and why such a scheme could be expected to work, despite the fact that the plaintiffs, as the sole owners of licensing rights to the Eight Mile Compositions, should have known who had a license and who did not. At this stage, however, plausible allegations, pleaded with particularity, suffice.

It may turn out that HFA is right and that its actions were truly blameless (or at least non-actionable). The plaintiffs' allegations depend, in significant part, on their own contentions regarding how certain documents would have been construed in the context of the conventions and ordinary practices of the music business. Of course, HFA itself is a veteran of the same business, and it disagrees with those assertions. At this stage, however, all the court can do is take the plaintiffs at their word, as it is required to in connection with a Rule 12(b)(6) motion, and wait to reevaluate the plaintiffs' claims when a record has actually been made. The First Amended Complaint has plausibly alleged with particularity that HFA's actions, in context, materially contributed to Spotify's ability to infringe on an ongoing basis. The court will therefore not dismiss Count II.

### C. Vicarious Infringement

HFA argues that it cannot be liable for vicarious infringement because vicarious liability only attaches to a party that had "a right to stop or limit" the underlying infringement, *Broad. Music, Inc. v. Meadowlake, Ltd.*, 754 F.3d 353, 354 (6th Cir. 2014) (quoting *Grokster*, 594 U.S. at 93), and it had no right to stop or limit Spotify's infringing actions. Situations in which vicarious

15

Case 3:19-cv-00736    Document 165    Filed 04/22/21    Page 15 of 18 PageID #: 1467

infringement is found to occur typically mirror conventional settings in which vicarious liability arises—that is, situations in which a principal, employer, or controlling business owner is held liable for the actions of his agent, employee, or controlled business. *See, e.g.*, *Purple Rabbit Music v. JCJ Prod., LLC*, No. 3:18-cv-00520, 2019 WL 6682199 (M.D. Tenn. Dec. 5, 2019). As HFA points out, it was Spotify's agent and Spotify was the principal—not the other way around—and doctrines of vicarious liability, in the copyright realm or otherwise, do not typically impute the actions of the principal to the agent.

The plaintiffs ask the court to use an arguably broader definition of vicarious infringement, taken from Sixth Circuit cases, which would reach situations in which the defendant had the "right and ability to *supervise* the infringing conduct." *Gordon v. Nextel Commc'ns & Mullen Advert., Inc.*, 345 F.3d 922, 925 (6th Cir. 2003) (emphasis added). It is not altogether clear to the court, however, that these are actually different standards. Specifically, it is questionable whether a party that observes the conduct of another without any right to stop or limit that conduct is actually "supervising" the other party. Regardless, even assuming that the supervision-based definition is broader than a definition based solely on the right to stop or limit, that broader definition is still a poor fit to the conduct at issue in this case. HFA worked for Spotify. It may have assisted in, been aware of, and/or been complicit in Spotify's infringement, but it was not Spotify's supervisor in any ordinary sense of the term.

If the court had accepted HFA's dramatically narrowed definition of contributory infringement, it might make sense to construe vicarious infringement broadly enough to reach situations such as this, in order to preserve the general principle that the Copyright Act incorporates traditional doctrines of secondary liability. The relatively malleable concept of "materially contributing" to infringement is, however, more than adequate to the task of reaching any

16

Case 3:19-cv-00736   Document 165   Filed 04/22/21   Page 16 of 18 PageID #: 1468

necessary gray areas, without the court's stretching the concept of vicarious liability beyond its ordinary uses. The court, accordingly, will dismiss Count III on the ground that it relies on an inapplicable form of secondary liability—although its premise that the underlying facts support secondary liability is not, itself, mistaken.

**D. Requests for Oral Argument and Permission to Amend the Complaint**

Because the court has decided these issues on the briefing, HFA's request for oral argument will be denied. Insofar as the guidance might be helpful to the parties in the future, the court notes that it is not typically the practice of the court to hold oral arguments related to motions that, under the Federal Rules of Civil Procedure, are designed to be resolvable on the parties' filings alone. Of course, there are exceptions, and the parties are free to request any hearing they wish. Generally speaking, however, this court does not typically grant such requests solely on the basis that the underlying issues are important, complicated, and/or highly contested.

The plaintiffs have requested that, "should this [c]ourt find that Eight Mile has not sufficiently pled either of its claims with sufficient particularity, which it believes it has, Eight Mile requests that this Court provide it leave to amend the [First Amended Complaint] as justice so requires." (Doc. No. 142 at 7.) Rule 15.01(a) of this court's Local Rules requires that a motion for leave to amend a pleading be accompanied by certain information, including a copy of the proposed amended complaint. Because no request that complied with that Rule has been made, the court will not grant leave to amend. If the plaintiffs wish to seek permission to file an amended complaint stating an actionable claim for vicarious infringement, the court will consider their request when and if it is made in compliance with the Local Rules.

17

## IV. CONCLUSION

For the foregoing reasons, HFA's Motion to Dismiss (Doc. No. 127) will be granted in part and denied in part, and HFA's Request for Oral Argument (Doc. No. 145) will be denied as moot. Count III, for vicarious liability, will be dismissed.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge