UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| EIGHT MILE STYLE, LLC; MARTIN AFFILIATED, LLC,<br><br>    *Plaintiffs,*<br><br>v.<br><br>SPOTIFY USA INC.; HARRY FOX AGENCY, LLC,<br><br>    *Defendant.* | Civil Case No. 19-CV-00736<br><br>Hon. Aleta A. Trauger<br><br>JURY DEMAND |
| SPOTIFY USA INC.,<br><br>    *Third-Party Plaintiff*,<br><br>v.<br><br>KOBALT MUSIC PUBLISHING AMERICA, INC.,<br><br>    *Third-Party Defendant*. | |

**SPOTIFY USA INC.'S MEMORANDUM IN SUPPORT OF MOTION TO COMPEL
PRODUCTION OF DOCUMENTS BY THIRD-PARTY DEFENDANT
<u>KOBALT MUSIC PUBLISHING AMERICA, INC.</u>**

Spotify USA Inc. respectfully moves to compel Kobalt Music Publishing America, Inc. to produce its 87 third-party blanket license agreements along with the amendments to those agreements (the "Blanket Licenses").

The Blanket Licenses represent a small number of defined documents that have apparently already been collected and for which there is no credible argument of undue burden.[1] The

---

[1] As stated during the hearing, Spotify does ***not*** seek the accounting statements to which Kobalt's argument about "undue burden" related.

1

documents are relevant to both (1) Spotify's license defense that Kobalt granted Spotify a blanket license (the "Spotify-Kobalt Blanket License") that encompassed the 243 compositions that are the subject of the claims (the "Compositions") by Plaintiffs Eight Mile Style and Martin Affiliated ("Eight Mile"); and (2) Spotify's third-party claim against Kobalt that Kobalt must indemnify Spotify (on the chance that Spotify is liable to Eight Mile) pursuant to the Spotify-Kobalt Blanket License.

The Spotify-Kobalt Blanket License covers the use of any and all works owned, controlled, or administered by Kobalt in line with industry practice for blanket licenses between administrators (like Kobalt) and digital streaming services (like Spotify). There appears to be no dispute that: (1) Kobalt's license agreement with Spotify is a blanket license; (2) unlike an "individual" license, a blanket license does not expressly identify by name within the four corners of the document each of the musical compositions subject to the license; and (3) blanket licenses generally identify musical compositions by name where those named compositions are *excluded* from the scope of the blanket license. Kobalt itself acknowledged these industry norms, emphasizing during the hearing that such norms are important for an administrator of its size, with a frequently changing catalogue composed of hundreds of thousands of musical works.

Despite evidence it has produced to the contrary in discovery, Kobalt maintains that it did not "own, control, or administer" the Compositions in the United States after 2011. Kobalt argues that the Spotify-Kobalt Blanket License therefore did not authorize Spotify to use the Compositions and that, accordingly, Kobalt's indemnity obligation does not extend to the Compositions. The extent of Kobalt's authority over the Eight Mile Compositions and the reasonableness of Spotify's belief that Kobalt's authority included the ability to grant and

administer licenses to use the Compositions are thus central questions in this litigation—and the Blanket Licenses go directly to answering those questions.

If one or more Blanket Licenses specifically carved out the Compositions—as Kobalt's own document productions indicate was the case at least once—it would tend to show that Kobalt understood that music providers (like Spotify) with which it entered into blanket licenses would reasonably expect the Compositions to be covered unless they were expressly excluded. By contrast, if a Blanket License did not contain an express exclusion and the licensees paid Kobalt royalties on the Compositions—a number of third-party royalty statements indicate that they did—it would tend to show either that Kobalt exercised the very licensing authority it now disavows or that the licensees (such as Spotify) reasonably believed as much. Either way, the Blanket Licenses are highly relevant.

Kobalt is plainly arguing multiple positions as to the manner in which it licensed the Compositions to Spotify and other companies, while at the same time withholding from discovery relevant documents that would support or refute its arguments. Kobalt has already produced "individual" licenses it issued for use of the Compositions (including after it supposedly lost licensing authority) as well as communications about some of the Blanket Licenses. It should not be allowed to withhold a small set of related, similarly relevant documents. Tellingly, Kobalt's principal argument for doing so at last week's hearing had little to do with the Blanket Licenses and their discoverability. Kobalt instead offered the same theory that it has already presented to the Court—namely, its contention that emails Kobalt sent to the Harry Fox Agency ("HFA") in 2013 and 2015 eliminated any room for Spotify to reasonably believe that the blanket license it executed with Kobalt covered the Compositions. (Dkt. 108, Kobalt's Answer; Dkt. 160, CMO at 12-14.)

3

Leaving aside that newly-produced evidence directly undermines the argument Kobalt made to the Court, Kobalt's position inverts the order of litigation by calling for the Court to resolve the merits of the case before discovery is complete. "Discovery is an integral part of the trial process," however, and the scope of discovery is "construed broadly" precisely in order to "enable[] the parties to develop fully and crystalize concise factual issues for trial." *Marsico v. Sears Holding Corp.*, 370 F. App'x 658, 664 (6th Cir. 2010). Nor can Kobalt reasonably maintain that producing this limited set of documents is disproportionate to the needs of a case in which Eight Mile seeks to recover from Spotify the maximum amount of statutory damages or "the value of [an] equity interest" in Spotify (Dkt. 97, First Amended Complaint, at 49).

Spotify respectfully requests that the Court order Kobalt to produce the 87 Blanket Licenses.

## BACKGROUND

### *This Litigation and the Kobalt-Spotify Blanket License*

Eight Mile claims that Spotify used without authorization 243 musical compositions that Eight Mile allegedly owns in whole or part. (Dkt. 97, First Amended Complaint.) Spotify denies Eight Mile's allegations. Among other defenses, Spotify contends that it has a direct license to the Compositions because Eight Mile's agent, Kobalt, authorized Spotify to reproduce and distribute them. (*See, e.g.*, Dkt. 160, CMO at 11.) As a result of the importance of Kobalt's role as Eight Mile's agent and its contractual indemnity obligations to Spotify, Spotify filed a third-party complaint against Kobalt on May 29, 2020. (Dkt. 91.)

Both Spotify's direct-license defense and its third-party complaint against Kobalt focus on the agreement that Kobalt entered into with Spotify in 2016. Specifically, Kobalt "grant[ed] Spotify a non-exclusive, non-transferable . . . irrevocable license throughout the [United States] to

4

[] reproduce and distribute the Publisher Compositions," defined to include "copyrighted, non-dramatic musical composition[s]" or "portions thereof that [Kobalt], whether now or during the Term, owns, controls, or administers." (*See* Dkt. 91, Third Party Complaint, ¶ 55.) Kobalt argues that the Spotify-Kobalt Blanket License did not furnish Spotify with a license to use the Eight Mile Compositions because, by 2016, Kobalt no longer "administered" for licensing purposes the Compositions in the United States. (Dkt. 108, Kobalt's Answer, ¶ 48 ("Kobalt did not own, administer or otherwise control the Compositions at any time after February 2011 with respect to the U.S. or Canada.").) Rather, Kobalt maintains that it only collected royalties for the Compositions as of 2011, when Bridgeport Music ("Bridgeport") became Eight Mile's licensing administrator.[2] (*See id.* ¶ 5.)

### *The Discovery Sought*

Spotify requested that Kobalt produce documents and communications "concerning [its] licensing of any of the Compositions to any party, including but not limited to Spotify" and its "involvement in the licensing and/or administration of any of the Compositions . . . with Streaming Services other than Spotify." Request Nos. 4 & 43 (Ex. A). Kobalt agreed to produce "documents and communications concerning Kobalt's licensing of the Compositions for territories including the United States" in response to the first request, but refused to produce documents in response to the second—*i.e.*, for streaming services other than Spotify. (Ex. B, Kobalt's Responses and Objections to Spotify's Requests for Production Nos. 4 and 43 to Kobalt). Following a meet-and-confer, Kobalt "supplement[ed]" its earlier responses, stating that it "will not agree to produce its license agreements with third parties that license Kobalt's entire catalogue without reference to

---

[2] As Spotify previously noted, Bridgeport is not even mentioned in Eight Mile's Amended Complaint and is only described by Eight Mile in the CMO as providing an "accounting service[]." (Dkt. 160, CMO at 6, 11.)

5

any particular works, authors, publishers, or repertoires (what we have described as 'blanket licenses')," but would agree to provide "documents and communications" relating to Kobalt's "individual" licenses "for any of the Compositions or for Plaintiffs' repertoire for use in the United States from January 1, 2011 to the present[.]" (Ex. C, 11/20/20 Letter to Aviki and Stillman, at 3-4.)

Kobalt's basis for refusing to produce the Blanket Licenses was its contention that "whatever representations or omissions Kobalt may have made to third parties, if any, is irrelevant" because "Spotify does not allege that it relied on anything other than [the Spotify-Kobalt Blanket License] and/or representations or omissions to Spotify and/or its agent, in exploiting the Compositions on its platform." *Id.* Spotify disagreed and pointed out that "Kobalt's representations about the scope of its authority to license the Asserted Compositions are [] of central relevance to Spotify's claims and defenses in this litigation." (Ex. D, 1/4/21 Email from Aviki to Wlodinguer and Kaplan).

Despite having resolved every other discovery issue to date, additional written exchanges and meet-and-confers did not move Kobalt off its refusal to produce the Blanket Licenses. The parties ultimately agreed, prior to initiating the May 25th hearing, that the Court's intervention was necessary.[3]

**LEGAL STANDARD**

"[T]he scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs

---

[3] Consistent with Local Rule 37.01(a), the parties worked consistently and in good faith in negotiating document discovery prior to bringing this discrete issue to the Court. To that end, Spotify is not currently seeking attorneys' fees under Federal Rule of Civil Procedure 37(a)(5) for bringing this motion.

of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Jones v. Johnson*, 801 F. App'x 338, 346, 350 (6th Cir. 2020) (quoting Fed. R. Civ. P. 26(b)(1)) (vacating grant of summary judgment in light of "unduly restrictive discovery rulings").

Courts construe relevance under Rule 26(b)(1) "broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *United States ex rel. Goodman v. Arriva Med., LLC*, 471 F. Supp. 3d 830, 839 (M.D. Tenn. 2020) (Trauger, J.) (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978)). Moreover, "the pertinent question" at this stage of litigation is "whether the documents are discoverable, not whether they are admissible." *Reitz v. City of Mt. Juliet*, 680 F. Supp. 2d 888, 891 (M.D. Tenn. 2010) (Trauger, J.) (granting motion to compel defendant to produce documents). In answering that question, and in managing the discovery process, "the trial court is given wide discretion." *John B. v. Goetz*, 879 F. Supp. 2d 787, 860 (M.D. Tenn. 2010); *see also Dasfortus Techs., LLC v. Precision Prod. Mfg. Co., Ltd (Hong Kong)*, 2011 WL 1875165, at *4 (M.D. Tenn. May 17, 2011) (Trauger, J.) (granting motion to compel defendant to produce documents).

## ARGUMENT

**A. Kobalt's Third-Party Licenses Are Relevant To Spotify's Claims And Defenses.**

### i. *The Blanket Licenses directly bear on whether Kobalt exercised licensing authority on Eight Mile's behalf and the reasonableness of Spotify's belief that it did.*

Spotify asserts that the Spotify-Kobalt Blanket License either authorized Spotify to use the Eight Mile Compositions, or requires Kobalt to indemnify Spotify for misrepresenting that it

7

possessed such authority. Kobalt disputes both contentions by denying that it administered the Compositions at the time it executed the Spotify-Kobalt Blanket License, because its authority was limited to royalty collection. Whether Kobalt had authority to license the Compositions and, if not, the extent to which it, or Eight Mile, led Spotify to reasonably believe that Kobalt had such authority are questions that go directly to Spotify's licensing defense and third-party claim. Kobalt's Blanket Licenses with third parties (including other digital music providers) will thus directly "bear[] on" (*Goodman*, 471 F. Supp. 3d at 839) crucial issues in this case.

The Blanket Licenses will fall into one of two buckets, both of which are likely to shed light on disputed questions about Kobalt's authority. First, some Blanket Licenses almost certainly expressly exclude by name the Eight Mile Compositions. At the hearing, Kobalt's counsel did not deny that such Blanket Licenses exist—and for good reason: Documents that Kobalt already produced *confirm* their existence. In a ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. Evidence that Kobalt specifically excluded the Compositions from other Blanket Licenses tends to show that, where not specifically excluded (as with the Spotify-Kobalt Blanket License), the Compositions are in fact included. At a minimum, they will demonstrate that Kobalt knew that licensees like Spotify would otherwise reasonably expect the Compositions to be included in any Kobalt-issued blanket license. That Kobalt produced *some* evidence of these third-party Blanket Licenses is an acknowledgment of their relevance. Kobalt has offered no credible rationale for producing communications *about* third-party Blanket Licenses but withholding the Blanket Licenses

8

themselves. None exists. Spotify is entitled to see how the Compositions were specifically excluded and in how many Blanket Licenses, and to ask witnesses why such exclusions were only made some of the time.

Second, Blanket Licenses that (like Spotify's) do *not* specifically exclude the Eight Mile Compositions are equally probative. As Kobalt agreed at the hearing, the norm in such instances is that the entire catalogue administered by Kobalt would fall within the scope of such a license. Spotify is entitled to review those licenses, to present them to sworn Kobalt witnesses, and to ask them what was being licensed pursuant to these agreements. Further, given Kobalt's production of accounting statements reflecting other licensees' royalty payments for the Compositions, Spotify should be able to ask witnesses—with reference to the actual Blanket Licenses—whether those royalty payments were made pursuant to Blanket Licenses that did not specifically exclude the Eight Mile Compositions.

During the hearing, Kobalt's counsel appeared to suggest that it would be impossible to know if payments from third parties for use of the Eight Mile Compositions were made pursuant to a Kobalt-issued blanket license or pursuant to some other license. Spotify is entitled to test that statement, and to the extent not even Kobalt knows what compositions are covered by its own blanket licenses, that hardly makes the Blanket Licenses irrelevant. To the contrary, it would support Spotify's reasonable belief that the Spotify-Kobalt Blanket License did cover the Compositions. Either way, whether they specifically exclude the Eight Mile Compositions or not, the Blanket Licenses go directly to the scope of Kobalt's licensing authority in the United States after 2011—an issue that is central to Spotify's claims and defenses in this litigation, and that Kobalt itself made *the* central feature of its own defense.

9

Kobalt makes the categorical assertion that "whatever representations or omissions Kobalt may have made to third parties, if any, is irrelevant" (Ex. C at 3). But ***individual*** licenses Kobalt has already produced affirm that Kobalt continued to exercise licensing authority with respect to the Eight Mile Compositions in the United States beyond 2011—when it claims to have lost such authority. For example, Kobalt recently produced a 2013 individual license for a third party's use of ███████████████████████████████████████████████████████████████. Kobalt's position that it ceased administering the Compositions for licensing purposes in the United States after 2011 does not turn on a distinction between individual and blanket licenses. If, as of 2013, Kobalt had the authority to issue an individual license to the Compositions—as it evidently did (or at least represented that it did)—that supports Spotify's expectation that the Blanket Licenses Kobalt is withholding will similarly reflect post-2011 licensing authority, and will do so in a licensing format (blanket as opposed to individual) that more closely aligns with the 2016 agreement with Spotify.

It is well-accepted that "[e]vidence concerning other contracts or business dealings may be relevant to prove the terms of a contract, the meaning of these terms, a business habit or custom, and occasionally, the authority of an agent." McCormick On Evid. § 198 (8th ed.) (2020). Accordingly, courts often recognize the relevance of similar third-party contracts in resolving disagreements over the meaning of a contract between the parties. *See, e.g.*, *One Source Env't, LLC v. M+W Zander, Inc.*, 2014 WL 5090855, at *3 (D. Vt. Oct. 9, 2014) (granting motion to compel production of third-party agreements as relevant to the interpretation of the parties' agreement); *Sedona Corp. v. Open Sols., Inc.*, 249 F.R.D. 19, 24 (D. Conn. 2008) (same); *SecuriMetrics, Inc. v. Iridian Techs., Inc.*, 2005 WL 8175969, at *3 (D.N.J. Feb. 10, 2005), *order clarified*, 2005 WL 8175978 (D.N.J. Dec. 16, 2005) ("to the extent [defendant] has entered into

10

contracts with [third parties] who are in similar situations as [plaintiff], the identical provisions in those contracts and the parties' course of dealing under such provisions are relevant to the interpretation of disputed terms in the [parties'] agreements"); *Sunrich, Inc. v. Pac. Foods of Oregon, Inc.*, 2003 WL 21088528, at *5 (D. Or. Mar. 4, 2003) (granting motion to compel production of third-party contracts as "likely to lead to the discovery of admissible evidence because it bears on industry practice and [an issue] involved in this case"). The Court should similarly grant Spotify access to such similar third-party agreements here.

### ii. Kobalt's arguments are premature and are not a basis upon which to deny Spotify discovery of the Blanket Licenses.

Rather than double down on its relevance objection, Kobalt instead focused during last week's hearing on its allegation that two emails Kobalt sent to HFA (in 2013 and 2015) eliminated Spotify's ability to believe that Kobalt administered licensing for the Compositions after 2011. To start, Kobalt puts the cart well before the horse in asking this Court to foreclose Spotify's discovery request by prematurely adjudicating Kobalt's merits argument, as the test is whether discovery "bears on" issues in the case and not whether the discovery sought would dispose of such issues. *See Marsico*, 370 F. App'x at 664; *Goodman*, 471 F. Supp. 3d at 839. But just as importantly, Kobalt's allegation that it "did not own, administer or otherwise control" the Compositions "at any time after February 2011" (Dkt. 108, Kobalt's Answer, ¶ 48) simply does not square with recently produced documents, including: ███████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

11

██████████████████████████████████████. In sum, there is much in the record already to question the substantive argument that Kobalt has advanced—and, at this point in discovery, Spotify needs and is entitled to the Blanket Licenses to help answer those questions.

**B.     The Production Burden On Kobalt Is Proportional And Minimal.**

The 87 Blanket Licenses present a low volume, particularly in relation to the more than 125,000 documents produced in this litigation to date, of which Spotify has itself produced more than 86,000. And with regard to Kobalt's comment at the hearing that the Blanket Licenses cover a nine-year span, that is largely irrelevant given that these documents would seem to have already been collected.[4] Nor has Kobalt argued that these documents are privileged, or even expressed any unique confidentiality concerns that cannot be ameliorated by the Protective Order. Indeed, other third-party licenses that Kobalt has produced have been designated under the Protective Order (Dkt. 164) without Kobalt availing itself of the most restricted designation. It would appear, then, that Kobalt has no heightened confidentiality concerns tempering Spotify's entitlement to these documents.

## CONCLUSION

Spotify respectfully requests that the Court compel Kobalt to produce the Blanket Licenses.

---

[4] With regard to other discovery requests, Kobalt has agreed that documents dating back as far as 2004 are relevant to this litigation (Ex. C at 2), so Spotify does not understand timing to be burdensome in this instance.

Dated: June 4, 2021                                              Respectfully Submitted,

                                                                 By: */s/ Aubrey B. Harwell III*

Kathleen M. Sullivan (*pro hac vice*)                            Aubrey B. Harwell III (BPR #017394)
Carey R. Ramos (*pro hac vice*)                                  Marie T. Scott (BPR # 032771)
Cory Struble (*pro hac vice*)                                    NEAL & HARWELL, PLC
QUINN EMANUEL URQUHART &                                         1201 Demonbreun Street, Suite 1000
SULLIVAN, LLP                                                    Nashville, Tennessee 37203
51 Madison Avenue, 22nd Floor                                    Telephone: (615) 244-1713
New York, New York 10010                                         Facsimile: (615) 726-0573
Telephone: (212) 895-2500                                        tharwell@nealharwell.com
kathleensullivan@quinnemanuel.com                                mscott@nealharwell.com
careyramos@quinnemanuel.com
corystruble@quinnemanuel.com                                     Matthew D. Ingber (*pro hac vice*)
                                                                 Rory K. Schneider (*pro hac vice*)
Thomas C. Rubin (*pro hac vice*)                                 Allison Aviki (*pro hac vice*)
QUINN EMANUEL URQUHART &                                         MAYER BROWN LLP
SULLIVAN, LLP                                                    1221 Avenue of the Americas
600 University Street, Suite 2800                                New York, New York 10020
Seattle, Washington 98101                                        Telephone: (212) 506-2500
Telephone: (206) 905-7000                                        mingber@mayerbrown.com
tomrubin@quinnemanuel.com                                        rschneider@mayerbrown.com
                                                                 aaviki@mayerbrown.com

                                                                 Andrew J. Pincus (*pro hac vice*)
                                                                 Archis A. Parasharami
                                                                 MAYER BROWN LLP
                                                                 1999 K Street, N.W.
                                                                 Washington, D.C. 20006
                                                                 Telephone: (202) 263-3328
                                                                 apincus@mayerbrown.com
                                                                 aparasharami@mayerbrown.com

                                                                 Allison L. Stillman (*pro hac vice*)
                                                                 LATHAM & WATKINS LLP
                                                                 885 Third Avenue
                                                                 New York, New York 10022
                                                                 Telephone: (212) 906-1200
                                                                 alli.stillman@lw.com

                               *Attorneys for Spotify USA Inc.*

# CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was filed electronically on June 4, 2021, with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to all parties and counsel of record by operation of the Court's CM/ECF system. All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's electronic filing system.

Timothy L. Warnock
Keane A. Barger
RILEY WARNOCK & JACOBSON, PLC
1906 West End Avenue
Nashville, Tennessee 37203
Telephone: (615) 320-3700
twarnock@rwjplc.com
kbarger@rwjplc.com

Brian D. Caplan
Robert W. Clarida
Julie Wlodinguer
REITLER KAILAS & ROSENBLATT LLC
885 Third Avenue, 20th Floor
New York, New York 10022
Telephone: (212) 209-3050
bcaplan@reitlerlaw.com
rclarida@reitlerlaw.com
jwlodinguer@reitlerlaw.com

Mark H. Wildasin
U.S. Attorney's Office
Middle District of Tennessee
110 Ninth Avenue, Sout
Suite A961
Nashville, TN 37203
Telephone: (615) 736-2079
mark.wildasin@usdoj.gov

Richard S. Busch
Lorne G. Hiller
Virginia M. King
KING & BALLOW
315 Union Street, Suite 1100
Nashville, Tennessee 37201
Telephone: (615) 259-3456
rbusch@kingballow.com
lhiller@kingballow.com
vking@kingballow.com

Andrew Hunt Davis
628 Westcott Lane
Nolensville, TN 37135
Telephone: (615) 838-1438
ddavis@kingballow.com

James F. Blumstein
Vanderbilt University
131 21st Avenue South
Nashville, TN 37203
Telephone: (615) 343-3939
james.blumstein@vanderbilt.edu

Jay S. Bowen
Lauren E. Kilgore
SHACKELFORD BOWEN MCKINLEY & NORTON, LLP
1 Music Circle South, Suite 300
Nashville, Tennessee 37203
Telephone: (615) 329-4440
jbowen@shackelford.law
lkilgore@shackelford.law

Chris M. LaRocco
Matias Gallego-Manzano
BRYAN CAVE LEIGHTON PAISNER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 541-2000
chris.larocco@bclplaw.com
matias.gallego-manzano@bclplaw.com

*/s/ Aubrey B. Harwell III*

15

Case 3:19-cv-00736   Document 175   Filed 06/04/21   Page 15 of 15 PageID #: 1543