UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| **EIGHT MILE STYLE, LLC and** | ) | |
| **MARTIN AFFILIATED, LLC,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | Case No. 3:19-cv-0736 |
| | ) | Judge Aleta A. Trauger |
| **SPOTIFY USA INC. and** | ) | |
| **HARRY FOX AGENCY, LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |
| | ) | |
| **SPOTIFY USA INC.,** | ) | |
| | ) | |
| **Third-Party Plaintiff,** | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **KOBALT MUSIC PUBLISHING** | ) | |
| **AMERICA, INC.,** | ) | |
| | ) | |
| **Third-Party Defendant** | ) | |

## MEMORANDUM & ORDER

Spotify USA Inc. ("Spotify") has filed a Motion to Compel Production of Documents (Doc. No. 174), to which Kobalt Music Publishing America, Inc. ("Kobalt") has filed a Response (Doc. No. 183), and Spotify has filed a Reply (Doc. No. 188). For the reasons set out herein, the motion will be granted.

## I. BACKGROUND

Music streaming services operate in extraordinary bulk. Such services aspire, to the extent economically and practically feasible, toward the ideal of the so-called "celestial jukebox[]"—a service that allows the listener to choose whatever music he would like to enjoy from a library so

comprehensive that it would have seemed almost miraculous until fairly recently. *See Bonneville Int'l Corp. v. Peters*, 153 F. Supp. 2d 763, 767 n.4 (E.D. Pa. 2001); *see also* N. Jansen Calamita, Coming to Terms with the Celestial Jukebox: Keeping the Sound Recording Copyright Viable in the Digital Age, 74 B.U. L. Rev. 505, 505 (1994). To that end, a streaming service needs many things—reliable software, physical infrastructure, and the business acumen to make the entire operation sustainable, to name a few. But, as much as anything, a music streaming service needs copyright licenses—a huge number of them. Getting the licenses necessary to lawfully stream the music that a company's users want to stream is, to say the least, important.

There are a few ways to obtain licenses to stream musical compositions, including composition-specific "compulsory licenses," which permit an entity to obtain certain non-exclusive rights to a composition, including the reproduction and distribution rights necessary for streaming, without the consent or participation of the rights owner. Obtaining a compulsory license, however, requires relatively strict observance of certain procedural requirements, without which an entity's chance at obtaining a license without the copyright holder's consent is lost. *See Yesh Music, LLC v. Amazon.com, Inc.*, 249 F. Supp. 3d 645, 651 (E.D.N.Y. 2017) ("Once a copyright owner distributes the musical work to the public, . . . anyone may obtain a compulsory license in the musical work by serving [a notice of intent ('NOI')] on the copyright owner within the applicable time frame and following other specific requirements set out in the copyright regulations." ) (citing 17 U.S.C. § 115(a), (b)) (internal quotation omitted). Obtaining licenses on a composition-by-composition basis, moreover, is demanding—perhaps prohibitively so—for a company that aspires to being able to meet nearly every need of nearly every listener. One mechanism for addressing this problem is to obtain a non-compulsory—meaning, voluntarily negotiated and agreed to—"blanket license" from an entity that is empowered by individual

copyright holders to administer the licensing of a vast catalog of copyrights in musical compositions. In light of the size of such musical catalogs, a blanket license will typically simply confer non-exclusive rights to the administrator's entire catalog—with, in some instances, specifically enumerated carveouts—rather than painstakingly enumerating the works at issue.

Kobalt is a musical publishing company with the rights to administer over 500,000 musical compositions—precisely the type of entity from which a streaming service might want to obtain a blanket license. (Doc. No. 184 ¶ 5.) In 2016, Kobalt entered into such a license agreement, which the court will call the "2016 Blanket License," with Spotify, which operates a major music streaming service. (*Id.* ¶ 22.) The 2016 Blanket License grants Spotify the right to reproduce and distribute sound recordings embodying any "copyrighted, non-dramatic musical composition[s] . . . that [Kobalt], whether now or during the Term, owns, controls, or administers"—which the agreement refers to as the "Publisher Compositions." (*Id.* ¶ 24.) As the language of the 2016 Blanket License suggests, what was or was not a Publisher Composition was expected to (and did) change over time, as Kobalt gained and lost rights related to various composers' works. The license agreement itself, moreover, did not identify any particular Publisher Compositions, either within the main body of the agreement or in any attachment. (*Id.* ¶ 25.) For Spotify to actually know whether a particular work was covered by the 2016 Blanket License at any given time, therefore, it would have to do some (but not necessarily much) additional digging. According to Kobalt, a blanket licensee can access a "data feed" including up-to-date information regarding Kobalt's catalog. (*Id.* ¶ 17.)

The plaintiffs are entities that own the rights to compositions by Marshall Mathers, commonly known to the public under his recording and performing name, Eminem. Specifically, the plaintiffs own the rights to an identified list of compositions referred to, for the purposes of

3

this case, as the Eight Mile Compositions. (Doc. No. 97 ¶ 1.) All parties to this case appear to agree that the plaintiffs were, at the relevant times, clients of Kobalt, although the precise nature of that relationship—specifically, which rights the plaintiffs granted to Kobalt and which rights they reserved for themselves—is contested. On August 21, 2019, the plaintiffs filed a Complaint in this court against Spotify, alleging that Spotify committed copyright infringement of the Eight Mile Compositions by allowing its users to stream recordings embodying those compositions, despite Spotify's lacking valid licenses to do so. (Doc. No. 1.) On May 29, 2020, Spotify filed a Third-Party Complaint against Kobalt, arguing that Kobalt either (1) licensed the Eight Mile Compositions to Spotify as part of the catalog covered by the 2016 Blanket License or (2) has an obligation to indemnify Spotify for Spotify's infringement, which Spotify committed based on its reasonable belief that the 2016 Blanket License covered those compositions. (Doc. No. 91.)

Kobalt has provided a Declaration by Bob Bruderman, its Executive Vice President of Global Digital Partnerships, explaining, among other things, Kobalt's history of dealings with the plaintiffs. (Doc. No. 184.) According to Bruderman, "Kobalt was, for a very brief time prior to February 4, 2011, the worldwide administrator of [the plaintiffs'] interests in" the Eight Mile Compositions. (*Id.* ¶ 7.) According to Bruderman, however, that particular relationship ended, and, "[o]n or about February 4, 2011, Kobalt entered into a *collection* agreement (the 'Collection Agreement') with Bridgeport Music, Inc. ("Bridgeport"), the U.S. administrator for [the] plaintiffs . . . [,] wherein Kobalt agreed to act as the collection agent for Bridgeport with respect to payments for the commercial exploitation of Plaintiffs' interests in" the Eight Mile Compositions. (*Id.* ¶ 6 (emphasis added).) The Collection Agreement, according to Bruderman, remains in effect, which would mean that, for the last decade, Kobalt has been collecting royalties related to the Eight Mile Compositions—much as if it were the plaintiffs' copyright

4

administrator—but it did not have any authority to actually license those compositions, although it did, "briefly," have that authority to do so prior to the current arrangement. (*Id.* ¶¶ 7, 9.)

On June 10, 2020, Spotify sent Kobalt its First Set of Requests for the Production of Documents. (Doc. No. 175-1.) Spotify requested, among other things, all documents and communications concerning Kobalt's "involvement in the licensing and/or administration of any of the Compositions . . . with Streaming Services other than Spotify." (*Id.* ¶ 43.) On August 10, 2020, Kobalt sent Spotify a Response indicating that it would comply with some of Spotify's requests but that it objected to the request regarding licensing to other steaming services on the ground that the request is

> overbroad and unduly burdensome, that it is vague and ambiguous, that it seeks documents that are neither relevant to the claims or defenses of any party and are disproportionate to the needs of the case, that it seeks documents without geographic limitation, [and] that it does not contain any relevant or reasonable time restriction.

(Doc. No. 175-2 at 36.) The parties met and conferred regarding the issue and other discovery-related disagreements, but they were unable to reach an accord regarding what Kobalt would produce regarding its licensing to other companies.

On November 20, 2020, Kobalt's counsel sent Spotify's counsel a letter setting forth its understanding of the disagreement and its position. (Doc. No. 175-3.) Counsel for Kobalt wrote:

> Kobalt's agreements with third parties, including other streaming services, have no conceivable nexus to Spotify's claims that Kobalt granted a mechanical license to Spotify to stream the Compositions. Moreover, Spotify does not allege that it relied on anything other than Spotify's and Kobalt's mechanical license agreement . . . and/or representations or omissions to Spotify and/or its agent, in exploiting the Compositions on its platform. Thus, whatever representations or omissions Kobalt may have made to third parties, if any, is irrelevant to the instant action.

(*Id.* at 3.) Despite its objections, Kobalt agreed to "produce documents and communications relating to Kobalt's synch licenses or individual mechanical licenses for any of the Compositions

5

or for Plaintiffs' repertoire for use in the United States from January 1, 2011 to the present that it has within its possession, custody or control." (*Id.* at 3–4.) Kobalt drew the line, however, at producing its blanket licenses with third parties, stating that "[s]uch blanket licenses will not assist a trier of fact in determining any issue of this case and it is an unduly burdensome exercise to require Kobalt to search for, review, and produce those agreements and related communications regarding the negotiation or effectuation thereof." (*Id.* at 4.)

On May 25, 2021, the court held a telephone conference with the parties to discuss the issue. During the telephone conference, it quickly became clear that the parties were not on the same page regarding the scope of Spotify's request. Kobalt believed that Spotify was seeking, not simply the blanket licenses themselves, but also a great deal of additional documentation that would have assisted in understanding those licenses' scope and operation. Spotify clarified, however, that it was, at least at this juncture, only seeking the licenses themselves. The court ordered Spotify to file a motion to compel so that the issue could be fully briefed, with any misunderstandings resolved. On June 4, 2021, Spotify did so, asking the court to order Kobalt to produce "87 third-party blanket license agreements along with the amendments to those agreements." (Doc. No. 174.) Spotify argues that the content of the licenses—including, particularly, whether they expressly carve out the Eight Mile Compositions—is relevant to the questions of (1) whether Kobalt retained or believed it retained the right to license the Eight Mile Compositions and (2) whether Spotify was reasonable in its belief that Kobalt did have such authority. Kobalt opposes the motion on the ground that the materials sought are "wholly irrelevant to this action and would serve as a gateway to excessively burdensome additional discovery." (Doc. No. 183 at 1.)

## II. LEGAL STANDARD

6

Case 3:19-cv-00736   Document 196   Filed 07/30/21   Page 6 of 10 PageID #: 1807

Rule 26(b)(1) of the Federal Rules of Civil Procedure provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense," as long as the discovery requested is "proportional to the needs of the case." Relevance, as the concept is used in Rule 26(b)(1), "has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978) (citing *Hickman v. Taylor*, 329 U.S. 495, 501 (1947)); *accord Marsico v. Sears Holding Corp.*, 370 F. App'x 658, 664 (6th Cir. 2010). Even if the party seeking discovery establishes the threshold requirement of relevance, however, "district courts have discretion to limit the scope of discovery where the information sought is overly broad or would prove unduly burdensome to produce." *Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 305 (6th Cir. 2007) (citations omitted).

### III. ANALYSIS

The parties appear to agree that producing the 87 requested agreements and related amendments would be, in and of itself, a fairly minor burden on Kobalt, particularly when compared to the voluminous other discovery that this case has already occasioned. Kobalt complains that "Spotify is really seeking to open the door to many additional subpoenas, depositions, document requests, and questions about Kobalt's business dealings with the Non-Party Licensees that have nothing to do with the contractual relationship between Spotify and Kobalt." (Doc. No. 183 at 19.) But if Spotify seeks future onerous discovery, there is a simple solution available to Kobalt: object again and, if the parties cannot agree following a meet-and-confer, come right back to the court, so that it can rule on the *actual* burdensome requests, not the request that Kobalt merely fears will lead to future overstepping. Because the burden associated

7

with this request is relatively minor, the determinative question is whether the non-party blanket licenses satisfy the standard for relevance under Rule 26.

As Kobalt points out, Spotify does not claim that its own personnel actually reviewed the non-party blanket licenses or that they formed their understanding of the scope of Kobalt's authority based on those agreements. Kobalt is correct that this fact weighs against the documents' potential relevance. Nevertheless, as Spotify has noted, Kobalt's dealings with other parties could still be reasonably expected to shed light on industry custom and habit related to blanket licensing and what a licensee might reasonably expect under such agreements. Moreover, if Kobalt had a policy of carving the Eight Mile Compositions out of its blanket licenses—as appears to have been the case at least once—it would raise reasonable questions regarding why no such carveout existed in Spotify's license.

Due to the substantial music industry presence in this district, this court has had the occasion to consider a number of copyright disputes related to musical compositions. It is the experience of the court that the music industry, like many other industries—construction, for example—is steeped in industry-specific customs, norms, understandings, and expectations that can make even straightforward events and transactions difficult for an outsider to interpret. As such, it is often helpful to explore, not merely the specific dispute that gave rise to litigation, but also broader practices in the industry that provide the context for that dispute. As the discovery that Spotify seeks could be reasonably expected to provide such useful context, the court is inclined to grant at least this one, relatively modest request. *See* 1 McCormick On Evid. § 198 (8th ed.) ("Evidence concerning other contracts or business dealings may be relevant to prove . . . a business habit or custom, and occasionally, the authority of an agent.").

Kobalt suggests that, even insofar as Spotify's arguments could be persuasive on an abstract level, the court should not be swayed in this instance because the evidence already available resolves any question regarding whether (1) Spotify could have reasonably believed that it was licensing the Eight Mile Compositions and (2) whether Kobalt was representing to other parties that it could license those compositions. (Doc. No. 181 at 6.) The court, however, is not inclined to resolve those purely factual questions at this early stage or in the context of a minimally burdensome discovery motion.

The court, accordingly, will grant Spotify's motion. It will do so, however, while also noting that nothing about its ruling should be construed as concluding that other potential document requests regarding non-party relationships, particularly requests that would be more burdensome and/or invasive than this one, would also be proper. Kobalt has raised legitimate points regarding whether the materials covered by such discovery would be relevant, and the court's ruling in this instance is dependent on the fact that the minimal burden involved means that only a relatively weak showing of relevance is sufficient to demonstrate that the requested document production would be "proportional to the needs of the case." Fed. R. Civ. P. 26(b). Spotify states that it has "no intent to engage in th[e] kind of expansive third-party discovery" that Kobalt fears, which, the court hopes, means that this ruling will resolve the matter. (Doc. No. 188 at 2.) If, however, Spotify changes its plans and does make any more onerous future request, the court will be prepared to consider any necessary motion at that time.

## IV. CONCLUSION

For the foregoing reasons, Spotify's Motion to Compel Production of Documents (Doc. No. 174) is hereby **GRANTED**, and Kobalt is **ORDERED** to produce the 87 third-party blanket

9

Case 3:19-cv-00736    Document 196    Filed 07/30/21    Page 9 of 10 PageID #: 1810

licenses described in Spotify's motion and any amendments thereto, in a manner consistent with the Stipulated Protective Order governing this case (Doc. No. 164).

It is so **ORDERED**.

_____
ALETA A. TRAUGER
United States District Judge