| | |
|---|---|
| EIGHT MILE STYLE, LLC; MARTIN AFFILIATED, LLC, <br><br> *Plaintiffs,* <br><br> v. <br><br> SPOTIFY USA INC.; HARRY FOX AGENCY, LLC, <br><br> *Defendants.* | Civil Case No. 19-CV-00736 <br><br> Hon. Aleta A. Trauger <br><br> JURY DEMAND |
| SPOTIFY USA INC., <br><br> *Third-Party Plaintiff*, <br><br> v. <br><br> KOBALT MUSIC PUBLISHING AMERICA, INC., <br><br> *Third-Party Defendant*. | |

### *AMICUS CURIAE* DIGITAL MEDIA ASSOCIATION'S MEMORANDUM IN SUPPORT OF DEFENDANT SPOTIFY USA INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

                                                                                                                  **Page(s)**

Introduction and Interest of *Amicus Curiae* ................................................................................. 1

Summary of Argument ................................................................................................................... 2

Argument ........................................................................................................................................ 4

       I.       The MMA "Grand Bargain" .................................................................................... 4

       II.      The "Foreclosure" Theory Flouts the Text, Intention, Purpose, Design, and Industry-wide Understanding of the MMA ........................................................... 8

Conclusion ................................................................................................................................... 13

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Eich v. Apple, Inc.*, No. 17-cv-9857 (E.D.N.Y. Dec. 17, 2017) ....................................................... 5

*Ferrick v. Spotify USA Inc.*, 2018 WL 2324076 (S.D.N.Y. May 22, 2018) ................................... 5

*Lowery v. Rhapsody*, No. 16-1135 (N.D. Cal. Mar. 7, 2016) ........................................................ 5

**Statutes**

Orrin G. Hatch-Bob Goodlatte Music Modernization Act of 2018, Pub. L. No.
    115-264, 132 Stat. 3676 ("MMA") ................................................................................ *passim*

17 U.S.C. §115 ............................................................................................................... *passim*

**Other Authorities**

Glenn Peoples, *Why UMG's Public Debut Boosted Warner & Other Music Stocks
    Too*, BILLBOARD (Sept. 21, 2021), https://www.billboard.com/pro/universal-
    music-public-listing-warner-stocks/ ............................................................................................ 2

H.R. Rep. No. 115-651, at 5 (2018) ............................................................................................. 12

Joshua P. Friedlander & Matthew Bass, *Year-End 2022 RIAA Revenue Statistics*,
    RECORDING INDUSTRY ASSOCIATION OF AMERICA (Dec. 2022),
    https://www.riaa.com/wp-content/uploads/2023/03/2022-Year-End-Music-
    Industry-Revenue-Report.pdf ...................................................................................................... 1

Kristin Robinson, *U.S. Music Publishing Revenue Grew 19% to $5.6B Last Year*,
    BILLBOARD (June 14, 2023), https://www.billboard.com/pro/music-publishing-
    revenue-2022-united-states-nmpa/ .............................................................................................. 2

Mark Mulligan, *How the DNA of a hit has changed over 20 years*, MIDIA
    RESEARCH (July 13, 2020), https://www.midiaresearch.com/blog/how-the-dna-
    of-a-hit-has-changed-over-20-
    years#:~:text=The%20more%20top%2Dclass%20songwriters,a%20larger%
    20number%20of%20people ......................................................................................................... 4

Murray Stassen, *At Least $5 Billion was Spent on Music Rights Acquisitions in
    2021. Could 2022 be Even Bigger?*, MUSICBUSINESS WORLDWIDE (Jan. 10,
    2022), https://www.musicbusinessworldwide.com/at-least-5-billion-was-
    spent-on-music-catalog-acquisitions-in-2021-could-2022-be-even-bigger/ ............................... 2

S. Rep. No. 115-339 (2018) ......................................................................................................... 10

Statement from the Digital License Coordinator on Transfer of Historical Royalty
    Payments (Feb. 16, 2021),
    https://digitallicenseecoordinator.org/resource/statement-from-the-digital-
    licensee-coordinator-on-transfer-of-historical-unmatched-royalty-payments/ ..........................7

Statement of Christopher Harrison, Chief Executive Officer, DiMA, before the
    United States Senate Judiciary Committee, at *5, 7–9, 12–13 (May 15, 2018) ..................6, 10

Statement of David M. Israelite, President and CEO, National Music Publishers'
    Association, before the United States Senate Judiciary Committee, at *6 (May
    15, 2018) ......................................................................................................................5, 6

Statement of Rep. Bob Goodlatte, Orrin G. Hatch-Bob Goodlatte Music
    Modernization Act: A Legislative History of Public Law No. 115-264, at
    E1319 (2020) ......................................................................................................................6

Digital Media Association ("DiMA" or "Movant") hereby respectfully submits this Memorandum of Law in support of Defendant Spotify USA Inc.'s ("Spotify") Opposition to Plaintiffs' Motion for Summary Judgment (ECF No. 426). For the reasons discussed below, Spotify's interpretation of certain provisions of 17 U.S.C. § 115, as modified by the 2018 Music Modernization Act (the "MMA"), should be endorsed by this Court, and Plaintiffs' interpretation rejected.

**Introduction and Interest of *Amicus Curiae***

DiMA is a trade association that represents the world's leading audio streaming services and innovators: Amazon, Apple Music, Feed.fm, Pandora, Spotify,[1] and YouTube. Together these digital music providers ("DMPs") connect millions of fans across the nation and around the world with essentially the entire history of recorded music, providing a dynamic and engaging listening experience and constantly innovating to strengthen the connection between artists and fans.

The state of the music industry in 2023 represents a true sea-change from the circumstances of just a decade ago, when the music industry was faced with declining revenues and struggling with how to get people to pay for music. DiMA's members and their rightsholder partners changed that trajectory. As the data show, streaming has reduced piracy and played a central role in the resurgence of the music industry. In 2022, streaming revenue for recorded music in the U.S. grew to "a record high [of] $13.3 billion," accounting for nearly 84 percent of the total revenue of the U.S. recorded music industry and resulting in the seventh consecutive year of growth.[2] The story is similar for music publishing revenues, with overall year-over-year growth of 19 percent in 2022

---

[1] No party in this litigation nor counsel for any party in this litigation (including Spotify) authored this Memorandum in whole or in part, or made any monetary contribution intended to fund the preparation or submission of this Memorandum.

[2] Joshua P. Friedlander & Matthew Bass, *Year-End 2022 RIAA Revenue Statistics*, RECORDING INDUSTRY ASSOCIATION OF AMERICA (Dec. 2022), https://www.riaa.com/wp-content/uploads/2023/03/2022-Year-End-Music-Industry-Revenue-Report.pdf.

to $5.6 billion, with streaming at the heart of that increase.[3] Those increased streaming revenues have boosted payments to artists and songwriters and been a central driver of successful music company IPOs, billions of dollars of rights catalog acquisitions, and major investments throughout the industry.[4]

While DiMA's member companies differ in size and business model, the revolutionary services they have built and the growth to which they have contributed all rely on the protections—and stability—of U.S. copyright law. This legal framework—17 U.S.C. §115 and the innovations of the MMA in particular—has allowed our members the flexibility that is critical to continue to innovate and develop global audio services that drive revenues for music rights owners and have returned the music industry to growth.

## Summary of Argument

The parties' pleadings and summary judgment briefing in the case implicate an issue of vital importance to DiMA and its DMP members: the breadth of coverage of the blanket license under Section 115(d) of the Copyright Act. As we understand it, one question (of many) before the Court on summary judgment is whether a DMP that failed properly to secure an individual compulsory mechanical license for a musical work though the Notice of Inquiry ("NOI") process that governed prior to the license availability date (January 1, 2021) is now "foreclosed" from offering tracks embodying that work to users under the blanket license, or whether the blanket license provides comprehensive coverage. *See, e.g.,* Pl.'s Am. Compl. ¶¶ 74, 109 (ECF No. 97).

---

[3] Kristin Robinson, *U.S. Music Publishing Revenue Grew 19% to $5.6B Last Year*, BILLBOARD (June 14, 2023), https://www.billboard.com/pro/music-publishing-revenue-2022-united-states-nmpa/.

[4] Glenn Peoples, *Why UMG's Public Debut Boosted Warner & Other Music Stocks Too*, BILLBOARD (Sept. 21, 2021), https://www.billboard.com/pro/universal-music-public-listing-warner-stocks/; Murray Stassen, *At Least $5 Billion was Spent on Music Rights Acquisitions in 2021. Could 2022 be Even Bigger?*, MUSICBUSINESS WORLDWIDE (Jan. 10, 2022), https://www.musicbusinessworldwide.com/at-least-5-billion-was-spent-on-music-catalog-acquisitions-in-2021-could-2022-be-even-bigger/.

As a key participant in the negotiation, drafting, and passage of the MMA, DiMA is uniquely positioned to assist the court in understanding the text, history, purpose, and intention of the MMA, the industry-wide consensus around what the MMA was intended to achieve, and how Section 115 operates in practice to achieve its intended results. As we explain, the MMA represented a once-in-a-generation consensus among all sectors of the music industry and its Congressional champions, addressing longstanding inefficiencies in the mechanical licensing ecosystem that had, by 2018, reached a point of crisis, with infringement risk and uncertainty threatening the very future of the DMPs whose innovative offerings had helped combat widespread piracy and turned declining revenues into rapid gains for artists and songwriters. *Supra* note 2–4.

The "foreclosure theory" would undo all that progress and undermine the certainty Congress intended the MMA to deliver to DMPs and copyright owners. The theory not only runs contrary to the plain text of section 115 as amended by the MMA, but is a complete outlier to the consensus understanding that prevailed among the copyright owners and DMPs who worked with Congress to enact the MMA and establish the blanket license, and who have successfully operated under its provisions since its implementation. It would jettison the bargain at the heart of the legislation and the fundamental benefit of the blanket license—comprehensive *blanket* coverage—and replace it with gaping holes in coverage that would not only subject DMPs to potentially crippling infringement risk, but harm the songwriters and artists who rely on the DMPs as a crucial source of revenue. The MMA was intended to *solve* the problems plaguing the industry, not exacerbate them, and neither DiMA nor any rational DMP would have supported the legislation were the blanket license riddled with gaps that would gut the benefits of

3

the blanket license and undermine the very certainty (and attendant investment) Congress clearly envisioned when it enacted the law.

## Argument

### I. The MMA "Grand Bargain"

The background and history leading to the passage of the MMA provide useful context here. Before the MMA, compulsory mechanical licenses were available solely on a work-by-work basis, and obtaining them involved a convoluted process whereby a DMP would need to identify the copyright owner of each and every song offered on its service and send an individualized notice of intent to license (NOI) to each of them in advance (or within 30 days) of streaming the track. This work-by-work process functioned well enough in an era where music was distributed an album or CD at a time, but ran into massive complications when applied to the new breed of on-demand services, the most prominent of which are represented by DiMA. The value proposition of those DMPs was (and remains) comprehensive catalogs of tens or even hundreds of millions of works. While that model did wonders to combat piracy and revolutionize the music industry, it also confronted the DMPs with the challenging task of clearing each of those millions of works one-by-one. That task was made even more difficult by the lack of a definitive database matching recorded music tracks with the owners of the musical compositions embodied therein and the fact that such ownership (including the common practice of split ownership for co-written works) is often not known by the record companies that distribute the tracks to DMPs (or even decided among those who write the songs) at the time of release—leaving DMPs uncertain of where to even send many NOIs.[5]

---

[5] The nature of songwriting has changed over time, with an average number of songwriters per song increasing from 2.4 to 4. Each of these songwriters can have unequal shares in the composition copyright claim and each may be affiliated with a different music publisher. *See* Mark Mulligan, *How the DNA of a hit has changed over 20 years*,

4

For such "unmatched" works, DMPs were thus typically relegated to a process (as spelled out in the pre-MMA version of Section 115) of sending NOIs to the Copyright Office instead of the (unknown) copyright owner. Again, this longstanding practice was fine when dealing with an album, but became incredibly burdensome when millions of tracks were involved. And past practice created significant discontent in the music publishing community, as Section 115 specified that DMPs were excused from paying royalties on such unmatched works until the work was registered and the owner identified. *See, e.g.,* Statement of David M. Israelite at *6 (referencing 60 million "royalty-free" NOIs filed with the Copyright Office by DMPs).

There are many other issues with the "old" Section 115 system too numerous to detail here, but a couple of key points emerge. First, the cumbersome work-by-work clearance process, in addition to creating tremendous costs and inefficiencies, inevitably led to mistakes and gaps in license coverage, including songs where NOIs were not sent. These oversights led to a raft of class action and individual music publisher litigation seeking hundreds of millions, if not billions, of dollars in statutory copyright infringement damages from major DMPs. *See*, *e.g.*, *Ferrick v. Spotify USA Inc.*, 2018 WL 2324076 (S.D.N.Y. May 22, 2018); *Lowery v. Rhapsody*, No. 16-1135 (N.D. Cal. Mar. 7, 2016); *Eich v. Apple, Inc.*, No. 17-cv-9857 (E.D.N.Y. Dec. 17, 2017). Second, the work-by-work NOI process created a huge pool of unpaid royalties for unmatched works. (The leading DMPs accrued royalties for unmatched works for which notice had been sent to the Copyright Office, notwithstanding the statutory exemption from that obligation.). And at a more general level, these and many other issues led to a climate rife with uncertainty and liability risk that curbed investment, wasted resources, and drained money from both services and songwriters.[6]

---

MIDIA RESEARCH (July 13, 2020), https://www.midiaresearch.com/blog/how-the-dna-of-a-hit-has-changed-over-20-years#:~:text=The%20more%20top%2Dclass%20songwriters,a%20larger%20 20number%20of%20people.

[6] *See, e.g.,* Statement of David M. Israelite, President and CEO, National Music Publishers' Association, before the United States Senate Judiciary Committee, at *6 (May 15, 2018) (testifying that songwriters "livelihood is

5

Case 3:19-cv-00736    Document 471    Filed 01/22/24    Page 9 of 18 PageID #: 40224

Recognizing the mechanical licensing system was fundamentally broken and standing in the way of investment and growth in the very category of service provider that was now the primary form of music distribution in the U.S., the entire music industry—songwriters, music publishers, record companies, and the DMPs (led by DiMA)—came together with Congressional champions to work towards a solution. That solution, now enshrined in the MMA, took the form of what the President and CEO of the National Music Publishers' Association referred to as a "grand compromise," *see* Statement of David M. Israelite at 8, and what everyone involved recognized as a landmark set of promises and tradeoffs.[7]

As part of this "grand compromise," the songwriters and publishers secured many benefits from the DMPs, including their agreement to make immediate payment of the accrued royalties for unmatched works to the Mechanical License Collective ("MLC"). Pursuant to the limitation on liability in the statute, twenty different music providers, spanning the range of smaller startups to the largest and most established services, transferred a combined $424.4 million in historical unmatched royalties and accompanying historical usage information to the MLC so that it could

---

threatened by the failure of law to keep pace with technology" and explaining that the MMA "works to correct many of the outdated and antiquated provisions of U.S. copyright laws that today impeded the proper functioning" of the market); Statement of Christopher Harrison, Chief Executive Officer, DiMA, before the United States Senate Judiciary Committee, at *5, 7–9, 12–13 (May 15, 2018) ("Antiquated procedures for utilizing the Section 115 license have forced digital music providers to curtail their catalog or risk copyright infringement litigation. Business uncertainty has reduced investments in new products and services and discouraged new market entrants.").

[7] *See, e.g.*, Statement of Rep. Bob Goodlatte, Orrin G. Hatch-Bob Goodlatte Music Modernization Act: A Legislative History of Public Law No. 115-264, at E1319 (2020) (stating that he "challenged the [music] industry to put their differences aside and to come together to create a unified reform bill, and to their credit, they delivered. This legislation has the support of songwriters, musical works copyright owners, digital music providers, individual artists, sound recording copyright owners, artist guilds, and performing rights organizations."); Statement of Sen. Lamar Alexander, *id.* at S6260 ("We have been able to get so far because the songwriters and the publishers and the digital music companies and the broadcasters and the record labels and others decided to work together over the last 2 or 3 years on what they agree on instead of on what they disagree."); Statement of Sen. Lamar Alexander quoting Sen. Grassley, *id.* ("The Music Modernization Act will really help songwriters, artists, publishers, producers, distributors, and other music industry stakeholders. This bill is the product of long and hard negotiations and compromise.").

identify the proper recipients and get the money in the songwriters' hands.[8] The songwriters and publishers also received a system whereby DMPs provide ongoing usage data and make royalty payments to the MLC whether ownership is known or unknown, replacing the practice whereby DMPs were excused from (or chose to escrow) payment until the owner correctly registered the work. Finally, the publishers and songwriters received a number of other benefits integral to the overall MMA bargain: the MLC being entirely funded by the DMPs rather than by an assessment against songwriter/publisher royalties; a change to a market-based rate-setting standard to govern Copyright Royalty Board ("CRB") proceedings; a centralized public database of song-ownership information and an ownership portal allowing copyright owners to identify and claim their songs; and the ability of the ASCAP and BMI rate courts to consider label royalties as benchmarks when setting royalty rates for musical works performances, which had previously been forbidden, among others.

In exchange for these compromises, DiMA and its DMP members received two key benefits absolutely essential to their support of the legislation. First, in exchange for payment of historical (and ongoing) unmatched royalties, the MMA provided a shield against infringement liability, even where the NOI process had failed (due to the ineffective process described above), for all uses before the blanket license availability date. 17 U.S.C. §115(d)(10). Second, starting on January 1, 2021, the MMA provided DMPs with a blanket license that would provide comprehensive coverage and eliminate the work-by-work licensing process (and attendant litigation) that existed prior to the MMA. 17 U.S.C. §115(d).

---

[8] *See* Statement from the Digital License Coordinator on Transfer of Historical Royalty Payments (Feb. 16, 2021), https://digitallicensecoordinator.org/resources/statement-from-the-digital-license-coordinator-on-transfer-of-historical-unmatched-royalty-payments/.

DiMA was intimately involved in every step of the MMA negotiation, with its leaders working closely with the Act's Congressional sponsors and songwriter and publishing company leaders and standing side-by-side with them in the Oval Office when the Act was signed into law. DiMA's participation (and that of its members) was absolutely vital to the MMA's development and passage. Given that involvement, DiMA has intimate knowledge of the concerns, tradeoffs, and intended operation of the MMA. For reasons set forth below, we can confidently say absolutely *no one* involved in the negotiation of the MMA thought the statute worked to "foreclose" any works from coverage under the blanket license—and DiMA would not have supported it if it did.

## II. The "Foreclosure" Theory Flouts the Text, Intention, Purpose, Design, and Industry-wide Understanding of the MMA

We understand that Spotify has explained in its opposition brief why the foreclosure theory is unsupported as a matter of statutory text and interpretation. DiMA will not delve into textual arguments here, except to highlight one that is, in our view, dispositive on its own. The subsection on which the argument rests, §115 (b)(4)(B)(i)(I), is clear that the failure to serve a notice of intention as required by paragraph (2)(A) "forecloses" the possibility of a compulsory license only "*under such paragraph*," *i.e.*, paragraph (2)(A). Paragraph (2)(A), in turn, deals solely with the process for obtaining a compulsory license during the period *"prior to the license availability date"* (emphasis added). Taken together, these provisions lead to the uncontroversial conclusion that a licensor that failed properly to serve an NOI prior to the blanket license availability date was foreclosed from receiving a compulsory license *prior to the availability date*—which is all that (2)(A) ("such paragraph") addresses.

Nothing in either of those two paragraphs addresses licensing (or any conditions for foreclosure) during the period *after* the blanket license availability date, the procedure for which

8

is addressed by a separate, parallel, set of paragraphs: §115 (b)(4)(B)(i)(II) and (b)(2)(B). Those latter paragraphs address the specific circumstances under which the *blanket* license is foreclosed: basically, where one fails to follow the blanket notice processes of §115 (b)(2)(B). But they in no way suggest that access to works under the blanket license is foreclosed by one's prior failure to follow the dictates of (2)(A) prior to the license availability date as well. Were it Congress's intent that the foreclosure provisions were meant to be cumulative, this surely would have been the place to say it. Congress did not.

***"Foreclosure" Theory Violates Core Pillars of the "Grand Compromise."*** With those statutory infirmities noted, we turn now to particular problems with the foreclosure theory where DiMA, as the service-side representative in the drafting and negotiation of the MMA, is uniquely positioned to offer assistance to the Court. To start, as should be immediately evident, the "foreclosure" theory violates two core pillars of the "grand compromise" described above. First, it would turn the blanket license into something that is no blanket at all, but a spotty patchwork that would sacrifice the certainty of comprehensive license coverage and replace it with the need to investigate, song-by-song, which songs, among catalogs numbering as high as 100 million songs, were and were not properly cleared via the NOI process in the years before enactment—a task only further complicated by inevitable and regular changes in publishing ownership for many tracks occurring in the intervening years.

Second, the foreclosure theory would decimate the MMA's liability shield, exposing services to the same sort of infringement liability they experienced in the pre-MMA era for playing any song under the blanket license for which an NOI was not properly sent prior to the license availability date. Indeed, the situation would be even *worse* than before for activity during the period between the 2018 enactment of the MMA and the 2021 blanket license

9

availability date, during which the MMA *removed* the option of filing NOIs with the Copyright Office. *See* §115(b)(2)(A). For any works added to a service during that period where the DMP did not know the copyright owner—and was thus unable to serve an NOI directly within the statutorily prescribed period (before or within 30 days of first offering the work)—the DMP would not only be foreclosed from using the work under the blanket license, but exposed to infringement liability for its use, not through any fault of its own, but because the MMA deprived it of the ability to file an NOI with the Copyright Office for the unmatched work.[9]

***The "Foreclosure" Theory Defies Industry Consensus.*** The above-described consequences of the foreclosure theory completely defy the industry-wide understanding of the MMA and would gut its fundamental purpose. As DiMA's CEO Chris Harrison testified to Congress at the time, the key attraction of the MMA from DiMA's perspective was "a *true blanket license* covering all musical works protected by copyright and available upon the filing of a single notice of license." Statement of Christopher Harrison at *8 (emphasis added). "The MMA's new blanket license," Mr. Harrison explained, "will enable digital music providers to offer *a complete catalog of music* to consumers without risk of copyright infringement." *Id.* (emphasis added). "Digital music providers submit one application to the MLC that covers *all music available on the service—a true blanket license.*" *Id.* at 14 (emphasis provided). And that is what the statute provides: a "blanket license."

As to the liability shield, its chief selling point—clearly appreciated and articulated by Congress—was to *erase* liability for gaps in the NOI process, not to reintroduce it. *See* S. Rep. No. 115-339, at 14 (2018) ("The legislation contains a key component that was necessary to

---

[9] In the end, the blanket license under a foreclosure theory would add few practical protections for DMPs relative to the pre-MMA era: it would cover works properly licensed in the past (which weren't the problem) but *not* cover works *not* properly licensed (which *were* the problem)—basically leaving DMPs in as bad a situation as before (if not worse) save for avoiding the time of issuing NOIs for new releases.

10

bring the various parties together in an effort to reach common ground by limiting liability for digital music providers after January 1, 2018, so long as they undertake certain payment and matching obligations."). Taken together, these paired reforms were integral to achieving the "intent of the MMA," which was "to provide *legal certainty* for past, present, and future usage . . . ." *See* Letter from Lindsey O. Graham, Chairman, Senate Committee on the Judiciary to Shira Perlmutter, Register of Copyrights (Sept. 30, 2020) (emphasis added). That certainty would disappear were the foreclosure theory to be adopted.

***The "Foreclosure" Theory Would Expose Streaming Services to Significant Liability***. In addition to being irreconcilable with the MMA's fundamental bargain, the "foreclosure" theory would expose services to potentially substantial liability that the MMA was meant to close off. This is no exaggeration. DiMA members (representing much of the music streaming industry) have uniformly been operating since January 2021 according to the industry-wide understanding that the statute does what it says and operates as literally everyone who negotiated it intended, *i.e.,* as a "true" blanket license and complete liability shield. DiMA is not aware of any DMP that has withheld tracks believing they were "foreclosed" under the blanket license.

To accept the foreclosure theory, by contrast, the Court would need to conclude not only that the entire streaming industry has it wrong, but that there is and was no way to fix the problem, notwithstanding passage of the MMA, because any failure to file an NOI before blanket license availability (which the statute required before or within 30 days of a song first being offered by a DMP) forever foreclosed compulsory licensing for such works. It is difficult (indeed impossible) to believe that Congress could have intended such a result without spelling it out explicitly—or that the MMA would *excuse* the use of unmatched works without an NOI *prior* to blanket license availability, only to *expose* DMPs to going-forward liability after January 1, 2021, for those same

11

works based on that same (previously excused) lack of notice. The MMA was meant to *solve* the problems of the pre-MMA period, not exacerbate or reinstitute past problems in a new form.

More to the point, the MMA was a *deal*—carefully negotiated by Congress with the input and participation of industry stakeholders—in which DiMA members made significant concessions in exchange for the benefits that the foreclosure theory would strip away: a comprehensive blanket license and a full liability shield. There is simply no way (as the legislative history recognizes) that DiMA, on behalf of its members—whose most basic product offering, after all, is a comprehensive, all-inclusive catalog of songs available to be streamed on-demand—would have compromised as it did only to receive a license filled with holes from "foreclosed" works.[10]

**The "Foreclosure" Theory Would Harm Various Other Constituencies Congress Intended to Protect Under the MMA.** We conclude by noting that various other constituencies Congress very clearly meant to protect in the MMA would be hurt as well were the foreclosure theory to be adopted. Consumers, for one, would be hurt as DMPs offering comprehensive catalogs would instead be forced to remove songs from services to avoid further liability—or to avoid individual negotiations with the owners of such songs. *See* H.R. Rep. No. 115-651, at 5 (2018) ("Song-by-song licensing negotiations increase the transaction costs to the extent that only a limited amount of music would be worth engaging in such licensing discussions."). And copyright owners—songwriters, music publishers, recording artists, and record companies alike— would lose royalties otherwise generated from those songs. Those copyright owners would also see royalties frittered away by costly litigation, directly violating Congress's oft-stated goal of

---

[10] *See, e.g.*, H.R. Rep. No. 115-651, at 5 (2018) (explaining that "the existing music licensing system does not functionally work to meet the needs of the digital music economy where commercial services strive to have available to their customers as much music as possible").

*avoiding* such litigation. *See id.* at 13 ("The Committee welcomes such agreement since continued litigation generates unnecessary administrative costs, diverting royalties from artists.").

## Conclusion

For the reasons stated above, Defendant Spotify USA Inc.'s interpretation of the Music Modernization Act as argued in its Opposition to Plaintiffs' Motion for Summary Judgment (ECF No. 426) should be adopted by this Court, and Plaintiffs' interpretation rejected.

Dated: January 19, 2024

    Respectfully submitted,

    /s/ *Robert A. Peal*

    Robert A. Peal
    SIMS | FUNK, PLC
    3322 West End Avenue, Suite 200
    Nashville, TN 37203
    Telephone: (629) 215-8917
    Facsimile: (615) 649-8565
    Email: rpeal@simsfunk.com

    -and-

    Todd Larson
    Patrick Lyons
    WEIL, GOTSHAL & MANGES LLP
    767 Fifth Avenue
    New York, NY
    Telephone: (212) 310-8000
    Facsimile: (212) 310-8007
    Email: Todd.Larson@weil.com
           Patrick.Lyons@weil.com

    *Counsel for Amicus Curiae*
    *Digital Media Association*

14

Case 3:19-cv-00736   Document 471   Filed 01/22/24   Page 18 of 18 PageID #: 40233